Filed 3/8/19

# CERTIFIED FOR PARTIAL PUBLICATION[*]

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION TWO

| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>STEPHON ANTHONY, et al.<br><br>    Defendants and Appellants. | No. A139352<br><br>(Alameda County Super. Ct. Nos. 164869A, 164869B, 164869C, 164869D) |

On May 16, 2009, at about 6:30 p.m. on a residential street in Berkeley, California, a masked man exited a gold Cadillac occupied by three other men and fired 17 shots from a semiautomatic assault rifle at 25-year-old Charles Davis as he walked down the street after a trip to a store. The shooter hit Davis multiple times, from head to foot, killing Davis as the shooter's companions visibly celebrated, and then returned to the Cadillac. The four sped away but were quickly spotted by police, who pursued the Cadillac in a high-speed chase that ended in two collisions, killing a driver of another car, Todd Perea, and a pedestrian, Floyd Ross, Jr.

The four defendants in this appeal—Stephon Anthony, Samuel Flowers, Anthony Price and Rafael Campbell—were arrested and tried together in Alameda County Superior Court before a single jury that found them guilty of committing multiple murders and other crimes that day, including the first degree murder of Charles Davis and the second degree murders of Perea and Ross. The jury also found defendants intentionally killed Davis while they were active participants in a criminal street gang known as "North Side Oakland" (NSO), and committed that murder in order to further

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, the opening paragraphs, Background, and Discussion parts V, VII, X, and XI are certified for publication.

NSO's activities.  The court's sentences included a sentence for each of them of life in prison without the possibility of parole for Charles Davis's murder.

Defendants, separately and together, present many arguments for reversal of their convictions.  They argue the prosecutor engaged in racially discriminatory peremptory challenges of prospective jurors.  They argue the trial court erred in certain evidentiary rulings, including its admission of Anthony's incriminating statements to Oakland police, which they contend violated Anthony's rights under *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*) and the other defendants' rights under *People v. Aranda* (1965) 63 Cal.2d 518 (*Aranda*) and *Bruton v. United States* (1968) 391 U.S. 123 (*Bruton*), and its admission of the People's gang expert's hearsay testimony, which defendants contend violated *People v. Sanchez* (2016) 63 Cal.4th 665 (*Sanchez*) and *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*).  They further argue the prosecutor engaged in many acts of misconduct in closing argument and the trial court committed several prejudicial instructional errors, including because of the recent enactment of Senate Bill Number 1437 (Senate Bill 1437), which changes the application of the natural and probable consequences doctrine to murder convictions.  Defendants also argue we must remand to the trial court to give it an opportunity to exercise its discretion to dismiss or strike certain firearm and prior serious felony conviction enhancements for sentencing purposes.

We conclude some error occurred here, although not nearly as much as defendants claim.  In the published portion of this opinion, we explain why the court erred under *Miranda* in admitting Anthony's statements to police on May 18, 2009, and erred under *Sanchez* and/or *Crawford* in admitting some of the gang expert's testimony, why these errors were harmless, and why defendants cannot raise their Senate Bill 1437 claim in this appeal before they have petitioned for relief in superior court under Penal Code section 1170.95.[1]  In the unpublished portion of the opinion, we discuss defendants' other claims, most of which lack merit, and also conclude the other error that occurred was

---

[1]  All statutory references are to the Penal Code unless otherwise stated.

harmless beyond a reasonable doubt because of the overwhelming, admissible evidence that defendants were NSO gang members who traveled together, heavily armed and with masks, into the heart of their rival Berkeley gang's territory, there in broad daylight executed Charles Davis, the brother of a suspected Berkeley gang member, and did so to retaliate for what they thought was that gang's killing of one of their own NSO gang members a few weeks earlier. There was likewise overwhelming evidence that defendants then left together in the Cadillac with Anthony driving recklessly to try to evade police at high speeds and with disregard for traffic laws and the safety of others, resulting in the killing Perea and Ross as well. We affirm the judgments in their entirety, except that we remand to the trial court to allow it the opportunity to exercise its discretion to dismiss or strike the firearm and prior serious felony conviction enhancements.

## BACKGROUND[2]

In a November 2010 information, the Alameda County District Attorney charged each defendant with five counts regarding the deaths of three people on May 16, 2009. Count one alleged that each defendant murdered Charles Davis (§ 187, subd. (a)) in a gang-related crime (§ 186.22, subd. (b)(4)), making each defendant eligible for a sentence of life without the possibility of parole (§ 190.2, subd. (a)(22)). A gang-related firearm use allegation was also attached to count one. (§§ 186.22, subd. (b), 12022.5, subd. (a), 12022.53, subds. (b), (c), (d), (e)(1), (g)). The district attorney alleged in count two that each defendant murdered Todd Perea (§ 187, subd. (a)) and in count three that each defendant murdered Floyd Ross, Jr. (§ 187, subd. (a)). The district attorney further alleged in each of these two counts that Anthony personally and intentionally inflicted great bodily injury on the victim (§ 1203.075), and alleged in count three each defendant committed multiple murders, which also made him eligible for a sentence of life without the possibility of parole (§ 190.2, subd. (a)(3)). The district attorney alleged in count four

---

[2] The record of this trial is voluminous. We summarize in this opinion only the evidence and procedural history necessary for resolution of this appeal.

3

that each defendant caused the death of Ross while evading a peace officer (Veh. Code, § 2800.3), and alleged the same in count five regarding Perea. The information also alleged that each defendant committed these crimes while on either felony probation or parole from state prison and had suffered prior convictions.

Defendants were tried together before a single jury in March and April 2013. The prosecution contended defendants were members of the NSO criminal street gang and acted together to murder Charles Davis on May 16, 2009, in order to avenge the April 23, 2009 shooting of a fellow NSO gang member, Nguyen Ngo, whom defendants believed was killed by a rival Berkeley street gang, and the possible attempted murders of Nguyen Ngo's brother, Bao Nguyen, who was also shot, but not fatally, and Anthony. Specifically, the prosecution contended that on May 16, the four defendants drove together, with two assault rifles, a semiautomatic pistol and homemade masks, in Anthony's gold Cadillac to West Berkeley. Sometime after 6:00 p.m., they came upon Charles Davis, who was walking on Allston Way near 10th Street. Charles had left his family's home on 7th Street in West Berkeley to buy a cigar at a local store. Charles was not a gang member, but he was the brother of Jermaine Davis,[3] suspected to be a member of the rival Berkeley gang and the shooter of Ngo. Flowers exited the Cadillac and, using an assault rifle, shot Charles from head to foot as another defendant drove the car around in a circle, another made celebratory exclamations and yet another held another rifle aloft. Flowers then returned to the car, which sped away. Moments later, police found Charles's dead body lying in the street on Allston Way, between 9th Street and 10th Street, which, according to the People's gang expert, was in "the heart" of the Berkeley Waterfront gang's territory.

At trial, the prosecution presented an eyewitness to the shooting, Timothy McCluskey. McCluskey testified that he was a retiree who lived with his wife in an upstairs flat of a house located near the intersection of 10th Street and Allston Way.

_____

[3] Hereafter we refer to Charles Davis and Jermaine Davis by their first names to avoid confusion, and mean no disrespect by doing so.

4

Sometime after 6 p.m. on May 16, 2009, he sat down to watch television and opened a can of beer when he heard gunshots outside. He went out his front door and about halfway down the stairs. He heard more gunshots and saw the back of someone at the west end of Allston Way, on the south side of the yellow line on the street, firing at what McCluskey thought was a parked car. The shooter started to back up "right towards" McCluskey while firing; McCluskey could see recoil as the shooter fired. McCluskey "kept popping in and out . . . looking" from behind his door jamb. The shooter was wearing a hat that was "kind of Rastafarian with green, yellow and black" and very distinctive. At trial, the parties stipulated that the distance from McCluskey's porch to the area where, according to McCluskey, the shooter was standing was about 120 feet.

McCluskey saw a car come into the intersection of 10th and Allston, do "donuts," loop around the intersection and stop on 10th Street. At trial he remembered the car do at least one circle, although at the preliminary hearing he said it had done about three. Around the time the car drove around in a circle, the man in the front passenger-side of the car lunged out of the car window and "started screaming like 'Yahoo!' " in a "jubilant," "celebratory" manner. McCluskey said he saw this man's face. He identified him as Anthony at trial.[4]

McCluskey further testified that the shooter stopped firing, turned around and started running in McCluskey's direction. He was wearing a loose mask that covered the lower half of his face. As he ran, the shooter dropped some blue fabric. He ran back and picked it up, and his mask fell off. McCluskey saw his full face, that his hair was under the hat, and that the hat appeared to contain "substantial weight." The man looked directly at McCluskey and ran towards the car that had looped the intersection. McCluskey, still ducking out of the way at times, saw the man run towards the car's passenger side but did not see him get into the car. The car headed northbound on

---

[4] Berkeley Police Officer Susan Lee testified that she saw Anthony was driving the Cadillac as she pursued it after the shooting. The prosecutor asserted in closing argument that "there were people trading spots in that car," although McCluskey testified he did not see anyone trade places.

10th Street. At trial, McCluskey hesitated for a moment as he identified Flowers as the shooter because, he said, Flowers was wearing glasses and had different hair. When Flowers removed his glasses, McCluskey said he had no doubt Flowers was the shooter.

A few moments after the shooting, McCluskey saw a police car drive down Allston Way and assumed it was pursuing the car involved in the shooting. He stopped the police car and told san officer the men had automatic weapons. McCluskey then went to see if he could help a person he saw lying in the street. He saw the person's face was "blown" off and the head had many gunshot wounds, realized he could not help and returned to the officer. He gave a statement to police about 45 minutes later. McCluskey described the shooter as an "Hispanic male or light-skinned black male" in his twenties, 5'8" to 5'10" tall and weighing about 150 pounds, thin and lanky, wearing a black, red and green Rastafarian knit cap.

That same evening, police brought McCluskey to the Berkeley Police Department. There, he identified the color of a blue towel shown to him as being familiar, although he had thought the fabric he had seen the shooter drop and pick up might have been a shirt or piece of cloth. He was also shown a cap at the police station, and at trial he identified a cap with orange, black, yellow and green stripes as consistent with the cap he saw on the shooter's head. He was also shown firearms, but did not recognize any of them as the weapon used by Flowers. Also, a Berkeley police officer testified that McCluskey told him shortly after the shooting that he saw the shooter pick up a white piece of fabric. McCluskey testified that he did not recall a white cloth.

That evening, police also brought McCluskey to the hospital and showed him defendants Anthony and Price. He testified that he told police that night that he did not recognize either of them as the shooter. At trial, he acknowledged that he did not identify Anthony to police that night as the man who lunged out the car window. He said he recognized Anthony that night, but was not asked about anyone but the shooter, and acknowledged that he was irritated at the police that evening.

McCluskey further testified that at some time in the weeks following the shooting, he saw something on the news and on the "America's Most Wanted" television show. He

6

also read something about the incident and saw a photograph of Flowers in the online publication "SF Gate." He did not recall if he saw photographs of anyone else because he focused on this photograph of Flowers, who he recognized right away as the shooter. He called a detective on the case to tell him Flowers was the shooter.

M'lisa Kelley testified that in May 2009 she lived with her husband and child in a building located on the corner of Allston Way and 10th Street. Sometime after 6:00 p.m. on May 16, 2009, she was in a back bedroom when she heard a "screeching" that sounded like tires, and then "some popping sounds." She went to her dining room window and looked out. She saw a fairly large, light-colored car stop near the center of the street a bit up from the corner. A brown hand was raised up on the rear driver's side of the car, either inside or outside the car, holding a dark, "long, skinny gun" with a "long snout" pointed at the sky. Kelley turned away for a moment and when she looked out the window again the car was gone.

A Berkeley police sergeant testified that at 6:34 p.m. on the day of the shooting, she heard a report over her car radio of possible gunshots in the area of 10th and Allston. She drove there and found the lifeless body of an African American male, shot in the head at least a couple of times, lying in the street. She heard a bystander "kind of blurt[] out that it was three or four black guys in a Cadillac; a gold Cadillac."

A forensic pathologist who performed an autopsy of Charles's body testified death was caused by multiple gunshot wounds from head to foot. At the scene, police recovered 17 shell casings of a caliber that was common for an AK-47 assault rifle.

A Berkeley police officer, Susan Lee, responded in her patrol car to a report of gunshots and came upon the Cadillac traveling at a high rate of speed near the scene of the shooting. During her pursuit, she saw Anthony was driving and a black male was sitting in the rear passenger-side seat wearing a Rastafarian hat. Lee pursued the Cadillac as it made its way to Sacramento Street and drove south. Other Berkeley police officers in their vehicles joined in pursuit. The Cadillac travelled at high speeds, drove at one point onto a grassy median on Sacramento Street to pass other cars and ignored stop signs.

7

Further testimony indicated that after being chased by police for about five to seven minutes, the Cadillac entered a busy intersection at Aileen and Martin Luther King, Jr. in Oakland at over 60 miles an hour and collided with a Mazda, killing the driver, Todd Perea. The two cars spun out of control, hit a third car, and the resulting mass hit a pedestrian, Floyd Ross, Jr., killing him too.

Bystanders witnessed the car chase. Kristina Cox was walking toward her car, which was parked on King Street near 62nd and Stanford in Berkeley. As she stood in the street, she saw a gold Cadillac traveling at about 50 miles an hour being pursued by law enforcement vehicles. As the Cadillac passed her she saw a man whom she identified at trial as Campbell, sitting in the front passenger-side seat. He looked at her, shrugged and smiled, and did so a second time as the car went to the corner. At trial, Cox had no doubt that the man was Campbell.

Sierra Carter was walking her dogs along Aileen Street near Martin Luther King, Jr. Boulevard when she witnessed the last part of the car chase and the crashes. When the Cadillac came to a rest, she saw two people get out of the vehicle, look around, pull up their pants, and run directly towards her as she stood in front of a home where the front grass and sidewalk met, about six car lengths away. The two ran up the grass by where Carter was standing as they ran away. As they went by her, Carter focused her attention on them and made eye contact with them. At trial, she identified one of the men as Flowers and the other as Campbell.

Police arrested Anthony and Price at the scene of the crashes. One officer testified that as he approached the Cadillac, he saw Price, who was injured in the crashes, attempting to get out of the Cadillac from the left rear seat. The officer blocked the door. About a week later, police in Florida arrested Flowers on an unrelated charge, and learned an arrest warrant had been issued for him in California. About six months after the incident, police arrested Campbell in Sacramento.

The police recovered various items from the Cadillac, which was registered in Anthony's name. These included a blue towel from the rear driver-side seat and two other pieces of a white t-shirt, one on the driver-side floorboard and one on the front

8

passenger-side floorboard.

Police found a Rastafarian cap on the front passenger-side floorboard of the Cadillac. Officer Lee testified that during her pursuit of the Cadillac she saw a passenger in the rear of the car wearing this cap, and McCluskey told a police officer the shooter was wearing that cap. A forensic scientist examined a bloodstain on the cap and sample cuttings from "six or eight" different areas of the cap, comparing them to reference specimens obtained from the defendants. He concluded Flowers was compatible as either a major or minor contributor of some of the cellular material on the sampled areas of the cap, but eliminated Flowers as the source of the blood on the cap. The scientist eliminated the three other defendants as significant contributors of any of this cellular material.

The police found two cell phones on the floorboard of the Cadillac, one belonging to Flowers and one belonging to Anthony, and also recovered a phone from Price. The People introduced at trial photographs that were found on these phones, as well as rap music with lyrics referring to NSO activities that were found on Flowers's and Price's phones. Investigators also examined the phones for contacts between defendants. From April 1 to May 16, 2009, they identified 136 communications between Flowers's phone and Anthony's phone, and 102 communications between Flowers's phone and Price's phone. Flowers last called Anthony the day before the May 16, 2009 incidents, on May 15, and last called Price on May 14. Investigators found 12 calls and 72 text messages from Anthony's phone to Flowers's phone, and one communication to Price. Anthony's most recent call to Flowers was on May 16, 2009, at 12:42 p.m.

Police also found a loaded, semiautomatic pistol in plain sight on the floorboard of the driver's seat of the Cadillac, and two semiautomatic assault rifles on the right front passenger-side floorboard, one empty and one loaded. As we will discuss, the police also found in the Cadillac a compact disc (CD) of rap music, a sheet of rap lyrics, a funeral flyer for Ngo and several photographs, including of Ngo.

The jury found each defendant guilty of count one, the first degree murder of Charles Davis, and found the related gang and multiple murder special circumstances and

9

firearm enhancement allegations to be true.  It also found each defendant guilty of counts two and three, the second degree murders of Perea and Ross, and counts four and five, vehicular evasion of a peace officer causing the deaths of Ross and Perea.  Defendants waived a jury trial on their prior conviction allegations and admitted the truth of those allegations.

Among the court's sentencing determinations was its imposition for all four defendants of a term of life in prison without the possibility of parole for committing multiple murders under section 190.2, subdivision (a)(3) and for the gang-related first degree murder of Charles under section 190.2, subdivision (a)(22), and a consecutive sentence of 25 years to life for the gang-related use of a firearm under section 12022.53, subdivision (e); a consecutive sentence of 15 years to life for Anthony and Flowers for each of counts two and three, the second degree murders of Perea and Ross respectively; a consecutive sentence of 30 years to life for each of these same counts for Price and Campbell; and, for all four defendants, two consecutive 10-year sentences for counts four and five, vehicular evasion of a peace officer causing the deaths of Perea and Ross respectively, which the court stayed.

Each defendant filed a timely notice of appeal.

## DISCUSSION

### I.

### *There Was No* **Batson/Wheeler** *Error.*

All four defendants contend, with Flowers taking the lead, that the People violated their federal and state constitutional rights to a fair and impartial jury by exercising race-based peremptory challenges to four prospective jurors.  Defendants focus their arguments entirely on one of these four prospective jurors, Ms. H., and claim the error regarding her excusal demonstrates error regarding the other three.  Their arguments lack merit.

#### A.  The Relevant Proceedings Below

The prosecutor exercised his peremptory challenges to excuse 10 prospective jurors, including Mr. C., Mr. N. and Ms. G.  At that point, Campbell's counsel made a

10

*Batson*/*Wheeler* motion,[5] alleging the prosecutor had made unconstitutional, racially discriminatory peremptory challenges. The court noted the motion for the record.

The prosecutor then challenged 10 more prospective jurors, the last one being Ms. H. Campbell's counsel renewed his *Batson*/*Wheeler* motion. The prosecutor challenged five more prospective jurors and alternate jurors, including Ms. F. (a prospective alternate juror) and Ms. A.

Mr. C. identified as Nicaraguan in origin, Mr. N. as African, Ms. G. and Ms. F. as African-American, Ms. H. as Filipino and Black, and Ms. A. as "Black, Latin American, Native American, and Japanese." At the subsequent hearing on these *Batson*/*Wheeler* motions, Campbell's counsel, joined by the other defendants, argued the prosecutor's challenges to Ms. G. and Ms. H. were for discriminatory reasons. Campbell's counsel also contended the prosecutor's challenges to Mr. C., Ms. N., Ms. F. and Ms. A. demonstrated a pattern of discrimination against prospective jurors who appeared African-American in skin tone, if not culturally.

The court found 4 of the prosecution's 21 peremptory challenges—to Ms. G., Ms. H., Mr. N. and Ms. F.—involved an identifiable class that was a suspect classification.[6] The court concluded the defense made a prima facie showing that these challenges were exercised for a discriminatory reason.

The prosecutor responded that a *Batson/Wheeler* motion had never been granted against him in his 20 years as a prosecutor. He referred to his professional relationships with African-Americans, including Anthony's defense counsel, to show he lacked racial bias. He also explained his reasoning for each challenge.

Specifically, the prosecutor said he was concerned Mr. C was unemployed, had "little life experience," used only the Internet and his phone as sources of information,

---

[5] The motion is named after *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*) and *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*).

[6] The trial court found Mr. C. did not "fall into the same suspect classification" as the others, and was not sure he fell into any suspect classification.

11

provided little background information, said he would not be able to follow the felony murder rule because it was "too harsh," and did not always pay attention to the prosecutor during voir dire.

The prosecutor said he had "too many questions" about Mr. N. to take him as a juror. The prosecutor was concerned that Mr. N. was difficult to understand, suggesting a possible language barrier; was raised in a different legal system; and did not provide a lot of background information on the juror questionnaire. The prosecutor, noting Mr. N. was an alternative high school teacher, also said he typically excused high school teachers because they "often come from a liberal background."

The prosecutor said he was concerned with Ms. G.'s inappropriate casual dress and unkempt appearance because she wore "a loud pink . . . T-shirt and . . . sweatpants" to court. Also, Ms. G. "had a problem with this three-strikes rule and the way officers would write it up," which inferred she believed officers were predisposed to lie. The prosecutor did not understand a lot of her voir dire responses, questioned her candor and thought she lacked sophistication. For example, she either did not appear to understand or was not paying attention to the court's discussion of the felony murder rule. The prosecutor was also concerned about Ms. G.'s enthusiasm for rap music.

The prosecutor said he was concerned that Ms. H. had a family member who had been arrested for domestic violence, was "a big fan of rap music," and was a single parent who had never married, suggesting she was not from the "more typical" family background shared by some other jurors. She did not have a particularly strong relationship with a brother, a police officer, describing their relationship just as "fine" and saying her brother never discussed his job. Further, Ms. H. had indicated her son had participated in an "anti-gang program" in high school, which suggested "maybe her son may or may not have had some issues." Also, she had given a number of "terse" voir dire answers, indicated her information came from television and the Internet, had visited a friend in jail, had a limited education and appeared to lack sophistication in her responses to the court.

12

As for Ms. F., the prosecutor thought she was particularly "loud" and "outspoken," and she had been absent from a meeting with the trial court until the bailiff found her. Ms. F. worked in the field of social services, causing the prosecutor concern that she had some sympathy for rehabilitation. She indicated on her questionnaire that she did not concur with the outcomes of the justice system, which, although she also said she believed that justice prevailed, suggested "some hostility" towards the system. She visited friends in jail, had a marijuana arrest and conviction, and the prosecutor felt hostility from her. She also said she would change the law on aiding and abetting and suggested the felony murder rule was not fair.

The prosecutor said he was not comfortable with Ms. A. because she had referred to a marijuana possession, visiting a family member in jail, overcrowding in the criminal justice system, and that she thought the system should be focused on programs and prevention. She also worked with troubled youth, was friends with probation officers and was a single parent who did not appear to have been married. The prosecutor said he sensed a "clear inference that the system . . . is not fair."

After hearing from defense counsel, the court concluded none of the prospective jurors discussed at the hearing were excused because of their race and denied defendants' *Batson/Wheeler* motion. It referred to its recollections of the prospective jurors during voir dire, the context of the prosecutor's challenges and its findings regarding the prosecutor's demeanor in explaining its decision.

Specifically, the court said it recalled Mr. C. demonstrating a "significant degree of pause in accepting the fairness" of certain laws; having difficulty understanding Mr. N. because of his "very, very heavy" accent; having difficulty discussing the three-strikes law with Ms. G.; Ms. A. talking about her work with youth and her comment about the need for more "scared-straight" youth programs in the criminal justice system; and that Ms. F. was loud and a "forcible personality." The court said it had nothing to add to the prosecutor's comments about Ms. H.

The court noted the prosecutor challenged 21 people, only four of whom arguably fell into a "suspect classification," and that six of twelve jurors[7] and two of four alternate jurors were of color, including one African-American juror. Also, two of the three victims in the case were African-American, which it thought made the case "the kind . . . in which the issue of race would be really a nonissue."

The court found "credible the recitation of reasons cited by [the prosecutor] . . . based upon assessing his demeanor . . . and his presentation," the lack of any history of prosecutorial discrimination or indications of procedural manipulation, contrary to circumstances discussed in case law. It also thought the prosecutor presented a "constellation of reasons" for his challenges, making any comparative analysis on any particular issue in favor of the defense motion unpersuasive.

## B. The *Batson/Wheeler* Legal Standards

"Both the federal and state Constitutions prohibit any advocate's use of peremptory challenges to exclude prospective jurors based on race. [Citations.] Doing so violates both the equal protection clause of the United States Constitution and the right to trial by a jury drawn from a representative cross-section of the community under article I, section 16 of the California Constitution." (*People v. Lenix* (2008) 44 Cal.4th 602, 612 (*Lenix*).)

A defendant's *Batson/Wheeler* motion alleges discriminatory use of peremptory challenges. (See *Lenix*, *supra*, 44 Cal.4th at p. 607.) The trial court employs a three-step procedure to determine the merits of such a motion. " 'First, the defendant must make a prima facie showing that the prosecution exercised a challenge based on impermissible criteria. Second, if the trial court finds a prima facie case, then the prosecution must offer nondiscriminatory reasons for the challenge. Third, the trial court must determine whether the prosecution's offered justification is credible and whether, in light of all

---

[7] The court listed six jurors and appears to have then mistakenly referred to "seven" jurors.

relevant circumstances, the defendant has shown purposeful race discrimination.' " (*People v. O'Malley* (2016) 62 Cal.4th 944, 974 (*O'Malley*).)

In the third stage of a court's *Batson*/*Wheeler* inquiry, "[t]he prosecutor's ' "justification need not support a challenge for *cause* and even a 'trivial' reason, if genuine and neutral, will suffice." [Citation.] A prospective juror may be excused based upon facial expressions, gestures, hunches, and even for arbitrary or idiosyncratic reasons.' [Citation.] 'The proper focus . . . is on the subjective *genuineness* of the race-neutral reasons given for the peremptory challenge, *not* on the objective reasonableness of those reasons . . . . All that matters is that the prosecutor's reason for exercising the peremptory challenge is sincere and legitimate, legitimate in the sense of being nondiscriminatory.' " (*O'Malley*, *supra*, 62 Cal.4th at p. 975.) "A ' "legitimate reason" is not a reason that makes sense, but a reason that does not deny equal protection.' " (*People v. Hamilton* (2009) 45 Cal.4th 863, 903, quoting *Purkett v. Elem* (1995) 514 U.S. 765, 769.) "We review a trial court's determination regarding the sufficiency of tendered justifications with ' "great restraint." ' [Citation.] We presume an advocate's use of peremptory challenges occurs in a constitutional manner." (*People v. Gutierrez* (2017) 2 Cal.5th 1150, 1159.)

Nevertheless, " ' "implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination." [Citation.] In that instance, the issue comes down to whether the trial court finds the prosecutor's race-neutral explanations to be credible. Credibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy.' " (*People v. Johnson* (2015) 61 Cal.4th 734, 755.) " ' "The ultimate burden of persuasion regarding [discriminatory] motivation rests with, and never shifts from, the [defendant]." ' " (*O'Malley*, *supra*, 62 Cal.4th at p. 974.) In order to prevail, the defendant "must show it was ' "more likely than not that the challenge was improperly motivated." ' " (*People v. Gutierrez*, *supra*, 2 Cal.5th at p. 1158.)

" '[T]he trial court is not required to explain on the record its ruling on a *Batson*/*Wheeler* motion.  [Citation.]  "When the prosecutor's stated reasons . . . are both inherently plausible and supported by the record, the trial court need not question the prosecutor or make detailed findings." ' " (*People v. Mai* (2013) 57 Cal.4th 986, 1054.)

" ' "We review a trial court's determination regarding the sufficiency of a prosecutor's justification for exercising peremptory challenges ' "with great restraint." ' [Citation].  We presume that a prosecutor uses peremptory challenges in a constitutional manner and give great deference to the trial court's ability to distinguish bona fide reasons from sham excuses.  [Citation.]  So long as the trial court makes a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal." ' " (*O'Malley*, *supra*, 62 Cal.4th at p. 975.)  Thus, we ask only whether substantial evidence supports the trial court's conclusions.  (*Lenix*, *supra*, 44 Cal.4th at p. 613; *People v. Chism* (2014) 58 Cal.4th 1266, 1314.)

"The exclusion by peremptory challenge of a single juror on the basis of race, gender, or ethnicity is an error of constitutional magnitude requiring reversal.  [Citation.]  On review, *Batson/Wheeler* error is reversible per se, and the remedy is a new trial without any inquiry into harmless error." (*People v. Arellano* (2016) 245 Cal.App.4th 1139, 1144; *People v. Snow* (1987) 44 Cal.3d 216, 226.)

### C.  Analysis

Defendants argue the court erred in denying their *Batson*/*Wheeler* motion by either isolating each reason the prosecutor gave for exercising his peremptory challenge of Ms. H. and finding the same or a similar characteristic for another seated juror or jurors, or by contending a stated reason was somehow invalid.  They further contend that, because of the clear error regarding Ms. H., they have no need to examine prejudice regarding the exclusion of the three other prospective jurors they mention and offer no argument about any of them.

Defendants' arguments are not persuasive, if only because the prosecutor's reasons, reviewed as a whole, and particularly his concern that Ms. H. was a rap music fan, were inherently plausible; the court did a thorough review of the prosecutor's

16

challenges and found him credible; and the context of the prosecutor's challenge to Ms. H. indicates he did not challenge her for a racially discriminatory reason. Accordingly, we conclude the trial court did not err in denying defendants' *Batson*/*Wheeler* motions.

Defendants engage in a piecemeal comparative analysis on each of several of the prosecutor's reasons for challenging Ms. H. This includes the prosecutor's expressed concern about her single parenting, her limited education, information sources and demonstrated lack of sophistication, her relationship with her police officer brother, the arrest of her family member for domestic violence, and her visiting a friend in jail. For each, defendants cite the same or a similar circumstance held by a seated juror or jurors. Defendants' comparative analysis is unpersuasive for three reasons. First, the prosecutor did not rely on one reason for challenging Ms. H. Defendants fail to show the reasons the prosecutor stated, *cumulatively*, were shared by any other seated juror. "While an advocate may be concerned about a particular answer, another answer may provide a reason to have greater confidence in the overall thinking and experience of the panelist. Advocates do not evaluate panelists based on a single answer. Likewise, reviewing courts should not do so." (*Lenix*, *supra*, 44 Cal.4th at p. 631; see also *People v. Cruz* (2008) 44 Cal.4th 636, 660 [rejecting *Batson*/*Wheeler* argument in part because prosecutor did not consider the prospective juror's view of the criminal justice system, shared by other jurors, in "isolation"].) The trial court found defendants' attempt at comparative analysis unpersuasive for this reason. It noted that "there were a variety of reasons why these jurors were excused, a constellation of reasons that were related to each of the jurors . . . ." It found the prosecutor relied upon the totality of factors he cited in challenging the prospective jurors in question. Defendants offer nothing to show the court's finding was incorrect.

Second, defendants do not sufficiently address a particular concern of the prosecutor's, that Ms. H. had indicated she was a rap music fan. During voir dire, one of the defense counsel asked, "does anyone here like rap music?" Ms. H. and Ms. G. answered affirmatively, Ms. H. characterizing her taste as "old school." Defendants

mock the prosecutor's stated concern that Ms. H. was a "big" rap music fan based on this answer. But this retort misses the boat by failing to address the substance of the issue.

The prosecutor challenged both Ms. G. and Ms. H., the only two prospective jurors who indicated they were rap music fans. This corroborates his stated concern about the issue—and its plausibility is demonstrated by the fact that it was defense counsel who first raised the issue. Further, in this particular case the prosecutor's concern was inherently plausible. As we will discuss in detail, a major issue at the trial was whether or not defendants acted on May 16 with gang-related intent. As part of the People's efforts to establish intent and motive for Charles's murder, the prosecutor introduced two rap songs specifically about violent NSO gang activity that were found on Price's phone, two similar rap songs found on Flowers's phone, and both recorded and handwritten rap music lyrics about NSO gang activity recovered from the Cadillac after it crashed. The prosecutor presented a gang expert witness who exhaustively reviewed these lyrics to explain their meaning and significance in NSO gang culture. The prosecution asserted these rap lyrics were particularly instructive about Price's and Flowers's motives and intentions on May 16, their NSO gang affiliations, and an association with Anthony, who the prosecution contended was mentioned by nickname in a lyric. The rap music found on Price's phone included a reference to killing relatives of foes, which was particularly relevant to the prosecutor's theory of his motive and intent for murdering Charles—that Charles was the brother of a member of a rival gang defendants suspected had murdered their fellow NSO gang member, Ngo. Given the significance of this rap music evidence to the prosecution's case, it is inherently plausible that the prosecutor would be concerned with seating jurors who had more familiarity with rap music than others out of concern that these jurors might be unduly influential in the jury room as perceived "experts" on the subject matter. We must affirm the trial court's denial of defendants' *Batson/Wheeler* motions if we conclude the prosecutor expressed a non-discriminatory, sincere reason for excusing a prospective juror no matter how trivial. It was plausible that the prosecutor would be concerned that a prospective juror might be unduly influential about the significance of important evidence of rap music lyrics he

18

planned to introduce at trial, and that the trial court found the prosecutor was credible in his recitation of reasons for excusing Ms. H. (and the others).  Ms. H.'s expressed enthusiasm for rap music is reason enough to conclude the trial court did not err.[8]

Defendants' comparative analysis is unpersuasive for a third reason. " '[C]omparative juror analysis is but one form of circumstantial evidence that is relevant, but not necessarily dispositive, on the issue of intentional discrimination.' " (*People v. Chism*, *supra*, 58 Cal.4th at p. 1318.)  Here, the trial court noted that the context of the prosecutor's challenges weighed against the conclusion that the prosecutor had excused any jurors for racially discriminatory reasons.  As we have discussed, the prosecutor challenged 21 people, only four of whom were in a "suspect classification," and six jurors and two alternate jurors were people of color, including one juror who was African-American.  Further, two of the three victims in the case were African-American, which the court thought made the case "the kind . . . in which the issue of race would be really a nonissue."  Defendants have no real response to these additional circumstances, or to the trial court's conclusion that they undermined the notion that the prosecutor was using preemptory strikes based on race.

In short, we conclude the court did not err in denying defendants' *Batson*/*Wheeler* motions regarding Ms. H. and the other prospective jurors defendants identify.[9]

## II.

### *The Court Properly Excluded Evidence of McCluskey's Bipolar Disorder and Lithium Medication.*

McCluskey was the only witness who identified Flowers as the man who shot Charles.  Flowers argues the trial court erred when it excluded evidence of McCluskey's bipolar disorder and lithium medication because it deprived him of his state and federal

---

[8] We do not mean to suggest that appreciation of rap music would always provide a race-neutral ground for excusing a juror and do not address its significance in contexts other than the one we are presented with here.

[9] Given our conclusion, we do not address the People's claim that defendants forfeited their appellate claims regarding prospective jurors other than Ms. H.

19

constitutional guarantees to a meaningful opportunity to present a defense. Anthony joins in Flowers's argument on the ground that his criminal liability for Charles's death is based on theories related to Flowers's actions. We conclude the trial court did not err.

**A. The Relevant Proceedings Below**

Before trial, the prosecutor moved to exclude any reference to McCluskey's bipolar disorder. He contended McCluskey's disorder caused depression and argued it was not relevant in the case: "Certainly the mental illness or emotional instability of a witness can be relevant as to one's credibility if such illness impacts a person's ability to perceive or recall. Bipolar disorder is not one of those psychological disorders. It has no bearing on . . . a person's ability to perceive or to recall. It's no different than asking this witness whether . . . he suffers from diabetes or . . . depression or . . . other . . . mood disorders. . . . [¶] Clearly it was being asked of this witness to both shame, embarrass, and create some question as to his ability to observe. And the People submit there are no correlations." The prosecutor characterized McCluskey as "a fully functioning individual" and cited several cases in support of his motion.

All of the defendants opposed the prosecution's motion. Their counsel contended, based on evidence presented at the preliminary hearing, that McCluskey took 750 milligrams of lithium a day and "had just . . . left work because he had just had a bipolar break." Flowers's counsel said, "we might want a[n Evidence Code section] 402 hearing on this issue," and asserted the issue should be pursued "a little bit more." The court said it would read the prosecutor's cited cases.

The next day, the court discussed at length the case law and McCluskey's preliminary hearing testimony. The court thought McCluskey seemed to be a "difficult" witness because he went on at some length in his answers and was "in general, kind of an excitable guy." It noted McCluskey's testimony that he took lithium for the past two years, and found nothing in the record to indicate he was not taking it daily. The court also thought there was a "gap in the logic" of the defense argument because McCluskey's bipolar disorder was "not the kind of diagnosis that is inherently the sort of one that goes to credibility," yet the defense offered no testimony that it "might have something to do

20

with one's perception and ability to recall and relate," or that a "well-medicated" person with bipolar disorder could be "set off" by the trauma of witnessing a shooting. The court noted discrepancies between McCluskey's statement to police and his preliminary hearing testimony, but said this was not necessarily unusual and was subject to cross-examination. In short, the court concluded that, although McCluskey's testimony suggested he was "an unusual guy" who spoke bluntly, there was no connection or offer of proof that any of his behavior was related to his bipolar disorder.

Flowers's counsel argued that McCluskey may have been upset when he gave his statement to police because of mental illness and that as a result it "could be" that he was wrong in his identification. The court found this was speculation. It also expressed a concern for McCluskey's privacy.

The prosecutor, based on a talk with McCluskey, made what in effect was an offer of proof that McCluskey took his lithium medication in the weeks up to and including the day of the shooting, and continued to take it.

Campbell's counsel contended, apparently based on McCluskey's preliminary hearing testimony, that the record indicated McCluskey started taking his lithium medication eight months before the shooting and, after a second "break," could not return to work and went on disability. She also contended McCluskey suggested he did not always take his lithium medication when he testified at the hearing that he did not notice a difference when he did not take his medication.

The court pointed out again that there was no evidence McCluskey demonstrated any behavior that was the result of his bipolar disorder or indicated he suffered from hallucination. It invited the defense to request an Evidence Code section 402 hearing and present expert testimony that might connect McCluskey's behaviors and his bipolar disorder.

Campbell's counsel asserted that "where the witness is demonstrating in the course of his testifying, in the course of his recapping to the officers at the moment, on the heels of the stress of the very exciting moment that there could be an issue related to his bipolar personality disorder," the defense should "be able to get that one thing in, with

21

the fact that he is supposed to be lithium-compliant." Price's counsel contended that McCluskey himself brought up his bipolar disorder and lithium medication in attempting to "explain his bizarre behavior on the stand" at the preliminary hearing, and in recounting what he saw at the shooting. According to counsel, McCluskey's doing so made it unlikely he would be embarrassed by cross-examination on these matters.

The court said that without expert testimony or an offer of proof that McCluskey was not telling the truth, the defense arguments were essentially that the jury should be allowed to speculate that McCluskey made errors about what he observed as a result of his bipolar disorder. The court was "troubled" by this, but did not make a final decision that day in order "to give people an opportunity to—if they want—to present some testimony on this point."

Thereafter, none of the defendants requested a section 402 hearing or offered proof, except for Flowers's submission of medical literature that included a discussion of "Impaired Cognition and Bipolar Disorder." The court, at the prosecution's urging, declined to take judicial notice of it. It granted the prosecution's motion to bar cross-examination of McCluskey about his bipolar disorder and lithium medication.

At trial, the court talked to McCluskey outside the presence of the jury about its in limine ruling. After McCluskey indicated that he was still taking 750 milligrams of lithium a day, the court told him not to volunteer information about his lithium intake. McCluskey testified on cross-examination that he did not drink any of the beer in the can he opened just before he heard gunshots. When asked if he was "under the influence of anything at that time," he responded, "No." The jurors were not informed of McCluskey's bipolar disorder or lithium medication.

## B. Analysis

We review a trial court's rulings on the admissibility of evidence for abuse of discretion. Our review "turns on the relevance of the evidence in question. . . . Evidence is relevant if it has any tendency in reason to prove a disputed material fact. (Evid. Code, § 210.)" (*People v. Waidla* (2000) 22 Cal.4th 690, 717–718 (*Waidla*).)

22

A trial court's discretion to exclude evidence, such as under Evidence Code section 352, is subject to a defendant's constitutional right to present a defense. "Evidence Code section 352 must bow to the due process right of a defendant to a fair and trial and to his right to present all relevant evidence of *significant* probative value to his defense." (*People v. Babbitt* (1988) 45 Cal.3d 660, 684.) "Whether rooted directly in the Due Process Clause of the Fourteenth Amendment [citation] or in the Compulsory Process or Confrontation clauses of the Sixth Amendment [citations], the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.' . . . In the absence of any valid state justification, exclusion of . . . exculpatory evidence deprives a defendant of the basic right to have the prosecutor's case encounter and 'survive the crucible of meaningful adversarial testing.' " (*Crane v. Kentucky* (1986) 476 U.S. 683, 690–691.)

Flowers and Price's argument fails for a simple reason: neither offered evidence below that McCluskey's bipolar disorder and lithium medication could have affected his observations of the shooting. The constitutional protections a defendant invokes apply to "*competent, credible evidence bearing on the credibility*" of a witness. (*Crane v. Kentucky*, *supra*, 476 U.S. at p. 690, italics added.) Defendants did not present competent evidence bearing on McCluskey's credibility.

Further, as the People contend,[10] trial courts have "wide latitude" under the confrontation clause to impose "reasonable limits" on cross-examination that otherwise would cause "confusion of the issues" or which would be "only marginally relevant." (*Delaware v. Van Arsdall* (1986) 475 U.S. 673, 679.) "A trial court's limitation on cross-

---

**10** The People also contend Flowers has lost his opportunity for appellate review on this issue by not making an adequate offer of proof below, based on *In re Mark C.* (1992) 7 Cal.App.4th 433, 445 ("[b]efore an appellate court can knowledgeably rule upon an evidentiary issue presented, it must have an adequate record before it to determine if an error was made") and other case law. We disagree. Defendants proffered McCluskey's preliminary hearing testimony in support of their arguments below. Therefore, the People's forfeiture argument lacks merit.

examination pertaining to the credibility of a witness does not violate the confrontation clause unless a reasonable jury might have received a significantly different impression of the witness's credibility had the excluded cross-examination been permitted." (*People v. Quartermain* (1997) 16 Cal.4th 600, 623–624.) More specifically, "the mental illness or emotional instability of a witness can be relevant on the issue of credibility, and a witness may be cross-examined on that subject, *if such illness affects the witness's ability to perceive, recall or describe the events in question*." (*People v. Gurule* (2002) 28 Cal.4th 557, 591–592, italics added.)

Here, the defense referred only to McCluskey's preliminary hearing testimony.[11] That testimony did not show his bipolar disorder or lithium medication affected his cognitive ability to observe the shooting. In the absence of evidence linking McCluskey's disorder to his credibility, the trial court acted within its discretion to prohibit cross-examination of McCluskey on these matters. Such cross-examination would invite the jury to speculate about the significance of these matters, and "exclusion of evidence that produces only speculative inferences is not an abuse of discretion." (*People v. Babbitt*, *supra*, 45 Cal.3d at p. 684 [court did not abuse its discretion in limiting cross-examination of a psychiatrist on " 'speculative' " matters in the absence of an offer of proof that these matters were related to defendant's behavior]; see also *People v. Rodriguez* (1986) 42 Cal.3d 730, 749 [court properly excluded cross-examination of a witness about her drug use, hospitalization and psychiatric counseling five years before trial because these matters "did not have sufficient bearing upon the credibility of her testimony at the trial"].)

## III.

### *The Court Did Not Err in Not Ordering the Disclosure of the Confidential Informant.*

Flowers argues he was deprived of a fair trial because prior to trial the People refused to disclose the identity of a confidential informant who purportedly told a third

---

[11] Flowers does not challenge on appeal the trial court's denial of his request that it judicially notice the medical literature he submitted.

party that Campbell said he had shot Charles, preventing Flowers from conducting discovery on the issue and possibly uncovering exculpatory evidence. Flowers requests that we examine the sealed proceedings held by the trial court regarding his motion to disclose the identity of the informant to determine whether the trial court properly denied his motion. We have done so. The trial court did not err in denying his motion under any standard of review.[12]

## A. The Relevant Proceedings Below

Before trial, Flowers moved for disclosure of the informant's identity under *Roviaro v. United States* (1957) 353 U.S. 53 and several California court decisions, including *People v. Hobbs* (1994) 7 Cal.4th 948, 959. Flowers based his motion on typewritten notes by Berkeley Police Department Detective Marble. Marble's notes state that on June 29, 2009, Berkeley Police Department Sergeant Jack Friedman called and said a former Oakland police officer, Jack Kelly, told him a confidential informant was in touch with Campbell. According to Marble's notes, Campbell called this informant twice on June 26, 2009, from a blocked number, reaching the informant on the second call. Campbell asked the informant to send him money in Oregon and said he would call back with the location. The notes then state, "The [informant] also said that Campbell is the shooter of Charles Davis."

The court held in-camera hearings on the motion. It denied Flowers's motion based on the findings it made during the in camera hearings, which are contained in the sealed record before us. The parties do not indicate that any evidence about the confidential informant or his statements was offered or admitted at trial.

## B. Analysis

When a confidential informant is a material witness on an issue of guilt, the prosecution must disclose his or her identity or incur a dismissal. (*Roviaro v. United*

---

[12] It is unsettled in California whether we review such rulings for abuse of discretion or de novo. (*People v. Gordon* (1990) 50 Cal.3d 1223, 1245–1246, overruled on another ground in *People v. Edwards* (1991) 54 Cal.3d 787, 835.)

*States*, *supra*, 353 U.S. 53; *People v. Lawley* (2002) 27 Cal.4th 102*,* 159.)  "An informant is a material witness if there appears, from the evidence presented, a reasonable possibility that he or she could give evidence on the issue of guilt that might exonerate the defendant." (*Lawley*, at p. 159; see also Evidence Code, §§ 1040–1042 [codifying the privileges and procedures regarding the refusal to disclose confidential informants' identities].)

As Flowers has requested, we have reviewed the sealed proceedings held regarding his motion to disclose the informant's identity under *People v. Hobbs*, *supra*, 7 Cal.4th at pages 973–975.  The record indicates that Marble did not recall and could not explain the reference in his notes to Campbell as the shooter, and neither Kelly, who had actually spoken to the informant, nor Friedman, who had relayed Kelly's report to Marble, could verify that the informant identified Campbell as the shooter.  On this record, there is not a reasonable possibility that the informant could have provided evidence that could have exonerated Flowers, and thus we find no error in the trial court's ruling.

## IV.

### *The Trial Court Did Not Err by Admitting the Rap Music Evidence.*

Price, Anthony and Flowers contend on multiple grounds that the trial court erred by admitting evidence of rap songs with lyrics that referred to NSO gang activity and to Anthony and Campbell by their nicknames, which police found on Price's and Flowers's cell phones.  They also object to the admission of handwritten rap music lyrics and a CD of rap songs recovered from the Cadillac after it crashed.  We find no error.

### A.  The Relevant Proceedings Below

After the Cadillac crashed, police recovered a cell phone belonging to Flowers from the car's floorboard and a cell phone from Price's pants pocket.  Investigators obtained a warrant and reviewed the contents of these two phones.  During trial, the prosecutor said he wanted to introduce particular rap songs from these phones.  After a sidebar at which the defense apparently opposed admission of these songs, the court held

a hearing outside of the presence of the jury to discuss the matter. The prosecutor said he had selected two out of more than 100 songs found on Price's phone and two out of more than 100 songs found on Flowers's phone to introduce. He said he chose these particular songs because they contained information about NSO gang activity and included specific references to Anthony and Campbell.

Price's attorney asserted the prosecutor was "cherry-picking" two of 121 songs found on Price's phone. Anticipating the prosecutor would argue the songs' lyrics were the equivalent of an Internet photograph of Price making gang signs, Price's counsel argued the two things were "apples and oranges" because such a photograph is displayed for "the world to see," but a song is listened to "in private or maybe with friends." He asserted the prosecutor should not be allowed to "bootstrap" the songs to other evidence in arguing their admissibility, and that the songs did not show Price was an NSO gang member any more than DVDs of violent movies showed their owner was violent.

The court said it could be reasonably inferred from a person's ownership of songs by musicians such as Bob Dylan and Joan Baez that the person had some affection for not just their music, but also for their political viewpoints. Price's attorney responded that "[w]hat the district attorney wants the jury to believe here is because my client listens to these kind of things, he must be the people on the street that practice these types of things. They're talking about a song about killing people, and doing all the things these songs talk about don't necessarily—and I don't even think circumstantially transmit into some kind of action."

The prosecutor emphasized he chose the four songs because of their references to some of the defendants and to NSO subsets. He analogized the songs to photographs of a person flashing gang signs, and argued "[t]he fact [Flowers and Price] listen to this music is very compelling circumstantial evidence that in fact they're members of [NSO]," citing particular lyrics. He argued the songs were admissible against Anthony and Campbell because one song referred to their nicknames, which was "circumstantial evidence that they're a team, that they operate together, that they work together. It's no different than a

27

photo. It's no different than a writing." He contended the defense arguments went to the weight of the evidence, not its admissibility.

Flowers's counsel adopted Price's arguments. He added there was no evidence Flowers sang any of the songs and challenged the prosecution's assertion that the songs' meaning connected them to gang activity.

Campbell's counsel argued the songs, particularly Song Number 1 from Price's phone, were prejudicial to Campbell and that Song Number 1's reference to "Ralphy" could not be "tied" to his client. Further, he said, the songs were inadmissible under Evidence Code section 352 and as hearsay regarding Campbell's state of mind.

Anthony's counsel agreed with Campbell's contentions. He argued Song Number 1 from Price's phone[13] was "basically an anthem . . . . [¶] . . . [T]o attach the nicknames of my client and Mr. Campbell into an anthem that screams out violence and gang behavior, then the jury, without a limiting instruction, would be left to believe that this behavior is also associated with two people who are only referenced as nicknames."

The court ruled the four songs were admissible under Evidence Code section 352 because "their probative value is not outweighed by any prejudicial effect. The songs selected are rife with members [*sic*] of ASAP, and some of the different monikers . . . are individuals that have already been mentioned or will be mentioned in these proceedings.[14] [¶] So they're . . . songs that are gangsta rap. They are particularly about the individuals, the gang and its subset that's alleged here, the neighborhood, Shattuck Street, West Street, all throughout these songs, and so on that basis, I do think that they are admissible." The court rejected that the songs contained inadmissible hearsay against Anthony and Campbell by referring to their possible nicknames because "the fact that their name is in [Price's] phone is admissible against them like the contact would be or

---

[13] The lyrics for all of these songs are set forth in footnotes 16 through 19, *post*.

[14] The court referred to previous testimony at a hearing held under Evidence Code section 402 by the People's proposed gang expert witness, Officer John Cunnie, in which he apparently identified the terms "Doodie" and Ralphy" in Song Number 1 from Price's phone as nicknames for Anthony and Campbell respectively.

the photograph would be." It concluded the references to their nicknames were admissible for the limited purpose of showing a link between them and Price, provided the jury was instructed to consider the evidence for that limited purpose. It also concluded the songs were potentially adoptive admissions for the owner of the phone from which they were taken.

At trial, the four songs were admitted into evidence and played for the jury. Two were taken from a micro SD card found in Price's phone and two were taken from Flowers's phone. The jury was provided with transcripts of the songs' lyrics. The trial court admonished the jury that, "to the extent that the individual phones you find are associated with individual defendants . . . [t]hey are offered and received only against that defendant. The information on the separate phones are [*sic*] not being offered against the other defendants."

The prosecution's gang expert, a former police officer with the Oakland Police Department, John Cunnie (who was a police officer with the San Francisco Police Department at the time of trial), testified about these lyrics in some detail. Regarding the lyrics of Song Number 1 from Price's phone,[15] Cunnie said an "AR-7" was a weapon; "ASAP" was a subset of NSO; "West Street" was ASAP gang territory; the lyric about killing the family of someone who could not be caught referred to a common gang violence tactic; and "AB" referred to the weapons banned by federal law. Among other things, Cunnie also testified that "Doodie" was Anthony's nickname.

---

[15] The transcript of the lyrics for Song Number 1 from Price's phone states: "Nigga, Nigga,/Yeah this ASAP bitch/Niggas ain't ready/Keep the AR-7/Make them bitch niggas messy/Bring my nigga T/As high as can be/All in the East man/Sippin on that lean/ASAP Young Money bitch we a team/Coming down West street with my nigga C/Or baby T/Yeah we bringin that heat/Unintelligible/If he take the stand man/He gonna get the best of me/Unintelligible/If I can't catch him then I'm gonna/Kill his family/No second thoughts/Hit him with the AB/Niggas can't see me/Rest in Peace Stevie/Catch me with Ralphie/Maybe TT/Can't forget Doodie/Unintelligible/Rest in Peace Doobie/Free my nigga C."

Regarding the lyrics of Song Number 2[16] from Price's phone, Cunnie said that "clips" referred to weapons ammunition; and "[i]f you ever need me/I'll be right there/The mob/ . . . Killers with me/But I'm not scared" referred to gang loyalty.

Regarding the lyrics of Song Number 1 from Flowers's' phone,[17] Cunnie said that "Cold Gunnaz" referred to members of the Bushrod gang; "5900" referred to the 5900

---

[16] The transcript of the lyrics for Song Number 2 from Price's phone states: "Ride with the top down all the time/Never slow **unintelligible**/Pushing kicks shooting clips/Cuz we don't care [¶] If you ever need me/I'll be right there/The mob/All we got/One change for our prayers/Step down/Killers with me/But I'm not scared [¶] I ain't worried bout niggas/I'm so prepared/Seems like I don't want nothing right **unintelligible**/No life is **unintelligible**/So I confess to a lot of sins I conceal/Get it off my chest/Insha'Allah I'll be blessed [¶] Back in the streets/Hustlin tryin to ice my wrist/It's kinda hard to stay in school seein shit like this/Grew up poor/Seen the door and I couldn't resist [¶] The swag dealer/The young homeboy/It's fucked up thinkin bout the life."

[17] The transcript of the lyrics for Song Number 1 from Flowers's phone states: "Cold Gunnaz in the building man/5900 man/Ice City Gunninfornia man/Shattuck Street we out here/This is not music man [¶] If niggas ain't with the movement/They gotta get out the way/When bullets fly its deadly in the game that we play/Fuck tomorrow/Young niggas trying to get through the day/All that loud talk you doing don't bring that shit my way/When I ride through the hood I see mugs from you and your crew/Your wifey standing beside you but bitches they get it too/To the game I stay true/And stuck to the code/You can find me on the front line when the drama unfolds [¶] **Unintelligible** so I feed my four extended clips/Ride through your hood in clean whips with 24s/All my clips with hollow tips/I ain't takin no chances/Them suckers that's comin for me/Gotta stop they advances [¶] Ain't too many niggas fuck with me and my Cold Gun clique/Lay you down in cold blood and proceed to get rich [¶] Rest in Peace for times we used to hit them hundred g licks/You smiling down on me bra/I'm holding it down in the bricks/Loaded thugs make you rain/I ain't throwin bills in clubs [¶] When I was 17 I graduated from having whips on dubs/Now I'm back on the scene/I ain't showin no love/I don't need no suckers around me/No hugs from fake thugs [¶] It's slugs and mean mugs for suckers trying to knock my shop/I'm a young hood star/And I'm still in my prime/On the block/I ain't a goof/I gotta stay on my grind/Its my time to shine/I was destined to climb [¶] Man if I don't do nothing/Ima gun/Livin life on the run/With my CGs playing with them drums [¶] If you suckers wanna know where to find me at/Cold Gun 59 Shattuck Street holla back/In the streets I be active/Cold Gun tactics [¶] Been gunnin since a young'un/So I don't need practice/You suckers trying to get at this/I'm triller than them other dudes/When there's beef/I chop em down/And turn them all to pea

block of Shattuck, the center of Bushrod gang territory; "Ice City" was another name for NSO; "This is not music" indicated the rapper was a real criminal who happened to be doing music; "When bullets fly its deadly in the game that we play" referred to the gang lifestyle; "Your wifey standing beside you but bitches they get it too" referred to bullets flying no matter who was standing where; "stuck to the code . . . so I need to feed my four extended clips" referred to high-capacity magazines; riding through your "hood" with clean "whips" referred to driving through gang territory; "hollow tips" referred to particularly damaging bullets; "my cold gun clip," "CG playing with them drums" and "Cold Gun 59 Shattuck Street" were NSO gang references; and "When there's beef/I chop em down/And turn them all to pea soup" referred to violence.

Regarding the lyrics to Song Number 2 from Flowers's phone,[18] Cunnie said that "I be on the spot where the Gunnaz be at" referred to Cold Gunnaz, i.e., the Bushrod

---

soup [¶] When these suckas see through/Yo block my squad breeze through/Fuck John Legend/We ain't ordinary people."

[18] The transcript of the lyrics for Song Number 2 from Flowers's phone included the following: "And they don't really wanna fuck with me/I be on the spot where the Gunnaz be at [¶] Any subject get fucked like pussy/The best side does this/I'm hood like hubcaps [¶] Proper like **unintelligible**/A thug that love rap/**Unintelligible** [¶] Won't miss an evac/Marijuana G packs/And keys stacked up like storage/Won't relax/Believe that/The shells like the tortoise won't be back/Be evaporated **unintelligible** [¶] Meet the fat girl like Norman can't be black/Thousands put away for the lawyers if you see that/Kayla and shotty get the kneecaps/And back on get back home/59 get black on."

The transcript of this song also states: "Top secret war shit/**Unintelligible**/The flow is unconscious/Like Steve Nash on offense/Three the hard way like Paul Pierce in Boston/Hollow tips/Fear got em coughing/Exhaustion [¶] This is just precaution/All in/I C E C I T Y in these eyes/I ain't gonna fear lies/Or fear cries/I seen too much this year I/Won't fall back/Or forget where I came from/They tryin to go/As soon as the pain comes/The hoes wanna detain him like Geronimo/Now they look like dominoes/Big 6 12 shot/4 5th hammer cocked back."

The transcript further states: "Now you know the North is/Defining new temperatures/Ice City is the new image here/**Unintelligible**/There's more than just FAB here [¶] ASAP came last year/**Unintelligible** in with us/It's only right that I am with us/Cold Gunnaz get it up/Cocaine distributors/Propane contributors . . . ."

31

gang; the reference to "59" was to 59th Street"; ASAP was a gang reference; "cocaine distributors" referred to drug dealing; "huggin the block" referred to occupying your gang's territory; "Tec" referred to the Tec-9 handgun, which was commonly carried around the neck on a shoe string as referred to in the lyrics; "In Ice City shots rang out/The funk ain't through" referred to gang violence, with "funk" referring to a rivalry with another gang; and muggers "trying to mug trying to act hard" referred to gang members demanding respect.

Cunnie also testified about a page of handwritten rap lyrics that police found in the Cadillac, which also was admitted into evidence. Cunnie said some of the lyrics referred to North Oakland gangs, including references to " 'Ice City' " and " 'cold nights in North Oakland,' " and that the phrases " 'hollow tip bullets,' " " '[a]ll the toys on destroy status' " " '[c]lips that hold 50' " and " '[k]eep an AR on me' " referred to violence and weapons.

Finally, Cunnie testified that he had listened to a CD that, according to the prosecutor, had been recovered from the Cadillac's front passenger seat. The CD contained "a lot of local rap . . . from all different neighborhoods and gang territory within Oakland, some of them being North Oakland and had reference to NSO and Ice City." This was especially the case for the first song, which was the same as one of the songs found on Flowers's phone.

In closing argument, the prosecutor repeatedly referred to the song lyrics admitted into evidence. For example, he used lyrics to argue that the four defendants "acted as a

The transcript also states: "Even though we wanted by cops/We still huggin the block/If you come through **unintelligible** my face/Ima make your breathin stop [¶] S on my chest my nigga/And I'm strapped down with two thangs/On the block/Tec around my neck from a shoe string [¶] Me and my nigga **unintelligible**/For the pain we go through/Ain't no stopping or aimin when I'm spittin at you [¶] On the block I'm still bangin/Fuckin with a certain few [¶] In Ice City shots rang out/The funk ain't through/Send slugs at suckas trying to mug trying to act hard [¶] Turn my parking lot into a zoo/With a Jaguar/I like fast cars/And I like fast broads/Drop everything on the spot when my cash call [¶] Cold Gunnaz in the building man/Ice City Gunnifornia man/We out here man."

team"; that the references to North Oakland "cliques" showed these cliques were aligned with each other; that Anthony was so notable a gang member that his nickname "Doodie" was mentioned in one song; that the songs on Price's phone indicated he was a gang member; that the "gang lyrics on Flowers' phone . . . spell out . . . everything we need to know" about his gang affiliation; that the violent song lyrics on Flowers's and Price's phones about North Oakland gang activity were "basically a confession" because they referred to "conduct as materialized in this case with the death of three innocent people," "the reality of what plays out in this case," and circumstantial and direct evidence of "intent, the knowledge, the motive"; that the handwritten lyrics found in the back seat of the car were circumstantial evidence that Campbell and Anthony knowingly participated in the crimes; that the lyrics portrayed something "real" going on in North Oakland; and that the songs glorified "a group of assassins, theoretically, who thrive on turf."

The trial court instructed the jury that the lyrics of the songs found on Price's and Flowers's cell phones "may be considered generally as evidence of street gang culture. Additionally, references to other individuals in these songs may be considered as circumstantial evidence that the owner of the phone knows or associates with these individuals. However, the lyrical content may otherwise be considered only as it tends to establish the state of mind of the owner of the phone, not the states of mind of those referenced in the lyrics."

The trial court also instructed the jury that it should consider evidence of gang activity only for the limited purpose of deciding whether "[t]he defendant acted with the intent, purpose, and knowledge that are required to prove the gang-related crimes, enhancements, and special circumstances allegations charged," or "[t]he defendant had a motive to commit the crimes charged." Further, the jury should "not consider this evidence for any other purpose. You may not conclude from this evidence that the defendant is a person of bad character or that he has a disposition to commit crime."

33

**B. Analysis**

Price and Flowers[19] raise multiple claims of error regarding the trial court's admission of the rap music evidence. The People contend that Price and Flowers have forfeited most of their appellate claims and in any event are wrong on the merits. We conclude Price and Flowers have forfeited some of their appellate claims and the remainder lack merit.

### 1. *Price and Flowers Have Forfeited Some, But Not All, of Their Claims.*

Price contends the trial court should have excluded not only the songs found on Price's and Flowers's phones but also the handwritten lyrics and the rap song CD the police found in the Cadillac. However, in the proceedings below no one objected to the admission of the handwritten lyrics or the CD,[20] or to Cunnie's testimony about them.

Also, Price, along with arguing the court incorrectly concluded the rap music evidence was admissible under Evidence Code section 352, makes three additional arguments for the first time on appeal: the evidence "amounted to inadmissible propensity and criminal profile evidence" in violation of Evidence Code section 1101 and related case law; the trial court's admission of this evidence "requires reversal under the California and federal Constitutions because the evidence deprived Price of his right to a fair trial," "uniquely tended to evoke an emotional bias against Price" and raised " 'the possibility of misuse of the evidence' " by the trier of fact; and the trial court did not apply the correct legal standard for evaluating the admission of rap lyrics and rap

---

[19] In this subpart of our opinion, we refer for convenience's sake to "Price" or "Flowers" when referring to the claims and arguments that each makes in their briefs. We recognize that Flowers and Anthony have joined in Price's arguments, and that Price has joined in Flowers's argument and in all arguments by his co-defendants that are to his benefit. We intend by our references to "Price" and "Flowers" to include those who join in their arguments.

[20] The record indicates that the admission of the CD's contents was discussed and delayed because the court had not actually heard them, but we have not found any indication that the CD's contents were subsequently admitted into evidence, which may have been an oversight. Nonetheless, Cunnie testified about the CD's contents without objection, as we have discussed.

34

performances. For the last argument, he cites a New Jersey Supreme Court case published after the trial, *State v. Skinner* (2014) 218 N.J. 496 (*Skinner*).

The People contend Price and Flowers have forfeited all of these appellate claims because they did not first raise them in the court below, citing Evidence Code section 353, subdivision (a) and *Waidla*, *supra*, 22 Cal.4th at p. 717 (" 'It is, of course, "the general rule" '—which we find applicable here—' "that questions relating to the admissibility of evidence will not be reviewed on appeal in the absence of a specific and timely objection in the trial court on the ground sought to be urged on appeal" ' ").

Price responds that his objections to the handwritten lyrics and the CD would have been futile in light of the court's admission of the four rap songs from Price's and Flowers's phones, relying on case law such as *People v. Hill* (1998) 17 Cal.4th 800, 821. This argument is untenable because Cunnie testified about the CD *before*, rather than after, the trial court ruled on the four rap songs. More significantly, the court's ruling about the four songs was based on specific circumstances—that the songs were from phones belonging to particular defendants and that one song referred to nicknames used by Anthony and Campbell. These circumstances did not pertain to the handwritten lyrics and CD. It is not at all apparent that defense objections to the CD and handwritten lyrics would have been futile. Therefore, Price has forfeited his appellate claims regarding the handwritten lyrics and CD.

Price contends that he may raise his constitutional due process claim despite not raising it below, citing *People v. Partida* (2005) 37 Cal.4th 428. In *Partida*, our Supreme Court held that a defendant on appeal may argue the challenged evidence should have been excluded under Evidence Code section 352 if the reason for excluding it, though not the legal theory, was asserted at trial. (*Partida*, at pp. 431, 435.) The *Partida* court wrote, "What is important is that the objection fairly inform the trial court, as well as the party offering the evidence, of the specific reason or reasons the objecting party believes the evidence should be excluded, so the party offering the evidence can respond appropriately and the court can make a fully informed ruling." (*Id*. at p. 435.) " '[A]s a general matter, no useful purpose is served by declining to consider on appeal a claim

35

that merely restates, under alternative legal principles, a claim otherwise identical to one that was properly preserved by a timely motion that called upon the trial court to consider the same facts and to apply a legal standard similar to that which would also determine the claim raised on appeal.' " (*Id*. at p. 436.)

Here, Price argues the admission of the songs from his and Flowers's phones evoked "an emotional bias" against him, and presented the "possibility of misuse of the evidence" by the trier of fact. These contentions are sufficiently similar to the arguments by defense counsel below to apply the *Partida* rule to Price's constitutional due process and Evidence Code section 1101 arguments. We also agree with Price that he did not forfeit his contention that the court erred by not following the legal standard outlined in *Skinner* (the New Jersey case) because that purportedly controlling case was not published until after the trial in this case. (See *People v. Black* (2007) 41 Cal.4th 799, 811–812.) We address these claims on the merits in the next subsection.

Price and Flowers raise other legal issues that are subject to forfeiture. Both contend the trial court erred in admitting the four songs from their phones because the songs were not authenticated. To the extent they intend this argument to constitute a separate and independent appellate claim, they have forfeited it by not first raising it in the trial court.[21] (*Waidla*, *supra*, 22 Cal.4th at p. 717.)

Similarly, Price and Flowers contend the prosecutor's references in closing argument to these songs as a "confession" and as foreshadowing their criminal activities was improper and highly prejudicial. These contentions constitute claims of prosecutorial misconduct, not court error in admitting the songs into evidence. The trial court did not admit the songs as confessions, but as circumstantial evidence of association, motive and intent. Thus, the court gave the jury limiting instructions,

---

[21] To the extent Price and Flowers intend to merely argue the lack of authentication makes these songs less probative of motive and intent, we disagree. They do not contest that the songs were taken from their phones. Thus, the songs *were* "authenticated" as being what they purported to be—rap music found on defendants' phones.

including that the information on each phone was being received only against the phone's owner; that the lyrical content "may be considered generally as street gang culture"; that "lyrical references to other individuals in any of these songs may be considered as circumstantial evidence that the owner of the phone knows or associates with these individuals"; and that "the lyrical content may otherwise be considered only as it tends to establish the state of mind of the owner of the phone, not the states of minds of those referenced in the lyrics." Price and Flowers have forfeited their prosecutorial misconduct claims because they do not establish they objected to the prosecutor's references or offered curative admonitions at the time the references were made. (*People v. Linton* (2013) 56 Cal.4th 1146, 1205.)

## 2. *The Court Did Not Err by Admitting the Songs from Price's and Flowers's Phones.*

Price and Flowers argue the court erred under Evidence Code section 352 by admitting into evidence the four songs from Price's and Flowers's phones. Price adds that the court also erred under Evidence Code section 1101 and the due process clause by admitting the songs.

Price and Flowers contend the trial court should not have admitted the four songs taken from their phones under Evidence Code sections 352 and 1101, subdivision (a). Evidence Code section 352 provides that the trial court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will, among other things, "create substantial danger of undue prejudice." Evidence Code section 1101, subdivision (a) provides in relevant part that "evidence of a person's character or a trait of his character . . . is inadmissible when offered to prove his or her conduct on a specific occasion," except that, among other things, evidence may be admitted "that a person committed a crime, civil wrong, or other act when relevant to prove some fact," such as motive or intent, "other than his or her disposition to commit such an act." (Evid. Code, § 1101, subd. (b).)

" ' "We review for abuse of discretion a trial court's rulings on relevance and admission or exclusion of evidence under Evidence Code sections 1101 and 352." ' "

37

(*People v. Fuiava* (2012) 53 Cal.4th 622, 667–668.) A ruling "will not be disturbed except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9–10.)

Price and Flowers argue that, on the one hand, the four songs do not establish any relevant motive or intent on their part and on the other hand, the songs contain inflammatory and highly prejudicial lyrics. We disagree. We must determine not whether the songs established a relevant motive or intent, but whether the trial court reasonably concluded they could be offered for these purposes. Regarding Price, Flowers and Anthony (for whom the songs were admitted to show his association with Price), we must further determine whether the trial court could reasonably conclude the songs had a probative value that was not substantially outweighed by the dangers of undue prejudice. (Evid. Code, §§ 352, 1101; *People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 408 [discussing section 352]; *People v. Lindberg* (2008) 45 Cal.4th 1*,* 22–23 [discussing sections 1101 and 352].)

We keep in mind that evidence is admissible even if it is prejudicial in the sense that it damages a defendant's case. " ' " 'The "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues. . . .' " [¶] The prejudice that section 352 " 'is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence.' [Citations.] 'Rather, the statute uses the word in its etymological sense of "prejudging" a person or cause on the basis of extraneous factors.' " ' " (*People v. Doolin* (2009) 45 Cal.4th 390, 439.)

Each defendant was charged with murdering Charles while acting for the benefit of a criminal street gang and as an active NSO gang participant. Therefore, the prosecution bore the burden of proving each defendant acted with an NSO-related intent in murdering Charles. Further, evidence of gang affiliation is admissible when it is relevant to show motive. (*People v. Sandoval* (1992) 4 Cal.4th 155, 175; *People v. Funes*

(1994) 23 Cal.App.4th 1506, 1518; *People v. Martin* (1994) 23 Cal.App.4th 76, 81.) The four songs taken from Price's and Flowers's phones were probative of their NSO affiliation and, in turn, their gang-related motive and intent.

Price and Flowers emphasize there was no evidence that either of them authored or rapped the lyrics in the songs. Price asserts that, "[i]n light of the popularity and prevalence of gangster rap music in today's society, it is absurd to conclude that rap lyrics establish their listener's true state of mind, motive or intent." If these songs were simply gangster rap music that had no connection to defendants or the gang they were alleged to be members of, we might agree. But instead, as the trial court found, the four songs were not generic gangster rap. The songs were specifically about NSO and its criminal street gang activities, so that possession of them could demonstrate more than mere appreciation of this genre of music. The songs referred to NSO and its subsets,[22] to North Oakland streets such as West and Shattuck and to two of the defendants. They also refer to the use of weapons with high capacity magazines and to the tactic of killing family members of gang foes (again, Charles, the murder victim, was the brother of Jermaine, a reputed Berkeley Waterfront gang member).[23] That Price and Flowers possessed these songs and may have listened to them was relevant to whether they were

---

[22] The trial court could reasonably conclude the lyrics referred to NSO and its subsets because in a preceding Evidence Code section 402 hearing, Cunnie had testified that Bushrod, Gaskill and ASAP were subsets of NSO. For this reason, Flowers's reply brief argument that a recently published case diminished the relevance of the rap music lacks merit. (See *People v. Prunty* (2015) 62 Cal.4th 59, 67–68 [holding that "when the prosecution seeks to prove the street gang enhancement by showing a defendant committed a felony to benefit a given gang, but establishes the commission of the required predicate offenses with evidence of crimes committed by members of the gang's alleged subsets, it must prove a connection between the gang and the subsets"].)

[23] Song Number 2 from Price's phone is the least specific of the four. However, its lyric, "Hustlin tryin to *ice* my wrist" (italics added), could reasonably be construed as a reference to NSO activity because "ice" is included in the phrase "Ice City," another term for NSO, and phrases like "North Pole" and "polar bears" were used to describe NSO and its members, according to Cunnie's section 402 hearing testimony.

affiliated with NSO and acted as NSO gang participants with the intent to further NSO's objectives in participating in Charles's murder.

Two cases relied on by the prosecution support our conclusion. In *People v. Olguin* (1994) 31 Cal.App.4th 1355 (*Olguin*), the appellate court upheld the trial court's admission of handwritten, gang-related rap lyrics found in the home of a defendant charged with a gang-related second degree murder a few weeks after the killing. (*Id*. at p. 1372 & fn. 3.) The defendant argued this evidence had little probative value, particularly given the timing of its discovery and lack of authentication. The *Olguin* court concluded, "Both the content and location of these papers identified them as the work of [the defendant]. [Citations.] . . . [T]his was not a case in which the date of creation of the work was critical. Regardless of whether these lyrics were written before or after the killing, they were adequately authenticated as the work of [the defendant]. As such, they demonstrated his membership in [the] Southside [gang], his loyalty to it, his familiarity with gang culture, and, inferentially, his motive and intent on the day of the killing. The trial court properly admitted them, carefully limiting them to those purposes." (*Id*. at p. 1373.)

Similarly, in *People v. Zepeda* (2008) 167 Cal.App.4th 25 *(Zepeda),* a trial court ruled that the prosecution could give the jury the lyrics, and play the recordings, of two "gangsta rap" songs written by a defendant charged with a gang-related murder. The appellate court, relying on *Olguin*, affirmed, concluding the lyrics were "probative of defendant's state of mind and criminal intent, as well as his membership in a criminal gang and his loyalty to it. The songs showed that defendant's gang had the motive and intent to kill" and, "although anticipatory, [were] explicitly relevant to the charges against defendant." (*Zepeda*, at p. 35.)

Price and Flowers attempt to distinguish both *Olguin* and *Zepeda* by pointing out that these cases involved rap lyrics written by the defendants. That fact was no doubt relevant but not dispositive in those cases. Here, the fact that the prosecution did not show that Price or Flowers authored or rapped the four songs does not render them irrelevant. From Price's and Flowers's possession of gang-specific lyrics, which directly

40

and explicitly referred to NSO and its criminal street gang activities, it could reasonably be inferred that each of them was affiliated with NSO and that as members they had a motive and intent to kill people affiliated with their rival gang, including family members of rival gang members. There was nothing "ambiguous" about the songs' lyrics, unlike the poem discussed in another case Flowers relies on, *In re George T.* (2004) 33 Cal.4th 620, 624 [concluding that "the ambiguous nature of the poem, along with the circumstances surrounding its dissemination, fail to establish that the poem constituted a criminal threat"].) The trial court could reasonably conclude that possessing and presumably listening to these songs was more than what Flowers characterizes as "generally entertainment." Further, that Anthony's nickname is mentioned in one song was relevant to whether he associated with Price and the NSO gang.

Price and Flowers also argue these songs were unduly prejudicial, with Price asserting their admission "prejudicially appealed to the fears and emotions of the jury by portraying Price as a very dangerous and violent person." We do not agree. Again, whether something is "prejudicial" under Evidence Code section 352 " 'is not synonymous with "damaging," but refers instead to evidence that " 'uniquely tends to evoke emotional bias against defendant' " without regard to its relevance on material issues.' " (*Zepeda*, *supra*, 167 Cal.App.4th at p. 35.) Here, other evidence of defendants' conduct was at least as violent and senseless as, and much more graphic than, any of the matters described in the songs. The evidence showed that defendants drove together to Berkeley with two semiautomatic assault rifles and a semiautomatic pistol in their car; that one got out of the car and repeatedly shot the brother of a suspected rival gang member as he walked down the street, obliterating the man's face and killing him; that one of the men in the car shouted in celebration while another raised a rifle into the air and a third spun the car around doing "donuts"; that the four then fled together in a car driven by Anthony recklessly and at a high speed in an attempt to avoid the police who pursued them; and that this led to the senseless deaths of two other innocent people. Nothing in the songs, which described violence in more general terms, was as inflammatory as these actions. Further, some of what Price and Flowers contend was

41

unduly prejudicial, such as the reference in one of the songs to killing relatives of foes, was in fact highly relevant to their motive and intent; in other words, it was only prejudicial in the sense that it damaged their case. This is not the undue prejudice with which Evidence Code section 352 is concerned. (*People v. Doolin*, *supra*, 45 Cal.4th at p. 439.)

Finally, the trial court gave the jury appropriate limiting instructions, which we presume the jury followed. (*People v. Sandoval* (2015) 62 Cal.4th 394, 422.) Price relies on three cases in which courts have found limiting instructions ineffectual, but these cases all involved evidence that was truly prejudicial. (See *People v. Guerrero* (1976) 16 Cal.3d 719, 727–730 [evidence defendant committed a previous "brutal and abhorrent" rape of an underage girl, admitted to show he murdered another woman when there was a paucity of evidence of attempted sexual activity in the present case]; *People v. Antick* (1975) 15 Cal.3d 79, 98 [evidence of a prior forgery conviction admitted to impeach defendant's credibility in a "close" case where there was "no direct evidence linking defendant to the charged offenses"], disapproved of in part on other grounds in *People v. McCoy* (2001) 25 Cal.4th 1111, 1123; *People v. Roof* (1963) 216 Cal.App.2d 222, 225–227 [regarding evidence of another charge calculated to prejudice defendant's character in a close case about defendant's intent in taking money from two customers, which prejudice was not cured by the court's instruction to jury that " 'we can forget about that' "].) These cases do not support a departure here from the presumption that the jury followed the court's instructions.

For these same reasons, we reject Price's constitutional due process argument. Admission of the rap songs did not render the trial fundamentally unfair. (See *People v. Partida*, *supra*, 37 Cal.4th at p. 436 ["the admission of evidence, even if error under state law, violates due process only if it makes the trial fundamentally unfair"]; *Jammal v. Van de Kamp* (1991) 926 F.2d 918, 920 [asking " 'whether the trial court committed an error which rendered the trial so arbitrary and fundamentally unfair that it violated federal due process' "].)

42

Finally, Price argues that the trial court erred by not applying the correct legal standard, as determined in *Skinner*, *supra*, 218 N.J. 496, a case decided by the New Jersey Supreme Court. The *Skinner* court held it was improper to admit certain violent and profane rap lyrics written by the defendant, who was accused of shooting a companion on the street in the course of a drug deal, because under the circumstances of that case they were highly prejudicial and bore little or no probative value as to his motive or intent in the charged attempted murder. (*Id*. at pp. 499–500.) The court held that such forms of self-expression about bad acts, wrongful acts, or crimes were inadmissible "unless the writing reveals a strong nexus between the specific details of the artistic composition and the circumstances of the underlying offense for which a person is charged, and the probative value of that evidence outweighs its apparent prejudicial impact." (*Id*. at p. 500.) It applied a four-part test used in New Jersey courts to determine the admissibility of evidence of prior crimes or wrongful acts, which required the evidence of the other crime to be (1) relevant to a material issue; (2) similar in kind and close in time to the offense charged; (3) clear and convincing; and (4) of a probative value that is not outweighed by the prejudice. (*Id*. at pp. 514–516.)

Price contends the trial court should have applied New Jersey's four-part test as a matter of law and because it is the appropriate standard to apply under the circumstances. We are not bound by the decisions of the courts of another state. (*Amerigraphics, Inc. v. Mercury Casualty Co.* (2010) 182 Cal.App.4th 1538, 1553.) The law in California regarding the admission of evidence, including the kind of evidence under consideration here, is clear under Evidence Code sections 352 and 1101, and related case law: "[W]here evidence of gang activity or membership is important to the motive, it can be introduced even if prejudicial." (*People v. Martin*, *supra*, 23 Cal.App.4th at p. 81.) Furthermore, *Skinner* is distinguishable on its facts because it did not involve the criminal street gang allegations—and the role of motive and intent in proving these allegations— that are central to this case. (See *People v. Hernandez* (2004) 33 Cal.4th 1040, 1049 [evidence of gang affiliation, including beliefs and practices, can help prove motive and intent]; *Olguin*, *supra*, 31 Cal.App.4th at p. 1373 [lyrics created by defendant properly

43

admitted because they demonstrated his gang membership, loyalty to the gang, familiarity with gang culture and, inferentially, motive and intent on the day of the killing].)  These cases, not *Skinner*, apply the relevant California law principles and support the admissibility of the rap music evidence here.

# V.

## *Admission of Anthony's May 18, 2009 Statements to Oakland Police Was Not Reversible Error Under* Miranda.

Anthony argues the trial court prejudicially violated his constitutional rights under *Miranda* when it denied his motion in limine to exclude evidence of his statements to Oakland police on May 18, 2009, two days after his arrest in this case.  We agree that the trial court erred, but conclude it was harmless.

### A.  The Relevant Proceedings Below

Prior to trial, the court held a hearing on Anthony's motion that his statements on three separate occasions to police—on April 23, 2009, May 17, 2009, and May 18, 2009—were inadmissible on *Miranda* and *Aranda/Bruton* grounds.  The court denied Anthony's motion, except that it excluded his statements to Berkeley police on May 17, 2009.

#### 1.  *Anthony's April 23, 2009 Statements to Oakland Police*

Sergeant Sean Fleming, a homicide detective with the Oakland Police Department, testified at the motion hearing that on April 23, 2009, he was assigned to lead the investigation of the murder of Nguyen Ngo and the possible attempted murders of Stephon Anthony and Bao Ngo[24] that had occurred that day on the 800 block of 45th Street in North Oakland.  That evening, he and another Oakland Police Department homicide investigator, Sergeant Phillips, interviewed Anthony at the police department. Fleming did not advise Anthony of his *Miranda* rights because Anthony was only a victim and witness to the shooting.

---

[24] For clarity's sake, we will refer to Bao Ngo as "Bao" to differentiate him from Nguyen Ngo, who was his brother.  We shall refer to Nguyen Ngo as "Ngo."  We mean no disrespect by doing so.

44

Anthony's April 23 interview with Fleming and Phillips was video-recorded, and the prosecution played it for the jury at trial.[25] Anthony told police he and Ngo arrived on 45th Street around Market Street in North Oakland to gamble with others. Fifteen minutes later, Ngo borrowed Anthony's car to go to a nearby store to buy dice. Upon his return, Ngo was shot by someone from a passing car as Ngo exited Anthony's car. Anthony and Bao were standing nearby. Ngo told Anthony the passing car was a Mercedes.

Anthony referred to Ngo as his "partner," "little partner," "best friend" and [o]ne of my best friends." He said they did not usually go to 45th Street because a shooting had occurred there, but they went there that day because Ngo used to live in the area, they were trying stay out of the way of the police and a gambling spot was there.

As his interviewers probed further about who could have shot Ngo, Anthony said, "We got problems with Berkeley. We got problems with the West," but he did not know who had done the shooting. Asked who "you all have funk with," "[l]ike real funk," Anthony responded, "We funking with Berkeley, always. I don't know why." Apparently referring to Berkeley gang members, he said "a few of 'em just got outta jail or somethin', " and indicated the "funk" was "seasonal." "That shit goin' kick off one time and then it's gonna fade off and then it's gonna kick off again. It's like, this the first thing of kickin' this shit off, right here." He said that in 2007, his friend "Steve" was killed at Emeryville High School and his "partner Rob" was shot coming out of a downtown club called "Jeffrey's" when "somebody had notified the people who he funking with . . . and they caught him outside sleepin'. " Asked if that was what happened with Ngo, Anthony said he was "not sure what was goin' on," thought "like maybe the motherfucker's tryin' to kick it off with us," and that he might have "to get to the bottom of this some way."

---

[25] The court reviewed the recording and a transcript of it for the hearing on the defense motions. Also, a transcript provided to the jury is contained in the record. We quote from this transcript.

Anthony said his main issue was with "cats from . . . Berkeley," but that he could not "put no face on this shit." He denied Ngo had done anything to cause someone to go after him. He said, "We don't even ride with guns. We haven't been ridin' with guns, lately," and added "that shit be dyin' down with . . . Berkeley. It's always gonna be there. But it's gonna die down sometimes. And it'll pop back up. Maybe it could be poppin' back up." He did not know who killed Ngo, or whether he or Ngo was the intended victim. However, "these cats from . . . Berkeley—you gonna hear about it. 'Cause typically, that's how this shit jump off. They come down here and do somethin' and then the word start to spread. And vice versa. . . . Shit spread and that's what . . . ignites more shit." He denied going to Berkeley or knowing his way around there, and said there was a greater police presence in Berkeley so they did not include Berkeley in their "missions."

Anthony continued that he did not know if the shooters were out to kill him. He speculated that if he was the shooter and "got funk with you," "I ain't gonna stop but I'm gonna make sure I'm gonna get you. If I get both a y'all, I mean, that's a, that's a good day." The police told Anthony "it would not be wise to try to retaliate in a situation like this," to "let us handle this shit," and to call them if he learned information that could help their investigation.

### 2. *Anthony's May 17, 2009 Statements to Berkeley Police*

Sergeant Christian Stines of the Berkeley Police Department testified at the motion hearing that he was assigned to investigate the events of May 16, 2009. The next morning, May 17, he and Berkeley Police Sergeant Jim Counts interviewed Anthony.[26] After they asked some background questions, Counts advised Anthony of his *Miranda* rights using an admonition and waiver form. Counts directed Anthony to initial the form in certain places, but Stines did not see what Anthony wrote. Anthony was asked if he wished to speak to the officers. Stines could not recall the exact word Anthony used and

---

[26] The court reviewed the recording and a transcript of this May 17 interview for the hearing on the defense motions we address here.

46

thought Anthony's answer was unclear, but was led to believe Anthony answered in the affirmative because he continued the conversation and was responsive to the officers' questions.

Stines testified further at the hearing that before asking Anthony questions, he looked over at the admonishment and waiver form and saw Anthony had written "No" to whether he wanted to speak to the officers. Stines thought the meaning of this was unclear and tried to determine if Anthony understood his rights and wanted to talk to the officers. Anthony indicated he wanted to talk by continuing to do so, and by not indicating he did not want to continue. Stines proceeded to ask him questions about the case. About five minutes later, Anthony said, " 'I wish I had my attorney present,' " and " 'I don't have nothing to say to you.' " The officers did not ask him further about the case.

Detective David Marble of the Berkeley Police Department testified at the motion hearing that on May 16, 2009, he was assigned to lead the investigation into the killings of Charles, Perea and Ross. The next day, Marble photographed Anthony in his jail cell in order to document his injuries. At the time, Marble knew Anthony had already been questioned by two Berkeley police officers. In response to Anthony's question, Marble told him he was being charged with three counts of murder. Anthony said, " 'I didn't mean to kill those people. Man, I didn't mean for this to happen. They wouldn't stop chasing me. Why wouldn't they stop chasing me?' " Marble told him "that we pretty much knew what happened and who the other people were that were in [your] vehicle." Anthony responded, " 'I can't tell on them. They're my friends.' " Marble then said, " 'Rafael Campbell?,' " to which Anthony responded, " 'You're on the right track.' " Marble also told Anthony he knew Ngo had been killed three weeks earlier and that Anthony had everything to do with it. Anthony said "he was thinking about talking to detectives about the murder of Bao's brother." Marble told him to let the jail staff know if he decided to do that. Marble prepared a written report of this conversation, which the court reviewed.

### 3. *Anthony's May 18, 2009 Statements to Oakland Police*

47

Sergeant Fleming of the Oakland Police Department testified at the motion hearing that the Berkeley Police Department contacted him on May 18, 2009, and said "Anthony had requested to speak to us . . . ." The Oakland police obtained a removal order, picked up Anthony and took him to an interview room at the Oakland Police Department, where Fleming and his partner, Sergeant Jones, interviewed Anthony.

Fleming further testified at the hearing that at the time of this May 18 interview, he knew Anthony was a suspect in a murder case in Berkeley that might be gang related, and he had heard "some things" that caused him to think the Ngo murder "possibly was related to a gang-related shooting." At the interview, Fleming told Anthony that they did not want to, and would not, talk about the Berkeley case. The officers did not ask Anthony about his Berkeley case, but instead "talked to him about the murder of Nguyen Ngo, and he was a victim/witness for that." Fleming did not advise Anthony of his *Miranda* rights. According to Fleming, Anthony was cooperative, responded to questions and volunteered information. He was not free to leave.

Anthony's May 18 interview with Fleming and Jones was recorded, and the recording was played for the jury. A transcript of the interview was provided to the jury, and it is contained in the record. It indicates Anthony was placed in an interview room before 5:49 p.m. and stayed there for the most part under physical restraints, with dinner provided to him, until Fleming and Jones began interviewing him almost five hours later, at 10:20 p.m. After some preliminary questions and talk about Anthony's high school football experiences, the officers and Anthony had the following exchange:

"[Fleming]: Okay. Hey, Stephon. So, um, remember I talked to you, uh, a few weeks ago, right? All right. Today um, guys from Berkeley called. They, uh, said you wanted to holler at us right? So I went and got this removal order signed by a judge. And that's why I came and swooped you up today, right? Hey, I just need to—just wanna explain to ya, we not here to talk—we know, I know you got some issues going on in Berkeley. We ain't here to talk about nothing about that, okay?

"[Anthony]: Yeah.

"[Fleming]: None of that, none of that we gonna speak on tonight, okay?

48

"[Anthony]: Hm.

"[Jones]: All right. 'Cause the rules are, once you, you know, once another agency arrests you, then you, you know, you invoked your right to counsel on ya. You know what that mean? When they start questioning, you ask for a lawyer?

"[Anthony]: Right. Yeah.

"[Jones]: Yeah. So when you do that other cops can't come in and try to talk to you about the shit. That's in the Constitution.

"[Anthony]: All right.

"[Jones]: So we just here to talk to you about the thing with, uh, Bao—I mean, uh . . .

[¶] . . . [¶]

"[Anthony]: 'Nugent.' "

Fleming then started asking Anthony questions about his friendship with Ngo, including how they met, how close they were, what Ngo was like and whether Anthony was "hurting" since Ngo was killed. Anthony said he had been very close to Ngo ever since he met him five years ago through two other friends, Rob Benjamin and Stevie Bailey. Ngo was a "thinker" who would think for everyone "in the whole car." Anthony had been "sick" since Ngo's death.

Fleming said he was trying to figure out what happened to Ngo and Bao that day. He also said he had talked by phone to Anthony a few times the previous week and had tried to get Anthony to come talk to him further. He then asked Anthony if anything had happened in the last six months that might have caused the shooting. Anthony said "it was real hectic in '07," and "[w]e was losing people left and right. And then the situation had died down." Asked about 2008, Anthony said, "It never over, unless you just kinda back up." Prodded further, Anthony said "we" had "[n]o losses" that year, and that "[n]obody else is coming, shooting at us." Asked what started to happen in 2008 or 2009, Anthony said, "I actually, um, heard that a few, umm, cats from Berkeley went to jail. I guess they did pay a little time and got out." When Fleming asked if "these some cats that y'all have some issues with or something," Anthony said, "I mean, it's always,

49

it's always been issues between Berkeley and North Oakland . . . ." He denied that "Nugent" (an apparent reference to Nguyen Ngo) or Bao had any issues with anyone when Ngo was shot.

Fleming asked Anthony a series of questions about what occurred on the day Ngo was shot. Anthony said just before the shooting, Bao noticed a blue Charger that "keep coming past" them. Anthony saw a man in the Charger talking on the phone named "Na Na," who was "from Berkeley." Asked, "So y'all been having problems with this 'Na Na' cat," Anthony said, "I guess they say he run Berkeley's side. Like if there's problems out there, he doling out the weapons and shit. Cars, rentals and shit. Telling 'em to go hit and shit. Orchestrating the hits." Anthony then said he wanted to be anonymous, and did not want to be recorded or for anything to be written down. Fleming commented again about Anthony's high school football experiences and then returned to the subject of Na Na.

Responding to further questions, Anthony said that about twenty seconds after he saw the blue Charger for the last time, another car came by, a gold "Benz," and a back door popped open. Anthony saw "long-ass dreads, black hoodie, cap, [and] some type of big gun" that could have been an AK or SK rifle and did not sound like a handgun. Shots were fired. Anthony put his head down and when he looked up, he saw a driver with dreads also and a person in the back seat; others told him there were three people in the car.

Asked who he heard did the shooting, Anthony said he heard Na Na orchestrated it and "they had somebody turn on us." He said a person who had been in jail with Berkeley people was at the scene that day, and speculated this person let the killers know he and Ngo were there. He thought the blue Charger was a diversion and that Na Na was talking on the phone to the Benz behind him. Asked, "Who you think shot y'all?," Anthony said, "Thurgood," because Anthony remembered that he "seen him and his bitch in that Benz on the freeway. . . . That's his bitch Benz." Asked how he knew Thurgood, Anthony said Thurgood had shot "Stevie" at a bowling alley. "And, uh, from what we was hearing shit, when, when them Berkeley niggas was coming through shootin', they

50

was saying 'Thurgood'—his name . . . was popping up the most." A short time later, Anthony was shown a photograph of a person who the transcript identifies as Jermaine, and Anthony identified him as Thurgood.[27]

Anthony said he heard that "Joe from Berkeley" and his brother, "Coleon," who was "real tight" with Thurgood, were also in the Benz, along with a fourth person named "Moose." Asked if they were "all Berkeley cats," Anthony said yes, except for Moose. Asked, "[H]ow did all this shit get started . . . [l]ike why Berkeley and, uh, and North Oakland just can't get along?," Anthony said he did not know and that it had started some time ago. Later in the interview, the officers probed further about the rivalry between Oakland and Berkeley gangs. Jones said the rivalry was "like, traditional Crips and Bloods gangbanging," to which Anthony agreed. Jones said, "You, you from here. I'm from here. If I see you, it's on," and Anthony said, "It's . . . not even no, 'We looking for this person or looking for that person.' When they was coming through shooting, they was looking for anybody from North Oakland. Anybody outside, they were shooting," whether in a gang or not. "Innocent people getting shot," he added.

Anthony also identified photographs of Joe and Coleon, identified in the transcript as photographs of "[Joseph Carroll]" and "[Coleon Carroll]."[28] Asked why he thought they were involved in Ngo's shooting, Anthony said after the shooting "motherfuckers been getting phone calls like, 'Yeah, we did that shit. We on 7th sliding through right now.' Some shit like that." Anthony remembered that "Smarty" got a call from Coleon saying that "he on 7th sliding through," which Anthony said meant "they" were on "Sixth, 7th, down by University" in Berkeley.

---

[27] The transcript identifies "Thurgood" as "[Jermaine Davis]." The source of this identification in bold is not indicated, but it does not appear that Anthony identified him by this name in the interview, since Anthony said he thought the man's real name was "Thurgood."

[28] The sources of these identifications in bold also are not indicated in the transcript.

In the middle of more questions about the shooting, Anthony was asked, "You all right, man?" He said, "The only reason why I'm tellin' y'all this information (unintelligible) kill, killed my little partner. Tried to kill Bao." Asked what it was "goin' to take for all this shit to stop," he said, "I don't even think it's going to stop." Jones said, "You don't think so? If 'Na Na,' 'Thurgood' and that little four or five group of dudes went to jail forever or they got killed or some other thing—it wouldn't stop still?" Anthony responded, "Yeah. It would probably stop. (Unintelligible). 'Cause I mean, if you trying to make a name for yourself in Berkeley, kill a North Oakland nigga." He continued, "just take the head off our body. Stevie was the head. Rob was the head. 'Nugent' like the motherfucking ribs. Seems like everybody that close to me been killed. That's like, that's a part of my body. I feel like, damn, the next thing you know, it'll be gone."[29] Asked, "Who do you think they was trying to hit when they came through there?," Anthony said, "I just know that them Berkeley niggas got a reputation for shootin' at North Oakland niggas no matter who the fuck it is. I think they was also trying to get a 'head' and score big. I mean, me, Bao and 'Nugent'—that's a big 'head.' Any one of us (unintelligible) like they be satisfied with any one of us."

The officers warned Anthony to be careful in Santa Rita jail. Anthony responded that he was not trying to be a snitch because "[t]hey'll kill me in jail." The interview ended a few moments later.

### 4. *The Court's Rulings*

After the testimony at the motion hearing was completed, Anthony's counsel argued that (1) the April 23 interview of Anthony in Oakland should be suppressed because Fleming did not give Anthony a *Miranda* warning, despite asking questions intended to obtain incriminating information about Anthony's gang affiliation and "funkin" with other gangs; (2) all of the statements Anthony made to Berkeley police on

---

[29] The transcript includes identifications of "Rob" as "**[Robert Benjamin]**" and Stevie as "**[Stevie Bailey]**." It is unclear from the transcript who provided these identifications.

May 17 after he indicated on the form that he did not want to talk with police should be suppressed; and (3) the May 18 interview of Anthony in Oakland should be suppressed because Anthony did not waive his previous day's assertion of his *Miranda* rights and the officers were trying to establish some type of motive for the killing of Ngo, knowing the May 16 shooting may have been in retaliation for that killing and for the simultaneous attempts to kill Anthony and Bao.

The court ruled the prosecution could not introduce in its case in chief any of Anthony's May 17 statements to Berkeley police after Anthony invoked his *Miranda* rights, including his statements to Marble, but could introduce Anthony's statements to Oakland police on April 23 and May 18.

Regarding the May 18 statements, the court found Anthony had invoked his *Miranda* rights under the Fifth Amendment the previous day, initiated the contact with Fleming and Jones, "certainly was in custody," "certainly" was subjected to an "interrogation," and was not re-admonished about his rights. These circumstances raised "complicated issues about reinitiation by a suspect." Citing *Edwards v. Arizona* (1981) 451 U.S. 477, *Oregon v. Bradshaw* (1983) 462 U.S. 1039 and *People v. Bradford* (1997) 14 Cal.4th 1005, it observed that Anthony reinitiated contact with "an investigation that he . . . had previously spoke to the police about . . . and . . . it was not the reason he was in custody. . . . Sure, it was related, but that's not why he was in custody. He was in custody for these murders, and he wanted to talk to the police about the murder of his friend, a subject he had previously spoken to them about. [¶] [The Oakland police] made clear to him that that's all they wanted to talk to him about, but they didn't re-admonish him." After hearing argument, the court concluded that the prosecution had shown "that on the facts here, Mr. Anthony was waiving his right to counsel to speak to the Oakland Police Department under the circumstances that he did. [¶] Now the fact that it results in information that [the prosecutor] wants to offer against Mr. Anthony is really not the question." Responding to further argument, the court acknowledged that as of the May 18 interview the Oakland police suspected Ngo's death was related to the events of May

53

16, but concluded, "that's not the analysis. The analysis is: Did Mr. Anthony waive his right to counsel? That's all I care about."

## B. Analysis

### 1. *The Trial Court Erred by Admitting Anthony's May 18 Statements in Violation of* **Miranda.**

Anthony argues the trial court prejudicially erred by admitting his May 18 statements to the Oakland police in violation of *Miranda* because the police asked him questions designed to make him incriminate himself regarding the events of May 16. The People contend Anthony, although in custody for the May 16 events, voluntarily spoke as a witness to another crime and was not subjected to a custodial interrogation, making his prior assertion of his *Miranda* rights and the lack of another *Miranda* warning irrelevant. Further, they contend, Anthony impliedly waived any *Miranda* rights by initiating his talk with Oakland police. We conclude the trial court erred by admitting Anthony's May 18 statements because the Oakland police ignored his prior assertion of his *Miranda* rights and asked him questions they should have known could result in Anthony incriminating himself. However, we also conclude the error was harmless.

We begin with the People's contention that the circumstances did not qualify for *Miranda* protection, even though Anthony was brought to the Oakland police department while he was in custody for the events of May 16. Relying on *People v. Maclem* (2007) 149 Cal.App.4th 674, they argue we should determine if *Miranda* applies here by analyzing "whether the language summoning the defendant from his prison lodging was coercive, whether the physical surroundings of the questioning were unduly coercive, whether the defendant was confronted with evidence of guilt, and whether there was an opportunity given to this person to leave the site of the questioning." (*Maclem*, at p. 687, citing *Cervantes v. Walker* (1978) 589 F.2d 424, 427–428.) They further contend this analysis leads to only one conclusion: that Anthony was not subjected to a coercive interrogation that required *Miranda* warnings.

We agree that the *Maclem* analysis is appropriate here, but disagree with the People's conclusion. The trial court determined that Anthony was subject to a custodial

interrogation, a factual finding to which we defer because it is supported by substantial evidence. (*People v. Bacon* (2010) 50 Cal.4th 1082, 1105.) Regardless of Anthony's request to speak to the Oakland police, he was removed to the Oakland police department under a court order and left in an interview room wearing physical restraints for virtually all of four and a half hours until Fleming and Jones began questioning him late in the evening of May 18. The two officers initiated and dictated the direction of their questioning; at no time did they ask Anthony why he, as Fleming put it, "wanted to holler" at them. (The record does not disclose Anthony's reasons either.) Instead, the officers began peppering Anthony with questions about the nature of his friendship with Ngo, his feelings about Ngo's death, and whether anything had occurred before Ngo's death that might have caused his shooting, including, following up on Anthony's own references, whether there were "issues" between some "cats" in Berkeley and "y'all." The officers also ignored Anthony's insistence during the interview that he did not want to be recorded. Also, Fleming testified that Anthony was *not* free to leave. The People fail to discuss why this evidence does not support the trial court's finding that Anthony was subjected to a custodial interrogation.

The People also argue Anthony was not the subject of a custodial interrogation because "[n]othing in *Miranda* precludes police from speaking freely to an incarcerated suspect, as long as ' "the speech would not reasonably be construed as calling for an incriminating response." ' " Citing *People v. Dement* (2011) 53 Cal.4th 1, 26–27 (*Dement*), disapproved in part on another ground in *People v. Rangel* (2016) 62 Cal.4th 1192, 1216, they contend that the officer's "limited questioning . . . was not reasonably likely to elicit an incriminating response." Once more, we have no issue with the People's statement of the law but disagree with their conclusion. As *Dement* indicates, " ' "[i]nterrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police . . . that the police *should know are reasonably likely to elicit an incriminating response* from the suspect.' " (*Dement*, at p. 26, quoting *Rhode Island v. Innis* (1980) 446 U.S. 291, 301, italics added.) Dement, a prison inmate, invoked his *Miranda* rights to a detective investigating the death of an inmate named

Andrews. (*Dement*, at p. 25.) A few hours later, after taking Dement to a hospital to treat his injuries, the detective asked him a question about an apparently unrelated homicide investigation in which Dement's wife had been questioned. (*Ibid.*) Dement expressed anger that the suspect in that case, Rutledge, had gotten his wife involved, said Rutledge and he were enemies, indicated Andrews was Rutledge's friend, said if law enforcement would get Rutledge into jail with the defendant, they would not have to worry about " 'the murders anymore' " or " 'taking him to court,' " and then would say nothing more. (*Ibid.*) The court concluded Dement made his incriminating statements in response to the detective's questions about a homicide the detective had no reason to believe was related to Dement, and not in an interrogation. (*Id.* at pp. 26–27.)

The circumstances discussed in *Dement* provide a sharp contrast to the circumstances before us, where the officers had reason to know that Ngo's shooting and the events of May 16 could be related. Fleming readily acknowledged in his testimony that when he questioned Anthony on May 18, he was aware Anthony was a murder suspect in a Berkeley case, that the case against Anthony might be gang affiliated, and that he had heard "some things" that caused him to think that the Ngo murder "possibly was related to a gang-related shooting." Further, Fleming had reason to suspect Ngo's death was related to a dispute between Oakland and Berkeley gangs. Anthony had told him this might be the case on April 23, saying he suspected the shooting was because "[w]e got problems with Berkeley," that "[w]e funking with Berkeley," that Berkeley gang members had just gotten out of jail and that perhaps "cats from . . . Berkeley" were igniting "more shit." Indeed, on May 18, Fleming apparently already suspected Jermaine, Charles's brother, was involved in Ngo's murder, as evidenced by his showing Anthony Jermaine's photograph within moments of Anthony saying he suspected someone named "Thurgood" had killed Ngo.

In other words, the record indicates that when they questioned Anthony on May 18, Fleming and Jones had reason to believe Anthony was involved in a May 16 killing committed in gang-related retaliation for the April 23 shooting of Ngo, and the attempted murder of Anthony and Bao. Yet they did not advise Anthony of his *Miranda* rights and

56

pursued lines of questioning that called for Anthony to give responses that bore directly on his motive and intent and were thus incriminating—asking, for example, about Anthony's relationship with Ngo, with his feelings about Ngo's death, the "issues" between "cats" from Berkeley and "y'all," and the rivalry between Oakland and Berkeley gangs. The People's contention that these lines of questioning were not reasonably likely to elicit an incriminating response from Anthony lacks merit.

The People's contention that Anthony waived his *Miranda* rights is equally unpersuasive because there is no indication Anthony made a *knowing and intelligent* waiver of his *Miranda* rights. "If . . . a defendant . . . requests counsel, 'the interrogation generally must cease until an attorney is present.' . . . However, if the defendant thereafter initiates a statement to police, "nothing in the Fifth and Fourteenth Amendments . . . prohibit[s] the police from merely listening to his voluntary, volunteered statements and using them against him at the trial." [Citation.] Moreover, if the defendant's statement is not only voluntary, but constitutes a knowing and intelligent waiver of his right to see counsel, the interrogation may resume. [Citation.] Such a knowing and intelligent waiver is "a matter which depends in each case 'upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.' " ' [Citation.] The state must demonstrate that the suspect knowingly and intelligently waived his right to counsel 'under the totality of the circumstances, including the necessary fact that the accused, not the police, reopened the dialogue with the authorities.' [Citation.] . . . . [T]he initiation of a conversation with officers, although not dispositive, 'is strong and essential evidence of a knowing and intelligent waiver.' '[T]he waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.' " (*People v. Hensley* (2014) 59 Cal.4th 788, 810.)

Here, Anthony asked to speak to the Oakland police, but, again, we do not know why, and Fleming and Jones never asked him. Rather, they confirmed with him his assertion of his *Miranda* rights in the Berkeley case *and* assured him they would not ask him questions about that case—in effect promising they would not ask him questions that

57

could cause him to incriminate himself in that case. Specifically, referring to the Berkeley case, Fleming said, "None of that, none of that we gonna speak on tonight, okay?" And after Anthony agreed, Jones said, "Yeah. So when you do that other cops can't come in and try to talk to you about the shit. That's in the Constitution." Nonetheless, Fleming and Jones proceeded to question Anthony about matters that were potentially incriminating in the Berkeley murder case. Their references to his Oakland gang activity and probing of his suspicions that Berkeley gang members, particularly Jermaine, killed Ngo were obviously relevant to Anthony's motive and intent for his suspected participation in the murder of Jermaine's brother, Charles, on May 16. In other words, Fleming and Jones confirmed with Anthony that he had asserted *and continued to assert* his *Miranda* rights, assured him that they would not ask him questions about matters that could cause him to incriminate himself in the Berkeley case, and nonetheless proceeded to ask him questions about matters that could cause him to incriminate himself in the Berkeley case. Under these circumstances, Anthony cannot be said to have made a knowing and intelligent waiver of his *Miranda* rights. To the contrary, he confirmed his assertion of those rights and proceeded to answer the officers' questions upon their representation that they would not ask questions that implicated these rights. At best, Fleming and Jones ignored Anthony's assertion of his *Miranda* rights and interrogated him about matters they knew or should have known would be incriminating. The law prohibits them from doing so. (*Dement*, *supra*, 53 Cal.4th at pp. 26–27.) The court should have granted Anthony's motion in limine regarding the May 18 interrogation.

### 2. *The Trial Court's Error in Admitting Anthony's May 18 Statements in Violation of* Miranda *Was Harmless*.

We conclude the trial court's error in admitting Anthony's May 18, 2009 statements to the Oakland police was harmless beyond a reasonable doubt. Other evidence provided ample support for his convictions. There is no doubt that Anthony was on the scene for all of the May 16 incidents. The Cadillac used in Charles's murder was registered in Anthony's name. Officer Lee identified him as the person driving that car moments after Charles's murder. Anthony was apprehended at the scene after his

58

vehicle crashed. His cell phone was found in the car. The evidence further indicates Anthony was among the persons in the Cadillac who celebrated as Flowers repeatedly shot Charles to death and was the person who drove the Cadillac with a conscious disregard for human life as the four fled from police, resulting in the deaths of Perea and Ross.

Further, the admissible evidence of Anthony's affiliation with the NSO gang is very strong. We have already discussed Anthony's April 23 statements to the Oakland police, including those suggesting he and Ngo engaged in gang activities and that he suspected Berkeley gang members had killed Ngo as part of a long-standing, violent conflict between NSO and the Berkeley gang. In addition, Fleming testified that on April 23, 2009, when he interviewed Anthony about Ngo's killing, Anthony showed him a "Bushrod" tattoo on his arm. Cunnie, the People's gang expert, later testified "Bushrod" was a subset of NSO. And all of this was by no means the only admissible evidence of Anthony's NSO affiliation; we will discuss more of this evidence in addressing the admissibility Cunnie's expert testimony, *post*.

Finally, Anthony's statements on April 23, 2009, to Oakland police, the voluntariness and admissibility of which he does not challenge on appeal, indicate he had a motive to participate in the NSO-related murder of Charles. That is, he suspected a rival Berkeley gang of which Charles's brother was a member was responsible for shooting and killing his close friend Ngo and attempting to kill him and Bao.[30]

Given the admissible evidence, the court's error in admitting Anthony's May 18 statements to the Oakland police was harmless beyond a reasonable doubt.

---

[30] There was evidence separate from Anthony's May 18 statements to Oakland police that Berkeley gang members and Jermaine, Charles's brother, were suspected of killing Ngo. Fleming testified that his investigation uncovered as suspects in Ngo's killing four men, Jermaine Davis, Coleon Carroll, Joseph Carroll and Greg Fite, whose nickname was " 'Na Na.' " Fleming said they all were "suspected gang members from Berkeley." Jermaine and Charles's sister testified at trial that Jermaine and Charles were brothers.

59

# VI.

## *The Court Did Not Commit* Aranda/Bruton *Error*.

Price, Flowers and Campbell, with Flowers taking the lead, argue the trial court's rejection of their motions to exclude Anthony's April 23 and May 18 statements to Oakland police violated their Sixth Amendment rights to confront witnesses against them, constituting error under *Aranda*/*Bruton*[31] and *Crawford*. We disagree. Anthony's April 23 and May 18 statements did not directly incriminate any of the other defendants and the trial court instructed the jury to consider these statements regarding Anthony only, and not regarding the other defendants. Under *Aranda*/*Bruton a*nd *Crawford*, then, these statements were not wrongly admitted at trial even though Price, Flowers and Campbell were also defendants.

## A. The Relevant Proceedings Below

Later in the hearing on Anthony's *Miranda* motion, the court turned to the *Aranda*/*Bruton* motion by Flowers, Price and Campbell regarding Anthony's April 23 and May 18 statements. After hearing argument and reviewing case law, the court denied these motions. The court stated, "We have a statement that just doesn't mention any of these three other guys. And so I'm not prepared and do not find any violation of *Aranda* in the use of these statements." The court also denied the three defendants' motions to sever Anthony's trial and to exclude the statements as unduly prejudicial under Evidence Code section 352.

At trial, Campbell's attorney again objected under *Aranda*/*Bruton* and *Crawford* to playing for the jury the recording of Anthony's April 23 statements to the Oakland police. The court denied the objection, admonishing the jury that "this item is being offered only against Mr. Anthony; not against the other three gentlemen." It gave this same admonition when the recording of Anthony's May 18 statements were played for the jury.

---

[31] See *Aranda*, *supra*, 63 Cal.2d 518 and *Bruton*, *supra*, 391 U.S. 123.

The court subsequently instructed the jury that Anthony's statements to the Oakland police should be considered against him alone. It also instructed pursuant to CALCRIM No. 305, "You have heard evidence that one or more defendants made a statement out of court prior to trial. You may consider that evidence only against the defendant making the statement, not against any other defendant."

**B. Analysis**

In *Crawford*, *supra*, 541 U.S. 36, the United States Supreme Court held that the Sixth Amendment bars the introduction of a witness's "testimonial hearsay" statements at trial unless the witness is unavailable and the defendant has had an opportunity to cross-examine the witness. (*Crawford*, at pp. 68–69.) "Statements taken by police officers in the course of interrogations are also testimonial . . . ." (*Id.* at p. 52.) However, "[o]rdinarily, a witness whose testimony is introduced at a joint trial is not considered to be a witness 'against' a defendant if the jury is instructed to consider that testimony only against a codefendant." (*Richardson v. Marsh* (1987) 481 U.S. 200, 206.)

*Aranda* and *Bruton* protect a codefendant's Sixth Amendment right to confront witnesses against him or her when a codefendant's out-of-court statement incriminating him or her is admitted into evidence. The cases " 'stand for the proposition that a "nontestifying codefendant's extrajudicial self-incriminating statement that inculpates the other defendant is generally unreliable and hence inadmissible as violative of that defendant's right of confrontation and cross-examination, even if a limiting instruction is given." ' " (*People v. Homick* (2012) 55 Cal.4th 816, 874.)

Conversely, such a statement is not prohibited from admission under *Aranda*/*Bruton* when it does *not* directly incriminate the codefendant, particularly when the trial court instructs the jury to limit its consideration of the statement to the confessing defendant only. "The United States Supreme Court 'limited the scope of the *Bruton* rule in *Richardson v. Marsh* (1987) 481 U.S. 200 . . . . The court explained that *Bruton* recognized a narrow exception to the general rule that juries are presumed to follow limiting instructions, and this narrow exception should not apply to confessions that are not incriminating on their face, but become so only when linked with other

61

evidence introduced at trial. (*Richardson*, *supra*, at pp. 206–207.) That is because, "[w]here the necessity of such linkage is involved, it is a less valid generalization that the jury will not likely obey the instruction to disregard the evidence." (*Id.* at p. 208.)' " (*People v. Homick*, *supra*, 55 Cal.4th at p. 874, quoting *People v. Lewis* (2008) 43 Cal.4th 415, 454; see *People v. Capistrano* (2014) 59 Cal.4th 830, 870 ["Statements that incriminate by implication . . . are not within the scope of *Bruton*"], overruled in part on other grounds in *People v. Hardy* (2018) 5 Cal.5th 56, 103–104; see also *Richardson v. Marsh*, *supra*, 481 U.S. at p. 211 ["the Confrontation Clause is not violated by the admission of a nontestifying codefendant's confession with a proper limiting instruction when . . . the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence"].)

Assuming without deciding that Anthony's April 23 and May 18 statements to the Oakland police were testimonial in nature—which the People do not concede—we conclude the statements do not come under the *Aranda*/*Bruton* or *Crawford* prohibitions. Anthony did not refer to any of the codefendants in his statements; the statements were not admitted at trial for use as to Flowers, Price or Campbell; and the trial court repeatedly instructed the jury to consider the statements as to Anthony alone. Any impact the statements had regarding Flowers, Price and Campbell was due to implications necessarily dependent on the jury's linking of these statements to other, admissible evidence. Anthony's statements strongly implied that he participated in NSO, that NSO had a long-standing, violent conflict with Berkeley gangs and that Anthony suspected a Berkeley gang and particular gang members were behind Ngo's shooting, but the statements did not facially incriminate Flowers, Price or Campbell. For Anthony's statements to have significance for Flowers, Price or Campbell, the jury had to consider other evidence, discussed elsewhere in this opinion, to determine whether each of them was affiliated with NSO and engaged in NSO-related criminal conduct on May 16, 2009. Such evidence would include the rap lyrics tying Price and Flowers to NSO, McCluskey's identification of Flowers as the shooter, Cox's identification of Campbell,

Carter's identification of both, the arrest of Price at the scene of the crash and phone calls tying Flowers to Anthony and Price to Anthony.

Flowers contends the trial court "diluted and contradicted" its limiting instructions by telling the jury pursuant to CALCRIM No. 358, "It is up to you to decide how much importance to give to the statements." We disagree. When considered in the context of the instructions as a whole, which made plain that the statements were admitted as to Anthony alone, CALCRIM No. 358 neither contradicted nor diluted the limiting instruction. (See *People v. Jablonski* (2006) 37 Cal.4th 774, 831 [we review jury instructions as a whole in assessing whether the jury was reasonably likely to misapply an instruction so as to violate the Constitution].)

Flowers also argues Anthony's statements were admitted for the jury to consider for purposes that extended beyond Anthony's own criminal liability, i.e., to establish the bases for Cunnie's expert witness opinions, which the jury was told could include hearsay. We discuss Cunnie's expert testimony in detail and the inadmissibility of certain portions of it as hearsay, *post*. The point here is that Cunnie merely opined on the meaning and significance of Anthony's statements to the Oakland police, and did not ascribe these statements to the other defendants.

Campbell also contends the court's "limiting instruction was ineffectual" because the prosecutor "amplified" Anthony's statements to the police when he asked the People's gang expert, Cunnie, a hypothetical to establish gang-related intent for Charles's shooting. We disagree. The hypothetical included as relevant that the victim was killed by a group of gang members who believed (as opposed to just one of them, i.e., Anthony, believing) that a rival gang was responsible for the killing a few weeks before of one of their comrades and the possible attempted murder of Anthony and Bao. The prosecutor said nothing about Anthony's statements. Also, his reference to the hypothetical group's intent could be easily inferred from the totality of the circumstances presented in this case, such as that Anthony and his codefendants were all members of NSO, a North Oakland gang that had a long-standing and ongoing, violent rivalry with a Berkeley gang; their fellow NSO gang member Ngo had recently been shot and killed and Anthony and

63

Bao had narrowly escaped being shot in the same incident; and that few weeks after that incident defendants drove into the heart of the rival Berkeley gang's territory with semiautomatic weapons and one brutally murdered the brother of a suspected Berkeley gang member in broad daylight while the others celebrated. From these circumstances, the jury could reasonably infer that all defendants acted in retaliation against the rival Berkeley gang they suspected was responsible for killing Ngo and shooting at Anthony and Bao.

## VII.

### *None of Cunnie's Gang Expert Testimony Is a Ground for Reversal.*

Defendants, with Flowers taking the lead, argue the trial court committed prejudicial error under *Sanchez*, *supra*, 63 Cal.4th 655, which was issued after the trial in this case, and *Crawford*, by allowing the People's gang expert, John Cunnie, to testify about inadmissible case-specific, and sometimes testimonial hearsay to establish defendants' NSO affiliations and their related motives, intents and activities. This evidence formed the basis for the jury's finding that the murder was gang-related and the resultant sentences of life without the possibility of parole under section 190.2, subdivision (a)(22) and consecutive 25-years-to life terms for the gang-related use of a firearm under section 12022.53, subdivision (e). We reject a number of defendants' arguments and conclude, assuming for the sake of argument that the trial court erred in some regards under *Sanchez*, *Crawford* and/or *Miranda*, these errors were harmless under both federal and state standards. Other evidence properly admitted at trial, including that part of Cunnie's expert testimony we conclude was properly admitted, overwhelmingly establishes defendants acted together as active NSO participants in furtherance of NSO's objectives in committing the first degree murder of Charles.

### A. The Relevant Proceedings Below

Before trial, defendants brought in limine motions to limit the prosecution's proposed gang expert evidence. The court conducted a hearing under Evidence Code section 402 to hear the prosecution's proposed gang expert testimony by Cunnie. Afterwards, defense counsel argued, among other things, that Cunnie's proffered

64

testimony improperly relied on hearsay and double hearsay, such as information obtained "through other officers, through perhaps double hearsay through what other officers derived from witnesses and gang members that they were conversing with, detaining, arresting; through his own instances in which he had detained, made contact with, arrested gang members, and/or conversed with witnesses." Defense counsel also objected to admission of some of the evidence on *Crawford* grounds.

The court thought some of the evidence Cunnie relied on, such as "certified convictions [and] independent evidence of the commission of crimes," was excepted from the hearsay rules. It stated regarding constitutional evidentiary questions that it was "bound by the ruling in [*People v. Gardeley* (1996) 14 Cal.4th 605] that the information relied on by [Cunnie] is not received for its truth." It indicated it would fashion an appropriate jury instruction and that the question for the jury was, "Is the information that [Cunnie's] relying on the sort of information that an expert in his field would reasonably rely on?" The court found that "everything [Cunnie] talked about" at the Evidence Code section 402 hearing was the type of information that someone in his field would reasonably rely on in forming an opinion. It ruled that various types of evidence were admissible in presenting Cunnie's expert testimony, including "the conversations with colleagues, the conversations with people on the street, the reading of police reports, the consulting taped and video audio statements of the defendant or other suspects in related crimes, et cetera, the examining the neighbors for graffiti, all these sorts of things that he talked about seems to me are the type of information that are reasonably relied upon . . . ." The court added, "I understand some of that information may not properly be received for its truth, but only for its effect on the expert."

Before trial, Flowers also objected to the admission, via Cunnie's testimony, of a statement in an exhibit, apparently a police report, that Flowers had been in possession of an assault weapon during a 2008 incident that led to his arrest and conviction for possession of marijuana for sale. Flowers argued this evidence was unduly prejudicial under Evidence Code section 352. The court ruled the evidence was admissible.

At trial, Cunnie testified as a gang expert about matters that we will soon review in greater detail, including the history and primary activities of NSO and its rivalry with Berkeley; the meaning and significance of numerous items and facts that were separately introduced into evidence; whether defendants were NSO gang members in 2009; and whether perpetrators described in a hypothetical based on the prosecution's factual allegations committed crimes for the benefit of a criminal street gang and with the specific intent of promoting or further assisting criminal conduct by gang members.

Defendants renewed their hearsay objections during Cunnie's trial testimony. This resulted in the trial court's admonition to the jury "to understand that an expert is permitted to consider information that might not necessarily be otherwise admissible," including hearsay, and that the court would instruct the jury further about its consideration of the expert's testimony. Defendants also all made a continuing objection to what one counsel characterized as "inadmissible hearsay regarding information [Cunnie] took from reports, police reports, statements from any witnesses, and/or any audiotaped statements he reviewed or jail calls, any audiotape as constituting a violation of [defendants'] Sixth and Fourteenth Amendment right."

The court admonished the jury that Cunnie's "testimony is being offered . . . not as character evidence, not to establish in any way that anybody is a bad person or has a character for violence to commit crime or anything like that. . . . [¶] It's offered very specifically on the question of the gang allegations that are contained in the Information, the charges that have to do with whether or not the crimes that are alleged were committed . . . in association with, in furtherance of, or for the benefit of a criminal street gang." The court added that Cunnie's testimony was also "being received on the question of a motive to commit the charged offenses."

66

After Cunnie testified, the court held a hearing outside the jury's presence to review the prosecution's proffered exhibits. The court admitted all of the exhibits the prosecutor showed to Cunnie that we will discuss, *post*.[32]

## B. The Legal Standards

In *Sanchez*, which the Supreme Court decided three years after the trial of this case, the court created a new paradigm for the presentation of gang expert testimony. (*Sanchez*, *supra*, 63 Cal.4th at p. 679.) Before *Sanchez*, an expert was given the latitude to testify both about general background information and about case-specific out-of-court statements in order to explain the basis for his or her expert opinion, and the court typically would instruct the jury to consider the information for that purpose only, and not for its truth. (*Id.* at pp. 679, 683, citing *People v. Gardeley*, *supra*, 14 Cal.4th 605.) In *Sanchez*, the court eliminated this latitude with respect to case-specific facts, which it defined as facts "relating to the particular events and participants alleged to have been involved in the case being tried." (*Id.* at p. 676.) It reasoned that when no other and competent evidence of those facts is offered, "there is no denying" that the hearsay statements relayed by the expert are being offered for their truth. (*Id.* at p. 684.) Indeed, the jury in *Sanchez* had been instructed that, in assessing the believability of the expert, it " 'must decide whether information on which the expert relied was true and accurate.' " (*Id.* at p. 684; CALCRIM No. 332.) While the jury had also been instructed that the hearsay statements on which the expert relied should not be considered " 'proof that the information contained in those statements was true,' " that instruction was in conflict

---

[32] At the beginning of the hearing, the court stated that to the extent it indicated throughout the hearing that there was "no dispute about an item, essentially, I'm referring to the foundational issues that then had to be satisfied for the item to come into evidence, not to any earlier objections that had to do with [Evidence Code section] 352, prejudice, cumulative, et cetera. If those have been made, they are preserved for the record. [¶] But we do have a whole bunch of items . . . all those previous objections notwithstanding, there is no dispute as to at this time." The court proceeded to admit the exhibits Cunnie commented on that we will soon discuss. Defendants do not now raise issues about their admissibility beyond those we will discuss.

67

with the first one and could not logically have been applied. "[The jury] cannot decide whether the information relied on by the expert 'was true and accurate' without considering whether the specific evidence identified by the instruction, and upon which the expert based his opinion, was also true." (*Sanchez*, at p. 684.) The state law evidentiary rule established in *Sanchez*, simply stated, is that out-of-court statements about case-specific facts may not be relayed by an expert witness unless they fall within an exception to the hearsay rule. Absent an exception, the case-specific facts must be established by competent (non-hearsay) evidence presented by other witnesses and the expert's opinion may be based on a hypothetical question that assumes those facts. (*Ibid*.)

In *Sanchez*, the court also addressed the Sixth Amendment's confrontation clause, as interpreted by the United States Supreme Court in *Crawford* and its progeny. (*Sanchez*, *supra*, 63 Cal.4th at pp. 685–686.) Admission through an expert of hearsay statements concerning case-specific facts, the court opined, not only would violate the Evidence Code but, if the hearsay statements were testimonial and *Crawford*'s exceptions did not apply, would also violate the Sixth Amendment. (*Sanchez*, at p. 685.) A "testimonial" statement is one made when the circumstances objectively indicate there is no ongoing emergency, and the "primary purpose" of the interrogation or other conversation " 'is to establish or prove past events potentially relevant to later criminal prosecution.' " (*Ohio v. Clark* (2015) 576 U.S. ___, 135 S.Ct. 2173, 2179–2180)[33]

The *Sanchez* court established a two-step analysis for determining the admissibility of out-of-court statements. "The first step is a traditional hearsay inquiry: Is the statement one made out of court; is it offered to prove the truth of the facts it asserts; and does it fall under a hearsay exception? If a hearsay statement is being offered by the prosecution in a criminal case, and the *Crawford* limitations of unavailability, as

---

[33] Our Supreme Court has held that testimonial statements "must be made with some degree of formality or solemnity" and have a "primary purpose" pertaining in some fashion to a criminal prosecution. (*People v. Edwards* (2013) 57 Cal.4th 658, 705.)

68

well as cross-examination or forfeiture, are not satisfied, a second analytical step is required. Admission of such a statement violates the right to confrontation if the statement is *testimonial hearsay*, as the high court defines that term." (*Sanchez*, *supra*, 63 Cal.4th at p. 680.)

The *Sanchez* court's hearsay analysis focused on an expert's testimony about the truth of case-specific facts, and not on the expert's reliance on these facts to form his or her expert opinion. The court emphasized that an expert "may still *rely* on hearsay in forming an opinion, and may tell the jury *in general terms* that he did so." (*Sanchez*, *supra*, 63 Cal.4th at p. 685.) "What an expert *cannot* do is relate as true case-specific facts asserted in hearsay statements, unless they are independently proven by competent evidence or are covered by a hearsay exception." (*Id*. at p. 686.) The court also affirmed the long-standing rule that expert witnesses have greater latitude than lay witnesses to testify about "generally accepted background information" (*id.* at p. 676), even when that information is based on hearsay: "In addition to matters within their own personal knowledge, experts may relate information acquired through their training and experience, even though that information may have been derived from conversations with others, lectures, study of learned treatises, etc." (*Id*. at p. 675.) "An expert may . . . testify about more generalized information to help jurors understand the significance of . . . case-specific facts." (*Id*. at p. 676.)

### C. Analysis

Defendants contend that most of Cunnie's expert testimony about their NSO affiliations and related activities was inadmissible. We conclude that, assuming some of his testimony was inadmissible, particularly in light of *Sanchez*, much of it was admissible because it related to his own background or to generalized information acquired through his training and experience, or represented his expert opinion about facts established through evidence that was admitted at trial independent of his testimony. We first describe the testimony of Cunnie that was admissible.

#### 1. *Background Information*

Cunnie testified that he had been a police officer with the Oakland Police Department for four and a half years ending in 2011, and was at the time of trial an officer with the San Francisco Police Department. He began his work in Oakland patrolling East Oakland and was moved to North Oakland in 2008, where he patrolled for about six months (as well as for a brief time later). He was then assigned to a North Oakland "problem-solving officers unit," where he worked for most of the remainder of his time with the department, during which "we encountered a lot of gang activity." Cunnie received training regarding gangs from the statewide police academy, the Alameda County Sheriff's Department, the California Narcotics Officers Association, San Francisco's gang task force, the Los Angeles City Attorney's Office and senior members of the Oakland Police Department. He also had helped train officers to investigate gang-related crime. He was allowed to testify as an expert in the identification of gang-related crimes in Oakland, and regarding NSO's rival gangs in Berkeley.

Cunnie testified that he had been involved in at least 15 gang-related investigations in Oakland, had made arrests of gang members in gang-related crimes, had spoken to about 15 people who admitted their association and membership in criminal street gangs and was familiar with signs and symbols used by Oakland gangs. He remained current with Oakland gang culture, trends and habits through 2009. He had assisted the Oakland City Attorney's office throughout that year and part of 2010 in its successful efforts to obtain a civil gang injunction against 15 NSO members. He had previously qualified in the courts of the state as an expert in NSO and Berkeley rival gangs.

## 2. *Information Acquired Through Training and Experience*

Cunnie testified that he was familiar with NSO, which was an informal North Oakland criminal street gang that started in 2001, had about 50 to 60 members, and claimed as "turf" the North Oakland streets with numbers in the 40s, 50s and 60s. NSO gang members primarily engaged in "gang crimes, including assaults, murders, robberies, burglaries [and] drug dealing," as well as assault with firearms, felony evasion from

70

police, armed robbery and ex-felon possession of firearms. Firearms were a "big tool" for NSO gang members, which they used to protect themselves from rival gangs, to intimidate people within their turf and to assault rival gang members.

Cunnie further testified that NSO was an "umbrella gang" with subsets that had an allegiance to it. Its "three major subsets" were "Bushrod, Gaskill, and ASAP/FT." The Bushrod subset was located around Bushrod Park at 59th and Shattuck in North Oakland. Its members sometimes referred to themselves as "Cold Gunnaz," in keeping with the "North Pole-Ice City theme" that NSO members used. Bushrod was the oldest, most established subset of NSO. Gang members' referred to Bushrod as "5-9 . . . or 5900 or the word 'Bushrod.' " Gaskill was centered around Gaskill Street in North Oakland, east of San Pablo Avenue and from 53rd Street to Stanford. ASAP started around 2007, when some members of the "Ghost Town" gang, located around 29th and 30th Streets in Oakland, moved uptown to Apgar Street to sell drugs, and then helped form ASAP. The area around 45th and Market in North Oakland was ASAP gang territory. FT was established before ASAP, but the two later became "kind of became synonymous."

NSO was also known as " 'Ice City' " or " 'the North Pole,' " and NSO gang members referred to themselves as " 'Polar Bears.' " Members used NSO-related graffiti to mark their territory, as indicated in photographs Cunnie took around North Oakland in 2009 and which he reviewed at trial. NSO gang members referred to "cold nights" in North Oakland as meaning "everybody [was] cool with each other." The phrase "NSO 456," sometimes used by gang members, referred to the streets in the 40s, 50s and 60s of North Oakland, and showed the gangs and subsets in those areas all claimed allegiance to NSO.

NSO gang members had NSO-related tattoos, which were "critical" in gang culture because they "show everlasting loyalty to the gang." Gang members also wore NSO-related clothing. For example, ASAP gang members wore "A's" baseball hats, using the "A" symbol to represent ASAP. Gang members commonly memorialized murdered gang members in clothing and tattoos. NSO gang members used "gang hand signs" as a "nonverbal way of communicating allegiance to the gang or showing what

71

gang you're a part of." NSO and some of its subsets, such as ASAP, had their own signs. Cunnie testified about numerous photographs that were admitted into evidence elsewhere during trial that depicted certain persons Cunnie said were affiliated with NSO who had NSO-related tattoos like "Ice City," wore A's hats, wore clothing with NSO-related symbols and made various NSO-related hand signs.

Cunnie further testified that he had talked to "NSO gang members who talk about Berkeley as their rival or that they need to be on the lookout for Berkeley gang members." The story Cunnie had heard most often was that the dispute between the gangs dated back to 2002, when a dispute erupted between an NSO and Berkeley Waterfront gang member and turned violent the following year. In the spring of 2010, Cunnie worked directly with Berkeley police in a two-week joint operation "where we spent time in Berkeley and North Oakland to try and make arrests to curb some of the violence between the two gangs." According to Cunnie, the intersection of 10th and Allston in Berkeley, where Charles was shot to death, was the heart of the Berkeley Waterfront gang territory.

### 3. *Testimony About Evidence Admitted Independent of Cunnie's Testimony*

Under *Sanchez*, Cunnie could testify about his expert opinion regarding evidence that was properly admitted elsewhere at trial, independent of his testimony. (See *Sanchez*, *supra*, 63 Cal.4th at p. 684.) Cunnie testified about two such categories of evidence—evidence that was relevant to defendants' conduct, but which was not specific to a particular defendant, and evidence that was specific to a particular defendant. Cunnie testified about items recovered from defendants and the Cadillac after the crashes. Along with the NSO-related rap lyrics found on Price's and Flowers's phones that we have discussed in the unpublished portion of this opinion, this also included what looked like a funeral flyer for Ngo on which were pictures of Ngo displaying the FT and ASAP hand gang signs, and there were also photographs of Ngo and Bao with one of them displaying gang hand signs. Cunnie said about one of the brothers, "In some of them he was in a group; in some of them he was displaying gang hand signs. Some of the photos . . . ended up on the funeral flyer . . . ."

72

Cunnie also testified about independently admitted evidence that pertained to Anthony, Flowers, Price and Campbell, and indicated each was affiliated with NSO. Regarding Anthony, Cunnie testified that a photograph of Anthony's jail cell wall taken in 2010 showed a handmade drawing with " 'Polar Bear' " written across the top and a head in the center of a $100 bill with the serial number "NP 005900," a possible reference to "North Pole" and the 5900 block of Shattuck, the location of Bushrod Park.[34] Photographs found on Anthony's phone depicted a watch called "Ice Time" and Ngo making an FT gang sign with his right hand. Cunnie also testified that he found photographs on the MySpace page of a third party depicting Anthony wearing a gray hat with an A's symbol, another individual "throwing" the ASAP gang hand sign, and Ngo and Bao.

Cunnie also opined that a number of Anthony's statements during his April 23, 2009 interview with Oakland police—which were admissible—were indicative of his gang activity and his concerns about Berkeley gangs. These included Anthony's statements that "[w]e got problems with Berkeley" and that "[w]e haven't even been riding around with guns lately." Cunnie said a "Bushrod" tattoo on Anthony's right forearm, shown in a photograph, was a reference to Bushrod Park or the Bushrod subset of NSO and showed "allegiance to NSO and particularly the Bushrod subset." Cunnie also said he was aware that Anthony had been convicted of burglary in 2007, which the prosecution established by introducing a certified copy of a court document.

Regarding Flowers, we have already discussed in the unpublished portion of this opinion Cunnie's testimony about the NSO-related rap lyrics found on his phone. Cunnie also testified about numerous photographs indicating Flowers was affiliated with NSO. These included photographs of Flowers's "Ice City" stomach tattoo; a tattoo on his left

---

[34] The reporter's transcript indicates the prosecutor referred to this photograph both as exhibit "263" and "63," and Price's counsel referred to exhibit 263 as well. The record indicates this photograph is exhibit 63. The exhibits list of the reporter's transcript for the relevant volume identifies exhibit 63 as "Color photograph of drawing taped to a wall," while it identifies exhibit 263 as "Bel Harbour Police Department report."

forearm of a $100 bill and the "A's" symbol; tattoos on Flowers's right and left forearms of the terms "bona fide" and "hustler," which, Cunnie said, read together, represented "the values of gang lifestyle," as did Flowers's "dis-honor" tattoo; Flowers displaying the FT and ASAP gang signs; Flowers displaying the ASAP gang sign wearing an A's hat; and Flowers displaying a hand sign Cunnie had seen NSO gang members display. An image of Flowers was also included on the front of the funeral flyer for Ngo.

Cunnie also testified about Flowers's conviction in 2008 for possession of marijuana for sale under Health and Safety Code section 11359. The prosecution introduced a set of certified court documents that established this conviction, which were admitted independent of Cunnie's testimony. Further, those court documents indicate Flowers had weapons when he was taken into custody, as they include the court's pronouncement at sentencing that "[d]efendant's weapons and ammunition are ordered destroyed."

Regarding Price, we have also already discussed in the unpublished portion of this opinion Cunnie's testimony about the NSO-related rap lyrics found on his phone. Cunnie also testified about photographs admitted into evidence elsewhere during trial that depicted a tattoo on Price's left shoulder stating " 'Polar Bear Price' "; a tattoo on Price's right shoulder stating "BRP," a reference to "Bushrod Park"; a tattoo across Price's back stating "Bushrod"; a tattoo stating " 'Loved by few, hated by many, respected by all' " next to a banner stating "5900," which Cunnie interpreted as a reference to the 5900 block of Shattuck; and Price and another individual displaying an NSO gang sign. Also, the prosecution introduced into evidence a certified copy of an abstract of judgment indicating Price was convicted of robbery in 2004. Cunnie testified that shortly after Price was released from prison, Cunnie encountered him as a passenger in a car driven by a third party wearing a "Bushrob" shirt, suggesting gang membership.

Regarding Campbell, Cunnie testified about several photographs that indicated Campbell was affiliated with NSO. These included photographs showing Campbell with a group of individuals, including Bao displaying an FT hand gang sign; a gang tattoo on Campbell's stomach that referred to the 5700 block of Gaskill in North Oakland, Gaskill

74

gang territory; tattoos on Campbell's right and left arms that state " 'Pola,' " an abbreviation for " 'Polar' " and "bear"; and a tattoo on the inside of Campbell's left forearm stating "live now" and "die later" around the drawing of a skeleton, which generally reflected gang values. The prosecution also introduced a certified copy of an abstract of judgment showing Campbell was convicted of robbery in June 2003.

Cunnie's expert testimony about criminal street gang behaviors generally further established that defendants' actions on May 16 were gang-related. As we have already described, evidence admitted independent of Cunnie's testimony established that about three weeks after Ngo's murder, defendants drove together to Berkeley with two semiautomatic assault rifles and a semiautomatic pistol in the car, Flowers exited the car and shot Charles to death as one defendant drove the car in a circle, another shouted in exultation and another held a rifle up in the rear driver-side area of the car, and the four then fled together in the car as Anthony drove recklessly, attempting to evade pursuing police cars at high-speeds, resulting in Perea's and Ross's deaths. Cunnie testified that a gang rival's killing of a gang member is an act of disrespect that in gang culture requires a response to avoid the appearance of weakness. The response often involves use of firearms in the rival gang's territory. Also, "committing crimes with other gang members is common because it's strength in numbers." Further, "[o]ften . . . in this gang rivalry, if they can't find the attended [*sic*] target, they'll settle for someone they know who is associated with their intended target, either a fellow gang member or someone that's associated with them." And if police were to pursue a gang or gang members, "submitting to police control would be a sign of weakness."

At the conclusion of Cunnie's direct examination, the prosecutor asked Cunnie to assume a hypothetical that closely tracked the prosecution's theory of what happened in this case and was supported by admissible evidence. An expert may be asked to assume a hypothetical set of case-specific facts for which there is independent competent evidence and testify about what conclusions can be drawn from those facts. (*Sanchez*, *supra*, 63 Cal.4th at pp. 676–677.) The prosecutor's hypothetical included that criminal street gang members retaliated against a rival gang that had shot at their members a few

75

weeks before, killing one of them, by driving together into the heart of the rival gang territory in daylight and shooting to death the brother of one of the rival gang members using one of the semiautomatic rifles they armed themselves with, and then attempted to evade pursuing police by engaging in a high speed chase that resulted in two other people being killed. The prosecutor asked Cunnie if in his opinion these crimes were committed for the benefit of a criminal street gang and with the specific intent to promote or further assist criminal conduct by gang members. Cunnie answered in the affirmative.

Finally, based on his review of the evidence we have discussed, as well as on his review of case-specific hearsay evidence we will discuss *post*, Cunnie had "no doubt" that Anthony, Flowers, Price and Campbell were NSO gang members in 2009.[35]

### 4. *Defendants' Arguments Regarding Cunnie's Expert Testimony*

Defendants, mindful that Cunnie's expert testimony about NSO, criminal street gang activities, defendants' NSO affiliations and their gang-related activities was an important part of the People's case against them, argue that virtually all his testimony was based on case-specific and/or testimonial hearsay and thus was inadmissible under *Sanchez* and *Crawford*. We conclude defendants fail to establish error regarding some of these claims, and that errors they do identify were harmless in light of the admissible, devastating evidence of their NSO activities and participation in the murders of Charles, Perea and Ross.

#### a. Defendants Do Not Establish Error Regarding Some Claims.

Defendants incorrectly challenge five categories of testimony by Cunnie as based on inadmissible hearsay.

First, they raise *Sanchez* challenges to some of the evidence we have recounted above that was admissible background information based on Cunnie's training and experience or evidence admitted elsewhere during trial independent of Cunnie's

---

[35] As we will discuss, Cunnie should not have testified about this case-specific hearsay under *Sanchez*, but he could rely on it to state his opinion about defendants' gang membership. (*Sanchez*, *supra*, 63 Cal.4th at p. 685.)

testimony. Specifically, they challenge Cunnie's discussion of the general history of the violent rivalry between NSO and the Berkeley gang, including information Cunnie obtained from other officers, investigators and purported gang members, which the prosecutor referred to in his hypothetical. Defendants are incorrect.

The *Sanchez* court stated with regard to background information that "experts may relate information acquired through their training and experience, even though that information may have been derived from conversations with others, lectures, study of learned treatises, etc. This latitude is a matter of practicality. A physician is not required to personally replicate all medical experiments dating back to the time of Galen in order to relate generally accepted medical knowledge that will assist the jury in deciding the case at hand. An expert's testimony as to information generally accepted in the expert's area, or supported by his own experience, may usually be admitted to provide specialized context the jury will need to resolve an issue. When giving such testimony, the expert often relates relevant principles or generalized information rather than reciting specific statements made by others." (*Sanchez*, *supra*, 63 Cal.4th at p. 675.) Accordingly, *Sanchez* "does not call into question the propriety of an expert's testimony concerning background information regarding his knowledge and expertise and premises generally accepted in his field. . . . Thus, our decision does not affect the traditional latitude granted to experts to describe background information and knowledge in the area of his expertise." (*Id*. at p. 685.)

In distinguishing between case-specific facts, which an expert may not relay, and background information as to which she may, the court gave as an example of the latter testimony that a "diamond is a symbol adopted by a given street gang." (*Sanchez*, *supra*, 63 Cal.4th at p. at p. 677.) The court indicated it could be established that a person has a diamond tattoo through testimony of a witness who saw the tattoo or an authenticated photograph, and the expert could opine that the presence of a diamond tattoo shows the person belongs to the gang. (*Ibid.*) The *Sanchez* court also stated that the expert in the case before it could testify "based on well-recognized sources in [the expert's] area of expertise" "about general gang behavior or . . . the Delhi gang's conduct and its

77

territory," which was "relevant and admissible evidence as to the Delhi gang's history and general operations." (*Id.* at p. 698.) Since *Sanchez*, California appellate courts have held that expert testimony about "the general attributes of the . . . gang, such as the gang's culture, the importance placed on reputation and guns, . . . the gang's rivals and claimed turf, the use of monikers and identifying symbols, and the like, [are] permissible as expert background testimony." (*People v. Iraheta* (2017) 14 Cal.App.5th 1228, 1247; *People v. Meraz* (2017) 6 Cal.App.5th 1162, 1175 [expert may provide general background testimony about gang's operations, primary activities and pattern of criminal activities].)

Here, given the nature of Cunnie's expertise, his training and experience were developed in the streets and in the police stations of North Oakland. Under *Sanchez*, he was not required to personally replicate all investigations dating back to the inception of the NSO-Berkeley gang rivalry in 2002 in order to relate general information about those two gangs and their rivalry. Under *Sanchez*, Cunnie's description of the two gangs' activities and their rivalry was admissible even though it was to a large extent derived from conversations with others or the review of police reports. Further, although not required, the fact of the rivalry is corroborated by other admissible evidence, such as Anthony's April 23 statements to Oakland police and testimony by Sergeant Emily Murphy of the Berkeley Police Department. Murphy indicated a joint task force was formed in the spring of 2009 "to address the violence that was going on between . . . groups . . . in South Berkeley and West Berkeley and in North Oakland."

Second, defendants contend that Cunnie testified about certain facts based on other inadmissible hearsay, including testimonial hearsay, such as his "discussion of tattoos, writings and media pages." Although vaguely stated, this appears to be an attack on Cunnie's extensive testimony about photographs of defendants' tattoos and gang signs. This argument fails because Cunnie did not rely on hearsay to testify that defendants had the tattoos or made the hand signs in question. Rather, he relied on other evidence that defendants do not contend was inadmissible. As we have already indicated, Cunnie testified about a number of photographs for each defendant that the prosecution proffered

78

elsewhere during trial, and the court admitted all of the photographs shown to Cunnie that we have discussed. Specifically, as we have discussed, after Cunnie testified, the court held a hearing outside the presence of the jury in which it admitted these exhibits without defendants making any objections relevant to the issues before us. Defendants do not challenge the court's admission of any of these photographs on appeal. Cunnie's testimony about the significance of these tattoos and gang signs was similar to that identified as admissible background information in *Sanchez*; he testified that particular tattoos and hand signs were used to convey allegiance to the NSO gang and its subsets.

Third, defendants Flowers, Price and Campbell complain about Cunnie's testimony regarding Anthony's statements to Oakland police on April 23, 2009, as inadmissible testimonial hearsay. As we have already discussed, the court did not err in admitting Anthony's statements during trial, and instructed the jury that it was to consider these statements as to Anthony only. Cunnie testified about the import of these statements, but did not assert that his observations applied to Flowers, Price or Campbell. In other words, he merely testified about evidence that was properly admitted independent of his testimony, and nothing more. (See *Sanchez*, *supra*, 63 Cal.4th at p. 684.)

Fourth, Flowers contends Cunnie testified about the primary activities of NSO based on police reports, apparently contending these reports were inadmissible case-specific hearsay. We must presume all intendments and presumptions in favor of the judgment, and " ' "on matters to which the record is silent, error must be affirmatively shown." ' " (*People v. Giordano* (2007) 42 Cal.4th 644, 666, quoting *Denham v. Superior Court of Los Angeles* (1970) 2 Cal.3d 557, 564.) This particular argument fails because the record is silent on the source of Cunnie's information, since none of the defendants specifically objected to this portion of Cunnie's testimony. Cunnie was not asked about his sources, and Flowers does not offer any citation to the record that

establishes that Cunnie relied on police reports.  Therefore, error has not been affirmatively shown.[36]

Fifth, Anthony similarly argues that Cunnie improperly relied on a 56-page "Gang Predicate Report" that he prepared to refresh his recollection during his testimony about police contacts and crimes involving Anthony and other gang members in 2007 and 2008. Cunnie could review this document to refresh his recollection so long as he did not testify about its contents.  He did not testify about its contents; nor was it admitted.  *Sanchez* is concerned with an expert's *testimony* about case-specific hearsay, not an expert's *reliance* on such information.

### b.  The Error Defendants Identify Is Harmless.

Defendants challenge various other aspects of Cunnie's testimony that come closer to, or undeniably were, based on case-specific and in some instances testimonial hearsay.

---

[36] Cunnie's testimony about NSO's primary activities was presented to establish that NSO qualified as a "criminal street gang" as defined by section 186.22, since gang allegations (e.g., §§ 186.22, subd. (b); 190.2, subd. (a)(22); 12022.53, subd. (e)) apply only where a gang so qualifies.  A criminal street gang is in relevant part "any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities" the commission of one or more of the criminal acts enumerated in section 186.22, subdivision (e)(1) to (25) or (31) to (33) and whose members engage or have engaged in a "pattern of criminal activity."  (§ 186.22, subd. (f).)  A "pattern of criminal gang activity" is "the commission of, attempted commission of, conspiracy to commit, or . . . conviction of two or more of" the enumerated offenses, which include burglary and unlawful homicide, where one occurred after the effective date of the statute and the last "occurred within three years after a prior offense, and the offenses were committed on separate occasions, or by two or more persons."  (§ 186.22, subd. (e)(3), (11).)  It need not be proved that the predicate offenses used to establish this pattern of criminal activity were gang related.  (*People v. Gardeley*, *supra*, 14 Cal.4th at pp. 621–622, disapproved on another ground in *Sanchez*, *supra*, 63 Cal.4th at p. 683, fn. 13.)  Further, evidence of present criminal acts is admissible to establish the "primary activities" requirement.  (*People v. Sengpadychith* (2001) 26 Cal.4th 316, 323.)  Even if Flowers had shown that Cunnie's "primary activities" testimony was based on inadmissible police reports, any error in admitting it would have been harmless.  Other evidence, including Anthony's 2007 burglary conviction and defendants' murders of Charles, Perea and Ross, established NSO's status as a criminal street gang, and this part of Cunnie's testimony was therefore cumulative.

80

This includes Cunnie's testimony of his understanding that defendants had certain contacts with legal authorities and committed certain criminal acts not shown by admissible evidence that indicated an affiliation with NSO[37]; that Ngo was an NSO member who helped start ASAP, that certain other individuals were NSO members and committed NSO-related crimes, and that certain NSO members were killed in incidents that were a part of the NSO-Berkeley gang rivalry; that there had been a shooting attack on Charles and others earlier in May at a liquor store in the Berkeley Waterfront gang's territory and a shooting incident involving an NSO member in the early morning hours of May 8, 2009, in Oakland; and that Jermaine and other people Anthony identified in his May 18 statements to Oakland police were Berkeley gang members. Many of defendants' *Sanchez* and *Crawford* arguments to Cunnie's testimony about these matters have merit, at a minimum because this challenged testimony was not based on admissible evidence or personal experience and, therefore, was case-specific hearsay. Cunnie testified before *Sanchez* and, accordingly, was permitted to testify about this case-specific hearsay to explain the basis for some of his opinions under *People v. Gardeley.* In some instances, the hearsay was testimonial and its admission violated *Crawford*.

However, we will not address defendants' contentions on the merits because, assuming it was error to admit all of this testimony, these errors were harmless beyond a reasonable doubt. The admissible evidence we have already discussed, both that to which Cunnie properly testified and that which was admitted elsewhere during trial through other witnesses and exhibits, overwhelmingly proved defendants' guilt of the

---

[37] Also, Flowers claims on appeal that Cunnie's testimony about his 2008 arrest for possession of marijuana for sale and possession of a submachine gun should have been excluded under Evidence Code section 352 because it was overly prejudicial to him. We do not address this argument in light of our conclusion that this evidence should have been excluded as case-specific hearsay. However, Flowers's 2008 conviction for possession of marijuana for sale was established by certified court documents that were admitted elsewhere during trial. Further, those court documents indicate Flowers had weapons when he was taken into custody, as they include the court's pronouncement at sentencing that "[d]efendant's weapons and ammunition are ordered destroyed."

81

offenses with which they were charged and the related enhancements. True, the inadmissible hearsay and testimonial hearsay evidence about which Cunnie testified made the case against defendants even stronger. But even without it the jury was presented with a compelling case that defendants together committed the NSO gang-related first degree murder of Charles and second degree murders of Perea and Ross.

For example, phone records show constant communications among three of the four defendants in the weeks and days leading up to the murders.[38] Three weeks after the murder of Ngo, an NSO gang member,[39] and the attempted murders of Anthony and Bao during the same incident by individuals Anthony suspected were Berkeley gang members, the four defendants drove together with two assault rifles and a handgun into the heart of the Berkeley gang's territory. Flowers brutally executed Charles, who was the brother of a reputed Berkeley gang member (as indicated by the testimony of Charles's sister and Oakland Police Sergeant Fleming), as the other defendants visibly demonstrated their support. Flowers's intent to murder Charles was obvious from his firing at least 17 shots at Charles. Any idea that Flowers acted alone or intended only to assault Charles is belied by this murderous barrage coupled with the celebratory acts of Anthony, Price and Campbell. The four then fled together in Anthony's Cadillac as Anthony drove recklessly, attempting to evade the police at high speeds, leading to the collisions and deaths of the two other victims. In light of these facts, all of which were amply proved by admissible evidence, any error was harmless beyond a reasonable doubt under *Chapman v. California* (1967) 386 U.S. 18, 24.[40]

---

[38] The parties do not indicate that there is any evidence one way or the other about any of these three defendants' cell phone communications with Campbell, whose phone was not among those recovered at the time police apprehended Price and Anthony.

[39] Regardless of Cunnie's hearsay testimony about Ngo's membership in NSO, Ngo's membership in NSO is apparent from Anthony's April 23, 2009 statements to police and from exhibits Cunnie testified about that were admitted elsewhere during the trial, which we have already discussed.

[40] As we have discussed, the court erred by admitting Anthony's May 18, 2009 statements to Oakland police in violation of Anthony's *Miranda* rights; therefore it was

82

# VIII.

### *There Was Substantial Evidence to Support Price's Conviction for the First Degree Murder of Charles*.

Price argues there is insufficient evidence to support his conviction for the first degree murder of Charles because the only evidence against him was his NSO gang affiliation and his presence in the Cadillac when Flowers shot Charles. He contends this conviction, as well as his convictions for the murders of Perea and Ross as the natural and probable consequences of the murder or assault upon Charles, must be reversed. We disagree.

" ' "In assessing a claim of insufficiency of evidence, the reviewing court's task is to review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] . . . The standard of review is the same in cases in which the prosecution relies mainly on circumstantial evidence. [Citation.] ' "Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court[,] which must be convinced of the defendant's guilt beyond a reasonable doubt. ' "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment." ' " ' " ' " (*People v. Tully* (2012) 54 Cal.4th 952, 1006–1007.) In other words, we " 'presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence. [Citation.] . . . A reversal for insufficient evidence "is unwarranted unless it appears 'that upon no

---

also error to allow Cunnie to testify about these statements. However, for the reasons we have already stated, the erroneous admission of this evidence was harmless as to Anthony, as well as to the other defendants. Cunnie's testimony about these statements is harmless for the same reasons.

hypothesis whatever is there sufficient substantial evidence to support' '' the jury's verdict.' '' (*People v. Manibusan* (2013) 58 Cal.4th 40, 87.)

Typically, we consider " 'three categories of evidence relevant to resolving the issue of premeditation and deliberation:  planning activity, motive, and manner of killing.' '' (*People v. Steele* (2002) 27 Cal.4th 1230, 1249.)  These need not be present in some special combination nor accorded particular weight, and the list is not exhaustive. (*Ibid*.)  All three categories are present here.

As we have already discussed, there is strong evidence that Price was affiliated with NSO.  Cunnie testified, based on certified records of conviction, about Price's commission of a crime of a kind that was one of the primary activities of NSO.  Cunnie testified about photographs admitted during the trial that showed Price's NSO-related tattoos and his use of an NSO gang hand sign, which Cunnie said demonstrated Price's allegiance to NSO.  Further, Price's cell phone included songs with lyrics that explicitly referred to NSO subsets and described gang-related violence.  (See footnotes 15 to 18, *ante*.)

As we have also discussed, there was significant evidence, including but not limited to Cunnie's testimony, that Price and the others acted together, whether as perpetrator and aiders and abettors or conspirators, in a willful, premeditated and deliberate murder of Charles.  Police found Price and Anthony at the scene of the collisions and found Price's cell phone on his person.  His, Anthony's and Flowers's cell phones reflected hundreds of communications between them in the two weeks leading up to the murder.  The victim of the shooting, Charles, was the brother of reputed Berkeley gang member Jermaine.  There was strong circumstantial evidence that defendants acted together in the killing of Charles and that they shot him in retaliation for the Berkeley gang's suspected murder of Ngo and attempted murder of Anthony and Bao a few weeks earlier—events that were fully consistent with a long-standing violent conflict between the gangs.  This includes the celebratory gestures made by Anthony, Price and Campbell as Flowers fired a barrage of bullets at Charles, the proximity in time between Ngo's

84

murder and the murder of Charles, and that defendants drove together armed into the heart of the Berkeley gang's territory.

In contending there is no substantial evidence that he encouraged or facilitated the murder or assault of Charles, or conspired to commit either of these crimes, and that his NSO affiliation and "mere association" with the other defendants are insufficient to support his convictions, Price relies on, among other cases, *Mitchell v. Prunty* (9th Cir. 1997) 107 F.3d 1337, 1338, overruled on another ground in *Santamaria v. Horsley* (9th Cir. 1998) 133 F.3d 1242, 1248. *Mitchell* and the other cases Price has cited are inapposite. *Mitchell*, for example, involved a series of escalating hostilities between rival gangs, which led to an impromptu confrontation in which the victim was shot by an unknown person; defendant and others escaped in two cars, one of which ran over the victim and killed him. (*Mitchell*, at pp. 1338–1339.) The Ninth Circuit held there was insufficient evidence to convict defendant of the murder because he could not have planned the impromptu confrontation, and no evidence suggested he helped in the victim's death. (*Id*. at pp. 1341–1342.)

Here, by contrast, there was nothing impromptu about defendants' encounter with and Flowers's killing of Charles, and the jury could reasonably infer from the circumstantial evidence we have discussed that Price aided and abetted, or conspired, to execute Charles.[41] Further, a barium and an antimony particle, and several lead particles, were collected from the back of Price's right hand around the time of his arrest. According to an expert presented by the People, this combination was characteristic of

---

[41] Price confuses things in two ways. First, he points out that the prosecutor asserted in closing argument that defendants were "trading places" in the Cadillac. However, the prosecutor appears to have asserted this because McCluskey saw *Anthony* in the front passenger's seat of the car at the scene of the shooting and Officer Lee saw him driving the car a short time later. Price was the only person observed in the rear driver-side seat, the area from which the gun was held aloft. Second, Price notes that McCluskey saw Anthony lunge out of the Cadillac, not Price. However, McCluskey saw Anthony lunge out from the front passenger seat and yell in jubilation. This was different from what Kelly saw, which was someone holding aloft a long gun from the rear driver's side of the vehicle.

gunshot residue, as "[t]here are very, very few other items that create that specific combination of elements and morphology." It can be reasonably inferred from this evidence that Price either fired a gun himself or held the assault rifle Flowers had used to kill Charles. This evidence also indicates Price was not a passive passenger present at an unexpected murder but an active participant in a planned murder.

The same is true of the police officer's testimony that Price was wearing a piece of T-shirt around his neck when he was arrested; two other such pieces were found in the Cadillac after the crashes and, as we have discussed, Flowers wore a mask made of some sort of fabric when he shot Charles. Cunnie testified that gang members wore such items as masks during attacks. Under the circumstances, the jury could reasonably infer from the mask that Price knew of the murder plan beforehand.

Price also argues that there is "no evidence whatsoever of any advance planning to kill Charles," who was not even a gang member, and, therefore, Price should not have been convicted of first degree murder. Again, we disagree. The phone records introduced at trial show Price in constant contact with Flowers (and Flowers was in constant contact with Anthony as well) in the two-week period leading up to the murder. Further, defendants drove to Berkeley with heavy weaponry, which suggests planning and premeditation. Far less evidence has been held sufficient to support a finding of premeditation. (See *People v. Wharton* (1991) 53 Cal.3d 522, 547 [the defendant's retrieval of tool used to murder victim showed planning].) Further, first degree murder requires that there be some element of willfulness, deliberation and premeditation, but "[t]he process of premeditation and deliberation does not require any extended period of time. 'The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly . . . .' " (*People v. Mayfield* (1997) 14 Cal.4th 668, 767, disapproved in part on another ground in *People v. Scott* (2015) 61 Cal.4th 363, 390, fn. 2.) It can be reasonably inferred from the evidence of defendants' travel into the heart of the Berkeley gang's territory with assault weapons not long after the murder of Ngo and the possible attempted murder of Anthony and Bao, as well as from their conduct

during the shooting, that defendants together selected Charles as the target of their vengeance and executed him in a willful, deliberate and premeditated manner.

In short, Price's contention that there was insufficient evidence to convict him of the first degree murder of Charles lacks merit.

**IX.**

***Defendants' Prosecutorial Misconduct Claims Are Either Forfeited, Meritless, or About Harmless Misconduct.***

All four defendants contend the prosecutor engaged in prejudicial misconduct in closing argument, and Anthony adds the alternative ground that, should we decide he has forfeited any of these claims, he received ineffective assistance of counsel (IAC). The People respond that defendants have forfeited many of these misconduct claims by failing to object and failing to propose curing admonitions in the trial court, and that defendants' claims lack merit. We conclude defendants have forfeited many of their claims, the prosecutor for the most part did not engage in misconduct and, to the very limited extent he did, the misconduct was harmless under any standard. We also reject Anthony's IAC claim.

Generally, "[a] prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process. Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury." (*People v. Morales* (2001) 25 Cal.4th 34, 44.) When a misconduct claim addresses "comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." (*Ibid*.) We presume "that 'the jury treated the court's instructions as statements of law, and the prosecutor's comments as words spoken by an advocate in an attempt to persuade.' " (*Id*. at p. 47.)

In general, a defendant may not raise a prosecutor misconduct claim on appeal unless there was a timely misconduct objection and a request for a jury admonishment to

disregard the impropriety in the trial court. (*People v. Young* (2005) 34 Cal.4th 1149, 1184–1185.) However, if an objection would have been futile or an admonition would not have cured the harm, the misconduct is cognizable on appeal even if there was no objection in the trial court. (*Id*. at p. 1188.)

As for the merits of a misconduct claim, we bear in mind that "the prosecutor has wide latitude in describing the deficiencies in opposing counsel's tactics and factual account. [Citations.] . . . Misconduct claims also have been rejected where . . . the prosecutor criticizes the defense theory of the case because it lacks evidentiary support." (*People v. Bemore* (2000) 22 Cal.4th 809, 846.) However, a prosecutor cannot engage in certain conduct during closing argument. This includes personally vouching for a witness (*People v. Williams* (1997) 16 Cal.4th 153, 257), commenting on facts not in evidence (*People v. Hill*, *supra*, 17 Cal.4th at pp. 827–828), expressing a personal opinion regarding a defendant's guilt where there is substantial danger that jurors will interpret this as being based on information other than evidence adduced at trial (*People v. Thomas* (2011) 51 Cal.4th 449, 487), attacking the personal integrity of, or casting aspersions on, defense counsel (*Hill*, at p. 832), and commenting directly or indirectly on a defendant's failure to testify, so-called "*Griffin*" error (*Griffin v. California* (1965) 380 U.S. 609; see *People v. Sanchez* (2014) 228 Cal.App.4th 1517, 1524). Defendants claim the prosecutor engaged in each of these kinds of misconduct.

Specifically, Anthony contends that the prosecutor improperly vouched for the prosecution's gang expert, Cunnie, when he described him as "an extremely gifted, talented officer." Anthony has forfeited this claim by failing to object below. He summarily contends any objection would have been futile in light of the trial court's rejection of other objections, but we do not think the court's rulings demonstrate futility, and we fail to see how this could be the case for defendants' numerous contentions on appeal, which involve a variety of evidence and circumstances. Therefore, we reject Anthony's and the other defendants' futility arguments to this and the other instances in which they did not object to statements by the prosecutor in closing argument. As for the merits of this particular statement, the prosecutor made it in the middle of summing up

Cunnie's credentials and experience from evidence in the trial record. The statement came within the wide latitude we are to afford counsel in closing argument, and it is unlikely that the jury understood the comment as personal vouching under these circumstances.

Next, Anthony and Flowers contend the prosecutor improperly referred to evidence presented at trial that in 2010, in a case in which Cunnie participated, a superior court issued an injunction limiting the activities of 15 people determined to be NSO gang members. Speaking of these 15 people, the prosecutor said, "And there has to be some evidence that they're connected to the gang, that they will present a threat. [¶] I mean a judge—it's all before a judge. I mean this is vetted. This is examined and analyzed, and both sides are allowed to present testimony. And 15 people were determined to be [NSO] gang members, and conditions were imposed, and John Cunnie was a part of that. You know John Cunnie, he's proactive." Defendants contend the prosecutor improperly referred to evidence not available to the jury to argue that "the gang issue had already been settled in a judicial proceeding, where evidence was critically examined, and approved by a judge."

Again, defendants forfeited this claim by failing to raise it below. As to the merits, the prosecutor's remarks were little more than statements of the obvious—that a court had issued an injunction in the course of a court proceeding that allowed for the presentation of evidence and argument. Cunnie testified to that effect when he indicated regarding the specific NSO members enjoined that evidence presented over the course of several months to the judge. This too was a proper statement within the wide latitude we are afford to counsel.[42]

---

[42] To the extent Cunnie testified from hearsay about the court's enjoining of specific NSO members in 2010, including the stay of the court's injunction against defendants, it was harmless error for the same reasons we have stated in our discussion of Cunnie's other hearsay testimony. To the extent the prosecutor erred by referring to this improperly admitted testimony, it was harmless for the same reasons.

Next, Anthony, Flowers and Price claim the prosecutor engaged in misconduct when he stated, "We know there was a lot of work done in this case. And when you think about the logistics—I mean I presented you with, you know, probably over 300 exhibits in this case. That, believe it or not, was just a fraction of the evidence that was recovered in this case." Defense counsel for Flowers and Campbell objected, and the court overruled the objections. Defendants contend the prosecutor impermissibly suggested the existence of facts damaging to the defense that were not in evidence.

Anthony and Price have forfeited their claims on this issue by failing to object below. As for the merits, the prosecutor engaged in misconduct when he referred to evidence purportedly recovered in the case that was not presented at trial. (See *Hill*, *supra*, 17 Cal.4th at pp. 827–828 [prosecutor referring to facts not in evidence was misconduct].) Nonetheless, it was harmless under the state and federal standards for evaluating prejudicial error. The prosecutor did not comment to show how much evidence of defendants' guilt was collected, but rather to show that, despite a "few mistakes" made by the Berkeley police in the case, "[t]here was also a lot of hard work and dedication and devotion put into this case." The prosecutor's comment was very general and did not refer to the nature or quality of this additional evidence. It was of little significance, particularly in light of the powerful evidence of defendants' guilt, which we discuss throughout this opinion.

Next, Anthony argues the prosecutor improperly expressed his personal opinion that defendants were guilty by frequently using the phrase "we know." Anthony contends that, while some of these uses were innocuous, others referred to certain contested facts as true and constituted misconduct. For example, the prosecutor said, "We may not know the contents of the phone calls, but we know there was circumstantial evidence and we know we have direct evidence that there was a conspiracy in this case." Elsewhere, he stated, "Now, we know in this case there's lots of evidence that they aided and abetted and conspired to commit first degree murder, but you don't have to go that far." Anthony also refers to the prosecutor's comment about Ngo's murder that "[w]e know obviously it's gang related. Officer Cunnie tells us that," and about defendants that

90

"we also know from all the evidence that they were going hunting that day. Plain and simple. That's what it was."

This argument also has been forfeited by the failure to object below. Regardless, we find no misconduct. It is plain from the quotes themselves that the prosecutor was commenting on the evidence rather than expressing a personal opinion about a defendant's guilt that the jurors might believe was based on information other than the evidence presented at trial. The prosecutor's use of the phrase "we know" was a manner of speech that did not amount to misconduct.

Next, defendants contend the prosecutor engaged in misconduct by directly or indirectly attacking the personal integrity and character of defense counsel. This includes that the prosecutor stated or implied that defense counsel had engaged in improper tactics when he said that "no one is going to pull the wool over your eyes" and "you have to realize . . . that reasonable doubt is a shield for the innocent . . . not a loophole for the guilty"; that there was "the suggestion in this case" that the police officer who testified about Price's efforts to get away at the scene of the crash "was a liar"; that, as the prosecutor was taught in law school, when the facts and law are against you, "bang the table," "[c]reate a distraction," and "[a]ttack the prosecutor"; that defense counsel, while "experienced," "skilled," "doing the best that they can," and "good people," had one big problem—"[t]heir clients are guilty as sin" and so "are trying to divert [the jury's] attention" because "[t]hey don't want [jurors] to look into the eyes of these men and see the evil in these eyes"; that defense counsel had been "unfair" to say in opening statement that counsel was going to make the prosecution witnesses "shake and rattle"; that the prosecutor was going to explain the law because "yesterday defense did their best to either ignore the law or make it confusing or take it out of context"; that the suggestion by Price's counsel that the prosecutor conspired with police, essentially told them what to say and had an entire floor of staff working with him was "a farce" and "absolutely untrue and unfair"; and that the defense versions of the evidence were "not only unreasonable, they're insulting to anybody with common sense and intelligence."

91

Defendants' contentions regarding these statements fall short for multiple reasons. First, and most importantly, defendants forfeited their claims regarding these comments by their failure to object below and to offer curing admonitions to the court. (*People v. Young*, *supra*, 34 Cal.4th at pp. 1184–1185.)

Second, even if we consider the merits, these comments were not misconduct. The prosecutor made his statements as critiques of defense counsel's arguments and tactics, and not as attacks on defense counsel themselves. Also, we must view the prosecutor's statements in light of defense counsel statements in closing argument the day before. (See *People v. Frye* (1998) 18 Cal.4th 894, 978 ["In addressing a claim of prosecutorial misconduct that is based on the denigration of opposing counsel, we view the prosecutor's comments in relation to the remarks of defense counsel, and inquire whether the former constitutes a fair response to the latter"], disapproved in part on another ground in *People v. Doolin*, *supra*, 45 Cal.4th at p. 421, fn. 22.) Price's counsel was particularly aggressive in his argument. He suggested the prosecutor was "overzealous," and said it was "clearly disingenuous," "clearly dishonest," and "outrageous" for the prosecutor to suggest that Price may have fired a weapon during the shooting of Charles, even though gunshot residue was found on Price's hand. He argued the prosecutor advanced theories of the case based not on evidence, but on "his disparaging remarks against my client and these other young men . . . like despicable, dastardly, cowardly, more recently, snakes in the grass, low-down, despicable as it gets," and asserted "[t]he District Attorney's case is based on passion and prejudice." Most notably, Price's counsel sharply attacked the integrity of the prosecutor (as well as all of the testifying police officers). Price's counsel, after contending that the prosecutor had more resources than the four defendants, including "an entire office up there on the 9th floor" with "inspectors" and "law clerks," and was "at the top of the food chain," contended the prosecutor had improperly coached all of the testifying police officers, whose testimony made up much of the prosecution's evidence. Specifically, Price's counsel stated that the testifying police officers "say pretty much what [the prosecutor] tells them to say" (to which the trial court overruled the prosecutor's objection).

92

A number of the prosecutor's statements that defendants contend attacked their counsels' credibility and character were not as sharp as and/or were a fair response to these attacks, such as that the defense versions of the evidence were "not only unreasonable, they're insulting to anybody with common sense and intelligence," and that "yesterday defense did their best to either ignore the law or make it confusing or take it out of context." (See *People v. Edwards*, *supra*, 57 Cal.4th at pp. 738–739 [prosecutor's rebuttal to defense counsel's characterization of his argument as "derisory" was fair]; *People v. Frye*, *supra*, 18 Cal.4th at p. 978 [prosecutor did not personally attack defense counsel despite calling defense counsel " 'irresponsible' " and describing the defense theory as " 'ludicrous' " and a " 'smoke screen' " because the focus of the comments was the evidence]; *People v. Medina* (1995) 11 Cal.4th 694, 759 [prosecutor's statements that " ' any experienced defense attorney can twist [and] poke a little, try to draw some speculation, try to get you to buy something' " were "unobjectionable"]; *People v. Sandoval*, *supra*, 4 Cal.4th at p. 184 [prosecutor's statements about defense counsel "were clearly recognizable as an advocate's hyperbole" and not as a charge of fabrication of evidence]; *People v. Huggins* (2006) 38 Cal.4th 175, 207 [prosecutor's statement that defense counsel " 'tried to smoke one past us' " and " 'will come in at the lowest price possible' " was "simply . . . colorful language to permissibly criticize counsel's tactical approach"].)  As for the prosecutor's reference to what he learned "back in law school," our Supreme Court held that a very similar statement was "fair rebuttal" when considered with the defense statements in closing argument.  (*Edwards*, at p. 740 [prosecutor's statement about " 'that . . . old law school deal . . . [,] "If the facts are on your side, you argue the facts.  If the law is on your side you argue the law.  If neither is on your side, you attack your opponent" ' " was "fair rebuttal"].)

Other prosecutor statements that defendants contend attacked their counsels' integrity and character were supported by the record.  For example, they complain that the prosecutor said the defense accused an officer of lying when he testified about Price's efforts to get away after the crashes.  But Price's counsel's contention that the testifying police officers "say pretty much what [the prosecutor] tells them to say" suggested such a

93

lie, and was made in part regarding this officer's testimony. Similarly Campbell's counsel in his opening statement *did* say regarding three prosecution witnesses, "Please listen very carefully to the testimony of each and every one of those witnesses because *they're gonna rattle; they're gonna shake.*" (Italics added.) Therefore, the prosecutor's reference to this was appropriate.

It is concerning that the prosecutor referred to defendants as "guilty as sin" and to the "evil" in the defendants' eyes, but such hyperbolic language has been allowed by our Supreme Court. (See *People v. Harrison* (2005) 35 Cal.4th 208, 246 [prosecutor's references to the defendant's " 'utter evil,' " that the defendant was " 'the complete and total essence of evil,' " and to " '[t]he layers of evil within [the defendant] surrounding a cold unyielding heart' " did not exceed "the permissible scope of closing argument"].) Further, the prosecutor made the statements less to attack defendants than to argue that the sharp attacks defense counsel had leveled at the prosecutor the day before were a diversion designed to prevent the jury from focusing on defendants' guilt. Under the circumstances, we do not think these comments exceeded the permissible scope of closing argument.

Anthony also challenges the prosecutor's remarks in defense of the People's eyewitness to Charles's shooting, McCluskey. McCluskey was subjected to much cross-examination by the defense regarding his various statements to police and his testimony. He also was a significant focus of closing argument, particularly by Flowers's counsel, who contended for a variety of reasons that McCluskey was an unreliable, "protective witness" who tried too hard to explain his supposedly flawed testimony. In rebuttal, the prosecutor argued that McCluskey was "subject[ed] to . . . humiliation and degradation" by defense counsel, who "were attacking and berating and mocking" him; that McCluskey was "protective" on the witness stand just as jurors would be if "you were attacked at your core, suggesting you were a liar, that you fabricated all these different parts of evidence," and then had to "go back home . . . and in the interim worry and wonder if . . . the next target might be you at some point."

94

Flowers's counsel objected, stating the prosecutor's remarks were "highly objectionable." The court responded, "I have to say [Price's counsel] set the bar a little bit low yesterday with some of his comments, so we're all grownups here. That's all I have to say." The court was apparently referring to several sharp comments by Price's counsel the day before that we have already described. We agree with the implication of the court's response that the prosecutor's remarks were less hyperbolic than the ones directed at him the day before, however hyperbolic the prosecutor's remarks may have been. Further, defendants do not show the prosecutor said anything that attacked their counsel's personal integrity or character, or was not based on the evidence.

Regarding the prosecutor's remarks about the defense treatment of McCluskey, the record indicates some aspects of the defense's extensive cross-examination of him, particularly by Flowers's attorney, were contentious as the defense probed inconsistencies between McCluskey's recollection at trial and past statements he had made. Indeed, the court felt it necessary to tell everyone to "all keep our composure," to tell Flowers's counsel to stop giving "little tiny speeches between the questions," and to comment that Flowers's counsel was "trying to confuse everybody in the room" with his line of questioning. In this context, the prosecutor's remarks about defense counsel's treatment of McCluskey also fell within the wide latitude we afford counsel in closing argument.

Finally, Anthony and Price contend the prosecutor engaged in misconduct by talking about the testimony of Myka Hammock, a counselor at a Bushrod neighborhood recreational center, who testified on Price's behalf. Anthony argues the prosecutor engaged in misconduct when he said Hammock's statement that there was no crime in the Bushrod neighborhood amounted to calling Cunnie "a liar" and was "ridiculous." Anthony forfeited this claim by not raising it below. Furthermore, the prosecutor's remark was in response to Flowers's counsel's assertion that Cunnie (and the prosecutor) had a different "reality" than Hammock in that to Cunnie, "it's all over. Every street is a killing zone. It's all turf. It's all drugs. It's all horrible. . . . In [Hammock's] reality, it

95

isn't."  We do not think there is a reasonable likelihood that the jury construed or applied the prosecutor's remark in an objectionable fashion.  This too was not misconduct.

Anthony also contends the prosecutor wrongly implied that defendants were required to prove their innocence, thereby reversing the burden of proof in violation of their constitutional rights, when he said that Hammock's testimony about Price's good behavior at a local gym was "a sign sort of how desperate the defense is and that there is no defense to this conduct."  Price contends this was a reference to Price's failure to testify prohibited by *Griffin v. California*, *supra*, 380 U.S. 609.  Once more, both defendants forfeited these claims by not objecting below.  Their contentions are also unpersuasive.  The prosecutor's statement was a fair comment on the quality of the evidence Price presented.  (See *People v. Bemore*, *supra*, 22 Cal.4th at p. 846 [prosecutor may criticize "the defense theory of the case because it lacks evidentiary support"].)  The prosecutor did not refer indirectly or directly to the burden of proof or to defendants' failure to testify, and it is not reasonably likely the jury understood his comment as anything other than an argument that the defense evidence was weak.

In short, defendants' claims of prosecutorial misconduct were for the most part forfeited and without merit and, to the very limited extent there was misconduct, it was harmless.  For these reasons, we also reject Anthony's claim that his counsel's failure to object to the prosecutor's statements was ineffective assistance of counsel.

## X.

### *The Court's Instructional Error Under* Chiu *Was Harmless.*

Defendants Anthony, Price and Campbell argue the trial court erred under California Supreme Court case law when it instructed the jury that it could convict them of first degree murder as aiders and abettors to an assault on Charles, the natural and probable consequence of which was first degree murder.  This was one of the prosecution's two theories of liability for count one.  In *People v. Chiu* (2014) 59 Cal.4th 155 (*Chiu*), which was decided after the trial of this case, our Supreme Court rejected the

96

then-existing statutory and doctrinal bases of the natural and probable consequences doctrine.[43] The three defendants contend we must reverse their first degree murder convictions, as well as the jury's related special circumstance findings, because the jury may have relied on this prohibited theory to convict them. The People agree the trial court's instruction was error under *Chiu*, but argue it was harmless because the record indicates the jury convicted the three based on the prosecution's other theory of liability: that they were direct aiders and abettors or conspirators in first degree murder. We agree with the People.

## A. The Relevant Proceedings Below

In his closing argument, the prosecutor asserted that Flowers was the man who shot Charles. He further argued regarding Anthony, Price and Campbell, "the evidence is clearly that they aided and abetted a first degree murder and that they conspired to commit a first degree murder." He also argued that if the jury did not find the three intended to commit first degree murder, it should nonetheless find they aided and abetted in, or conspired to commit, a firearm assault on Charles, the natural and probable consequence of which was Flowers's first degree murder of Charles.

The court instructed the jury regarding both of these theories, including with the use of the court's modification of CALCRIM No. 403. The jury convicted Anthony, Price and Campbell of the first degree murder of Charles. The verdict forms do not indicate on what theory of liability the jury relied.

## B. Analysis

### 1. *The Trial Court Committed* Chiu *Error*.

After the trial, the California Supreme Court held that "a defendant cannot be convicted of first degree premeditated murder under the natural and probable

---

[43] The Legislature subsequently made statutory changes to the application of the natural and probable consequences doctrine to both first and second degree murder in Senate Bill 1437, which went into effect on January 1, 2019. Defendants raise claims regarding the retroactive application of those statutory changes to their three murder convictions, which we discuss in the next subpart.

consequences doctrine . . . .” (*Chiu, supra*, 59 Cal.4th at p. 167.)  The court concluded that, given the vicarious nature of liability under the natural and probable consequences doctrine (*id*. at p. 164), “the connection between the defendant’s culpability and the perpetrator’s premeditative state is too attenuated to impose aider and abettor liability for first degree murder under the natural and probable consequences doctrine, especially in light of the severe penalty involved . . . .” (*Id*. at p. 166.)  Subsequently, an appellate court, relying on *Chiu*’s reasoning, held that an uncharged conspiracy cannot be the basis for first degree murder liability under the natural and probable consequences doctrine. (*People v. Rivera* (2015) 234 Cal.App.4th 1350, 1356.)  Based on this case law, we conclude the trial court erred by instructing that an aider and abettor or conspirator who did not intend to kill could be convicted of first degree murder under the natural and probable consequences doctrine.[44]

## 2. *The Trial Court’s Instructional Error Was Harmless.*

The court’s error was harmless beyond a reasonable doubt.  The record indicates the jury found Anthony, Price and Campbell guilty of first degree murder based on a legally correct theory.

“When a trial court instructs a jury on two theories of guilt, one of which was legally correct and one legally incorrect, reversal is required *unless there is a basis in the record to find that the verdict was based on a valid ground*.”  (*Chiu, supra*, 59 Cal.4th at p. 167, italics added.)  Thus, we affirm a first degree murder verdict when the record demonstrates “beyond a reasonable doubt that the jury based its verdict on the legally valid theory.”  (*Ibid*.)

The jury was presented with the legally correct theory that Anthony, Price and Campbell directly aided and abetted or conspired in Flowers’s first degree murder of Charles.  “Aiders and abettors may still be convicted of first degree premeditated murder

---

[44] The People concede Anthony, Price and Campbell have not forfeited their *Chiu* claims by not raising them below because the court’s instructional error implicates their substantial rights.  Therefore, we address the merits of the *Chiu* claims.

based on direct aiding and abetting principles. [Citation.] Under those principles, the prosecution must show that the defendant aided or encouraged the commission of the murder with knowledge of the unlawful purpose of the perpetrator and with the intent or purpose of committing, encouraging, or facilitating its commission." (*Chiu*, *supra*, 59 Cal.4th at pp. 166–167.) As for conspirators, one who conspires to commit a murder is guilty of first degree murder when a co-conspirator commits the murder. (*People v. Cortez* (1998) 18 Cal.4th 1223, 1237 ["all conspiracy to commit murder is necessarily conspiracy to commit premeditated and deliberated first degree murder"].)

The jury's verdicts indicate beyond a reasonable doubt that the jury relied on this legally correct theory. First, for each of these three defendants, the jury found true the special circumstance allegation that he committed multiple murders. The jury was instructed under CALCRIM No. 702 to consider this special circumstance, as well as the special circumstance of murder while an active participant in a criminal street gang, if it found defendant was an aider and abettor or conspirator in the first degree murder, and not the actual killer. The People had to show beyond a reasonable doubt that such a defendant "acted with the intent to kill" for the jury to find these special circumstances true.[45] The jury's findings that Anthony, Price and Campbell, none of whom was proven to be the actual killer, intended to kill Charles strongly suggests that its first degree murder verdicts for each of them were based on its conclusion that each aided and abetted or conspired to *murder* Charles, not merely to assault him.

Anthony, Price and Campbell argue these jury findings do not necessarily mean the jury found they committed first degree murder. They contend the jury's findings that they each acted with an intent to kill establish only an intent to commit second degree murder and, further, that the jury could have found the natural and foreseeable

---

[45] The jury also found true the special circumstance allegation that Flowers murdered Charles while an active participant in NSO and that the murder was carried out to further the activities of a criminal street gang. The jury was instructed under CALCRIM No. 736 that to make this finding it had to find the actual killer "intentionally killed Charles Davis."

consequence of an intent to commit this more limited crime was the first degree murder of Charles. We disagree for three reasons.

First, as we have already discussed, murder conspirators are necessarily guilty of first degree murder. (*People v. Cortez*, *supra*, 18 Cal.4th at pp. 1237–1238.)

Second, while a person may aid and abet in a second degree murder, the jury was not presented with circumstances that could reasonably support such a conclusion for the three defendants. Every aspect of their conduct indicates they acted with willfulness, deliberation and premeditation to murder Charles, as we have already described. These circumstances indicate they were intent upon murder when they drove together into Berkeley, and were intent upon murdering Charles specifically when they came upon him because of his familial relationship to reputed Berkeley gang member Jermaine. Their actions show planning, motive and a preexisting intent to kill, rather than unconsidered, impulsive actions. Accordingly, the prosecutor emphasized a first degree murder theory in his closing argument to the jury, such as when he asserted, "This was an ambush and an execution. Plain and simple."[46]

Third, the jury's finding that Flowers acted with the intent to kill and its verdict that his killing of Charles was murder in the first degree are powerful indications that its "intent to kill" findings regarding Anthony, Price and Campbell were based on its conclusion that they joined with him to commit first degree murder. On this record, it would have been nonsensical for the jury to conclude that, while Flowers acted with premeditation and deliberation in committing the murder, he was aided and abetted, or in a conspiracy, with three defendants who did not form the intent to kill until the murder occurred. The jury would have had to conclude that Flowers concealed his own

---

[46] Anthony also argues that the prosecutor argued to the jury that the premeditated and deliberate murder of Charles could have been a probable and foreseeable consequence of an intention to aid and abet, or conspire to commit, second degree murder. The record does not support his characterization. Rather, the prosecutor suggested briefly that second degree murder could be the probable and foreseeable consequence of an assault.

murderous intent from Anthony, Price and Campbell as they drove into the heart of the Berkeley gang's territory until the moment Flowers killed Charles, and that each of the three decided on the spur of the moment to aid and abet, or conspire, with Flowers to murder Charles. This despite Flowers's near constant cell phone communications with both Anthony and Price in the days leading up to the murder, and defendants' travel together to the rival Berkeley gang's territory heavily armed and with masks. There is no evidence to support this theory, and the circumstances we have already described make it highly implausible. (See *People v. Guiton* (1993) 4 Cal.4th 1116, 1127 [in evaluating whether a jury verdict was supported by substantial evidence when the jury was presented with both a supported and unsupported factual theory, "[a]n appellate court necessarily operates on the assumption that the jury has acted reasonably, unless the record indicates otherwise"].) Defendants' argument that the jury's "intent to kill" finding was consistent with second degree murder ignores the overwhelming evidence.

Finally, Campbell argues that it cannot be determined from the jury's special circumstance findings whether the jury improperly relied on the natural and probable consequence of assault theory because, although the special circumstance instructions include that the jury must find an "intent to kill," they also state that "[t]he People do not have to prove that the actual killer acted with the intent to kill in order for this special circumstance to be true." Further, although the jurors were instructed only to consider the special circumstance allegations if they had already found the defendant guilty of first degree murder, they could have done so under the improper natural and probable consequence of assault theory. These arguments lack merit in light of the jury's special circumstance findings that each defendant, including Flowers, who the evidence plainly indicated was the shooter, did act with the intent *to kill*. This finding shows that the jury concluded that in firing a barrage of bullets at Charles, Flowers acted to murder him and not merely to assault him.

In short, we conclude the court's instructional error under *Chiu* was harmless beyond a reasonable doubt.

## XI.

***Defendants Cannot Raise Their Senate Bill 1437 Claim in This Appeal.***

Defendants next argue we must reverse both their first and second murder convictions because of recent statutory changes to the application of the natural and probable consequences doctrine (as well as the felony murder rule) to first *and* second degree murder that extend beyond our Supreme Court's holding in *Chiu*, *supra*, 59 Cal.4th 155.[47]  These changes, which the Legislature adopted in 2018 in Senate Bill 1437 and which went into effect on January 1, 2019, ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life.  (Stats. 2018, ch. 1015, § 4; § 1170.95, subd. (a)(3).)  Defendants contend that, since Senate Bill 1437 went into effect while their appeals were pending, they are entitled to reversal of their convictions in this appeal based on the retroactive application of these changes under *In re Estrada* (1965) 63 Cal.2d 740 (*Estrada*).

The People do not disagree that Senate Bill 1437 applies retroactively to defendants' cases.  However, they point out that Senate Bill 1437 also establishes a specific procedure, outlined in section 1170.95, by which those who have been convicted of murder based on a natural and probable consequences theory of liability or felony murder rule may petition the sentencing court to consider the evidence, including new and additional evidence beyond that contained in the record of conviction, and, if appropriate, vacate a murder conviction under the new law.  The People contend defendants can only seek Senate Bill 1437 relief through this petition procedure, and cannot seek relief in this direct appeal.  We agree with the People.

---

[47]  We discuss the issues raised by "defendants" in this section without identifying which defendant raises which issue, or which defendant makes a particular argument in support of an issue, because all of the defendants either raise the issues we discuss or join in them as raised by other defendants.  Specifically, Flowers has submitted extensive briefs that at the very least touch on these issues.  Anthony joins in the Senate Bill 1437 arguments made by the other defendants, and Price does the same.  Campbell joins in the reply brief arguments made by Flowers and Price and the opening brief arguments made by Anthony.

As an appellate court explained in discussing a similar petition procedure for retroactive relief based on changes in sentencing contained in Proposition 47, "[t]here are no constitutional rights involved here:  The right to appeal and the right to pursue recall and resentencing are both statutory." (*People v. Scarbrough* (2015) 240 Cal.App.4th 916, 924–930 (*Scarbrough*) [trial court had no jurisdiction to hear a Proposition 47 petition while appeal was pending].)  Our role, then, is to determine the intent of the Legislature in enacting Senate Bill 1437.  (See *People v. Lara* (2018) 4 Cal.5th 299, 307 (*Lara*) ["In order to determine if a law is meant to apply retroactively, the role of a court is to determine the intent of the Legislature"].)

A recently published Second Appellate District opinion, *People v. Martinez* (2019) 31 Cal.App.5th 719 (*Martinez*), addresses whether a convicted defendant whose case was pending on appeal on January 1, 2019, could seek vacatur of his murder conviction under Senate Bill 1437 in his appeal or was required to file a petition in the sentencing court instead.  We quote extensively from *Martinez* in discussing defendants' Senate Bill 1437 claims.

As for the Legislature's specific statutory changes, "Senate Bill 1437 was enacted to 'amend the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life.' (Stats. 2018, ch. 1015, § 1, subd. (f).)  Substantively, Senate Bill 1437 accomplishes this by amending section 188, which defines malice, and section 189, which defines the degrees of murder, and as now amended, addresses felony murder liability.  Senate Bill 1437 also adds . . . section 1170.95, which allows those 'convicted of felony murder or murder under a natural and probable consequences theory . . . [to] file a petition with the court that sentenced the petitioner to have the petitioner's murder conviction vacated and to be resentenced on any remaining counts . . . .' (§ 1170.95, subd. (a).)

"An offender may file a petition under section 1170.95 where all three of the following conditions are met:  '(1) A complaint, information, or indictment was filed

against the petitioner that allowed the prosecution to proceed under a theory of felony murder or murder under the natural and probable consequences doctrine[;] [¶] (2) The petitioner was convicted of first degree or second degree murder following a trial or accepted a plea offer in lieu of a trial at which the petitioner could be convicted for first degree or second degree murder[;] [¶] [and] (3) The petitioner could not be convicted of first or second degree murder because of changes to Section 188 or 189 made effective January 1, 2019.' (§ 1170.95, subd. (a)(1)–(3).)

"Pursuant to section 1170.95, subdivision (c), the petition shall include, among other things, a declaration by the petitioner stating he or she is eligible for relief based on all three aforementioned requirements of subdivision (a).  A trial court that receives a petition under section 1170.95 'shall review the petition and determine if the petitioner has made a prima facie showing that the petitioner falls within the provisions of this section.' (§ 1170.95, subd. (c).)  If the petitioner has made such a showing, the trial court 'shall issue an order to show cause.' (§ 1170.95, subd. (c).)

"The trial court must then hold a hearing 'to determine whether to vacate the murder conviction and to recall the sentence and resentence the petitioner on any remaining counts in the same manner as if the petitioner had not . . . previously been sentenced, provided that the new sentence, if any, is not greater than the initial sentence.' (§ 1170.95, subd. (d)(1).)  'The parties may waive a resentencing hearing and stipulate that the petitioner is eligible to have his or her murder conviction vacated and for resentencing.  If there was a prior finding by a court or jury that the petitioner did not act with reckless indifference to human life or was not a major participant in the felony, the court shall vacate the petitioner's conviction and resentence the petitioner.' (§ 1170.95, subd. (d)(2).)  Significantly, if a hearing is held, '[t]he prosecutor and the petitioner may rely on the record of conviction or offer new or additional evidence to meet their respective burdens.' (§ 1170.95, subd. (d)(3).)  '[T]he burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing.' (§ 1170.95, subd. (d)(3).)  'If the prosecution fails to sustain its burden of proof, the prior conviction, and any allegations and enhancements attached to the

104

conviction, shall be vacated and the petitioner shall be resentenced on the remaining charges.'  (§ 1170.95, subd. (d)(3).)

"Section 1170.95, subdivision (f) states:  'This section does not diminish or abrogate any rights or remedies otherwise available to the petitioner.' "  (*Martinez*, *supra*, 31 Cal.App.5th at pp. 723-724.)

In *Martinez*, the defendant was convicted of first degree murder.  (*Martinez*, *supra*,  31 Cal.App.5th at p. 722.)  On appeal, he contended that the court should afford him the ameliorative benefits of the recently enacted Senate Bill 1437.  The People argued the defendant was required to seek this relief by filing a petition as allowed under section 1170.95 and could not circumvent that process by seeking retroactive relief in his appeal.  (*Martinez*, *supra*, 31 Cal.App.5th at p. 724.)

The appellate court agreed with the People in an extensive analysis:  "Our Supreme Court recently summarized the principles articulated in *Estrada*, *supra*, 63 Cal.2d 740:  ' "[A]n amendatory statute lessening punishment is presumed to apply in all cases not yet reduced to final judgment as of the amendatory statute's effective date" (*People v. Floyd* (2003) 31 Cal.4th 179, 184, citing *Estrada*, at p. 744), unless the enacting body "clearly signals its intent to make the amendment prospective, by the inclusion of either an express saving clause or its equivalent" (*People v. Nasalga* (1996) 12 Cal.4th 784, 793; see *Estrada*, at p. 747).  This rule rests on an inference that when the Legislature has reduced the punishment for an offense, it has determined the "former penalty was too severe" (*Estrada*, at p. 745) and therefore "must have intended that the new statute imposing the new lighter penalty . . . should apply to every case to which it constitutionally could apply" (*ibid.*).'  (*People v. DeHoyos* (2018) 4 Cal.5th 594, 600 (*DeHoyos*).)

"Two recent California Supreme Court opinions in circumstances analogous to those here point the way to the proper resolution of whether Senate Bill 1437 should be given retroactive effect on direct appeal notwithstanding the bill's enactment of the section 1170.95 petitioning procedure.

105

"In *People v. Conley* (2016) 63 Cal.4th 646 (*Conley*), our Supreme Court considered whether *Estrada*'s holding compelled a conclusion that the Three Strikes Reform Act of 2012, commonly known as Proposition 36, applied retroactively to defendants whose judgments were not yet final. (*Conley*, at pp. 655–656.) The defendant in *Conley* had been sentenced to an indeterminate term of 25 years to life under the 'Three Strikes' law. Voters passed Proposition 36 while his appeal was pending (*Conley*, at pp. 654–655), and the initiative reduced the penalty for some third strike offenders whose third strike was not a serious or violent felony (*id.* at p. 652). Proposition 36 also created a postconviction procedure that allowed prisoners who were already serving indeterminate life terms to seek resentencing for offenses that, if committed after the act's effective date, would no longer support life terms. (§ 1170.126, subd. (b).)

"The defendant in *Conley* argued he was entitled to rely on *Estrada*'s retroactivity rule, which would enable him to seek Proposition 36 relief without complying with the initiative's petition procedure. (*Conley*, *supra*, 63 Cal.4th at pp. 654–655.) That procedure, among other things, gives trial judges discretion to withhold Proposition 36 relief if a judge finds that resentencing the petitioner would pose an unreasonable risk of danger to public safety. (*Conley*, at pp. 654–655; § 1170.126, subd. (f).)

"Our Supreme Court rejected defendant Conley's argument and held the postconviction procedure provided by section 1170.126 was the exclusive means by which those who had been sentenced before Proposition 36's effective date could seek relief under the new law. (*Conley*, *supra*, 63 Cal.4th at pp. 661–662.) The court acknowledged the continuing vitality of the *Estrada* rule in the unremarkable case of an ameliorative statute silent on whether it applies retroactively, but the Supreme Court concluded Conley was not entitled, on direct appeal, to invoke Proposition 36's changes to prior law for three principal reasons.

"First, Proposition 36 was 'not silent on the question of retroactivity' but instead 'expressly addresse[d] the question in section 1170.126, the sole purpose of which is to extend the benefits of [Proposition 36] retroactively.' (*Conley*, *supra*, 63 Cal.4th at

106

p. 657.)  In doing so, Proposition 36 did not distinguish between persons serving final sentences and those serving nonfinal sentences.  (*Conley*, at p. 657.)

"Second, Proposition 36 made resentencing contingent on a court's evaluation of a defendant's dangerousness.  Conferring an automatic entitlement to resentencing on defendants whose cases were still pending on direct appeal would not allow courts to conduct that inquiry, and the court found no basis to hold the electorate intended 'for courts to bypass the public safety inquiry altogether in the case of defendants serving sentences that are not yet final.'  (*Conley*, *supra*, 63 Cal.4th at pp. 658–659.)

"Third, the changes in law worked by Proposition 36 not only reduced previously prescribed criminal penalties but also established 'a new set of disqualifying factors that preclude a third strike defendant from receiving a second strike sentence,' factors that the prosecution was required to plead and prove.  (*Conley*, *supra*, 63 Cal.4th at p. 659.)  Because Proposition 36 did not address the complexities involved in applying the pleading-and-proof requirements to previously sentenced defendants, the court concluded the electorate did not contemplate those provisions would apply to previously sentenced defendants.  (*Conley*, at pp. 660–661.)  Rather, they intended such defendants to seek relief under section 1170.126, which did not contain pleading-and-proof requirements.

"Our Supreme Court reached a similar result in *DeHoyos*, *supra*, 4 Cal.5th 594, which presented the question of whether Proposition 47 ('the Safe Neighborhoods and Schools Act') applied retroactively to nonfinal cases on direct appeal.  'Proposition 47 redefined several common theft- and drug-related felonies as either misdemeanors or felonies' and enacted a petitioning procedure similar to that enacted as part of Proposition 36.  (*DeHoyos*, at p. 597.)  The *DeHoyos* court noted Proposition 47, like Proposition 36, was 'an ameliorative criminal law measure that is "not silent on the question of retroactivity," but instead contain[ed] a detailed set of provisions designed to extend the statute's benefits retroactively.'  (*DeHoyos*, at p. 603.)  Those provisions included a recall of sentence petitioning mechanism for individuals 'serving a sentence' for a covered offense as of Proposition 47's effective date.  (§ 1170.18, subd. (a).)

"As it did in *Conley* when analyzing Proposition 36, the *DeHoyos* court found it significant that Proposition 47's recall of sentence petitioning mechanism drew 'no express distinction between persons serving final sentences and those serving nonfinal sentences, instead entitling both categories of prisoners to petition courts for recall of sentence' and 'expressly ma[king] resentencing dependent on a court's assessment of the likelihood that a defendant's early release will pose a risk to public safety, undermining the idea that voters "categorically determined that 'imposition of a lesser punishment' will in all cases 'sufficiently serve the public interest.' " (*Conley*, [*supra*, 63 Cal.4th] at p. 658; see § 1170.18, subd. (b).)' (*DeHoyos*, *supra*, 4 Cal.5th at p. 603.) The *DeHoyos* court acknowledged Proposition 47 differed from Proposition 36 in that it did not 'create new sentencing factors that the prosecution must "plead[ ] and prove[ ]" (§ 1170.12, subd. (c)(2)(C)) to preclude a grant of leniency.' (*DeHoyos*, at p. 603.) The court explained, however, that other indicia of legislative intent, including Proposition 47's broad statement of purpose, revealed the initiative's petitioning procedure was meant to be the exclusive avenue for retroactive relief for all previously sentenced defendants, whether or not their sentences were final. (*DeHoyos*, at p. 603.)

"The analytical framework animating the decisions in *Conley* and *DeHoyos* is equally applicable here. Like Propositions 36 and 47, Senate Bill 1437 is not silent on the question of retroactivity. Rather, it provides retroactivity rules in section 1170.95. The petitioning procedure specified in that section applies to persons who have been convicted of felony murder or murder under a natural and probable consequences theory. It creates a special mechanism that allows those persons to file a petition in the sentencing court seeking vacatur of their conviction and resentencing. In doing so, section 1170.95 does not distinguish between persons whose sentences are final and those whose sentences are not. That the Legislature specifically created this mechanism, which facially applies to both final and nonfinal convictions, is a significant indication Senate Bill 1437 should not be applied retroactively to nonfinal convictions on direct appeal.

"The remainder of the procedure outlined in section 1170.95 underscores the legislative intent to require those who seek retroactive relief to proceed by way of that

108

statutorily specified procedure. The statute requires a petitioner to submit a declaration stating he or she is eligible for relief based on the criteria in section 1170.95, subdivision (a). (§ 1170.95, subd. (b)(1)(A).) Where the prosecution does not stipulate to vacating the conviction and resentencing the petitioner, it has the opportunity to present new and additional evidence to demonstrate the petitioner is not entitled to resentencing. (§ 1170.95, subd. (d)(3).) The petitioner, too, has the opportunity to present new or additional evidence on his or her behalf. (§ 1170.95, subd. (d)(3).) Providing the parties with the opportunity to go beyond the original record in the petition process, a step unavailable on direct appeal, is strong evidence the Legislature intended for persons seeking the ameliorative benefits of Senate Bill 1437 to proceed via the petitioning procedure. The provision permitting submission of additional evidence also means Senate Bill 1437 does not categorically provide a lesser punishment must apply in all cases, and it also means defendants convicted under the old law are not necessarily entitled to new trials. This, too, indicates the Legislature intended convicted persons to proceed via section 1170.95's resentencing process rather than avail themselves of Senate Bill 1437's ameliorative benefits on direct appeal." (*Martinez*, *supra*, 31 Cal.App.5th at pp. 724–728.)

We agree with this analysis by the *Martinez* court, and adopt it. In doing so, we reject defendants' arguments that they are entitled to the consideration of the merits of their Senate Bill 1437 claims in this appeal.

Defendants contend for several reasons that the Legislature did not intend the petition procedure enacted by Senate Bill 1437 would be the exclusive remedy for defendants such as themselves. First, defendants contend Senate Bill 1437's statutory changes are materially different from those discussed in *Conley* and *DeHoyos*. Defendants emphasize that each of those cases held that the Legislature intended the petition procedure at issue to be the exclusive remedy for retroactive relief in large part because the proposition (Proposition 36 in *Conley* and Proposition 47 in *DeHoyos*) did not afford retroactive relief automatically; rather, it authorized the sentencing court to determine in its discretion whether a petitioner posed an unreasonable risk of danger to

public safety before granting any retroactive sentencing relief. They note that Senate Bill 1437 does not provide such discretionary authority to sentencing courts and contend this difference is determinative. As Flowers puts it, in the absence of such a "risk of danger" assessment, Senate Bill 1437 "does not depend upon a yet-to-be determined question of fact" and, therefore, defendants' retroactive claims based on Senate Bill 1437 should be considered on direct appeal

We disagree. Although Senate Bill 1437 does not contain a "risk of danger" provision, it does not provide automatic retroactive relief to convicted defendants any more than do Proposition 36 and Proposition 47. Rather, as the *Martinez* court explained, it creates a petition procedure in which the People are afforded an opportunity to present new and additional evidence to demonstrate the petitioner is not entitled to resentencing, and the petitioner is afforded the opportunity to present new and additional evidence on his or her behalf as well, before the court determines the appropriate relief. (§ 1170.95, subd. (d)(3).) These opportunities, unavailable on direct appeal, indicate the Legislature intended those seeking the ameliorative retroactive benefits of Senate Bill 1437 proceed by way of this petitioning procedure. As the *Martinez* court stated in response to the same argument that defendants make here, "neither *Conley* nor *DeHoyos* holds that inquiry [into risk of danger] was the indispensable statutory feature on which the result in those cases turned. To the contrary, *Conley* notes '[o]ur cases do not "dictate to legislative drafters the forms in which laws must be written" to express an intent to modify or limit the retroactive effect of an ameliorative change; rather, they require "that the Legislature demonstrate its intention with sufficient clarity that a reviewing court can discern and effectuate it." ' (*Conley*, *supra*, 63 Cal.4th at pp. 656–657; see also *Lara*, *supra*, 4 Cal.5th at p. 312 [explaining *Conley* held *Estrada*'s inference of retroactivity was inapplicable because 'the legislation contained its *own retroactivity provision*'].) Accordingly, we look not for specific procedural conditions, but for indicia of the Legislature's intent." (*Martinez*, *supra*, 31 Cal.App.5th at p. 728.) Employing this approach in addressing section 1170.95, the *Martinez* court observed that "the other indications the Legislature intended to restrict individuals who have already been

convicted to the petitioning procedure outlined in section 1170.95 are considerable." (*Ibid..*) We agree.

Second, defendants argue Senate Bill 1437, as reflected in its language and the Senate's supporting declarations about its purpose, provides substantively different and greater retroactive relief than Proposition 36 and Proposition 47 because it changes the law regarding a person's *liability* for murder, rather than merely providing the opportunity for a reduced sentence, and, therefore, they have the right to seek retroactive relief as a part of their overall right to challenge their convictions on appeal. They also contend they are not seeking the same relief as that which may be obtained via the petition procedure, i.e., vacatur and resentencing, but instead are simply seeking the standard appellate remedy of reversal of their convictions and remand for a new jury trial. They reason that by our granting them reversal and a new jury trial, the People will have the same opportunity afforded to them by the petition procedure to present new and additional evidence in support of the murder charges against defendants. Therefore, the People are not deprived of any of the rights afforded to them under Senate Bill 1437. None of these arguments are persuasive because they ignore that the Legislature prescribed a specific avenue for convicted defendants to seek retroactive relief, the petition procedure outlined in section 1170.95. As the *Conley* court explained regarding Proposition 36, the Legislature "took the extraordinary step of extending the retroactive benefits of the Act beyond the bounds contemplated by *Estrada*—including even prisoners serving *final* sentences without the Act's ameliorative reach—but subject to a special procedural mechanism for the recall of sentences already imposed." (*Conley*, *supra*, 63 Cal.4th at pp. 657–658.)

Defendants refer to numerous cases in contending that they are entitled to the retroactive relief provided by Senate Bill 1437 on direct appeal.[48] We have reviewed all

---

[48] These cases include *Lara*, *supra*, 4 Cal.5th at pp. 307–310, *People v. Robbins* (2018) 19 Cal.App.5th 660, 678–679, *People v. McKenzie* (2018) 25 Cal.App.5th 1207, *People v. Garcia* (2018) 28 Cal.App.5th 961, 971–973, *People v. Eagle* (2016) 246

111

the cases defendants cite.  None involves or grapples with the legislative enactment of a specific procedure for the consideration of retroactive relief of a change in the law.  They are thus inapposite.  (See *Martinez*, *supra*, 31 Cal.App.5th at pp. 728–729 [finding cases cited by the defendant to be inapposite because none of them "involved a new or amended law that 'modif[ied], limit[ed], or entirely forb[ade] the retroactive application of ameliorative criminal law amendments' "].)  The cases that do grapple with such an enactment are *Conley* and *DeHoyos*, and they support the *Martinez* case's holding that retroactive relief must be sought under the statutory procedure.

Defendants further contend that to restrict their avenue for relief to the petition procedure would place them in the untenable position of having to wait for the resolution of their appeal before they can bring a petition, because the sentencing court does not have concurrent jurisdiction with the appellate court.  (See *Scarbrough*, *supra*, 240 Cal.App.4th at pp. 924–930 [trial court had no jurisdiction to hear a Proposition 47 petition while appeal was pending].)  Defendants contend that to construe Senate Bill 1437's petition procedure as their exclusive avenue for relief leaves them without an effective remedy, an absurd consequence that we must presume the Legislature did not intend.  (See *In re Greg F.* (2012) 55 Cal.4th 393, 406.)  Further, it is contended that such a construction would frustrate judicial economy and that, to the extent Senate Bill 1437 is ambiguous, we must construe it in favor of defendants (see *People v. Davis* (1981) 29 Cal.3d 814, 828; *Estate of Stoker* (2011) 193 Cal.App.4th 236, 242).

---

Cal.App.4th 275, *People v. Ramos* (2016) 244 Cal.App.4th 99, *People v. Wright* (2006) 40 Cal.4th 81, 90, 94–95, *People v. Rossi* (1976) 18 Cal.3d 295, 302–304, *People v. Gutierrez* (2014) 58 Cal.4th 1354, 1384–1387, *People v. Nasalga*, *supra*, 12 Cal.4th at p. 791 (plur. opn. of Werdegar, J.), *People v. Millan* (2018) 20 Cal.App.5th 450, 455–456, *People v. Zabala* (2018) 19 Cal.App.5th 335, 344, *People v. Francis* (1969) 71 Cal.2d 66, *People v. Arredondo* (2018) 21 Cal.App.5th 493, 506–507, *People v. Wood* (2018) 219 Cal.App.5th 1080, *People v. McKenzie* (2018) 25 Cal.App.5th 1207, *People v. Buycks* (2018) 5 Cal.5th 857, *People v. Garcia* (1984) 36 Cal.3d 539, *People v. Garewal* (1985) 173 Cal.App.3d 285, 297 and *In re C.E.M.* (1970) 13 Cal.App.3d 75, 77.

We reject these arguments. There is nothing in the petition procedure enacted by Senate Bill 1437, which is outlined in section 1170.95, that indicates the Legislature intended that convicted defendants were entitled to immediate retroactive relief. (See *Scarbrough*, *supra*, 240 Cal.App.4th at p. 928 [concluding nothing in Proposition 47 contemplates immediate retroactive relief in rejecting a similar argument].) Also, the *Scarbrough* court concluded regarding Proposition 47, " '[i]t is reasonable for the voters to have designed a statutory process where the trial court considers a petition for a recall of sentence after final resolution of legal issues related to the conviction and original sentence (which may have components that are unaffected by [the Three Strikes Reform Act of 2012]).' " (*Scarbrough*, at p. 925, quoting *People v. Yearwood* (2013) 213 Cal.App.4th 161, 177 [regarding section 1170.126].) The same is true here. The *Scarbrough* court also deemed Proposition 47 voters to have been aware of this previous interpretation in *Yearwood* when they approved Proposition 47, further evidence of their intentions to design a petition process that was only available after the resolution of a pending appeal. (*Scarbrough*, at p. 925.) This can be equally said about the Legislature's awareness of *Scarbrough* and *Yearwood* when it adopted Senate Bill 1437.

That defendants must wait until the resolution of their appeal before pursuing their petition does not deprive them of a remedy. As the *Scarbrough* court said about the same argument, "[b]y concluding there is no concurrent jurisdiction to resentence a defendant . . . , we merely delay the resentencing; we do not preclude its application." (*Scarbrough*, *supra*, 240 Cal.App.4th at p. 928.) Defendants also do not establish that concurrent jurisdiction would result in judicial economy. The *Scarbrough* court's rejection of a similar argument applies with equal force here: "[C]oncurrent jurisdiction would not support judicial economy. Our efforts to review the initial judgment may be rendered futile; we may be asked to review conflicting judgments, each with different errors to be corrected; and the trial court may be asked to effectuate a remittitur against a judgment that has since been modified. These scenarios would lead to chaos, confusion, and waste—not judicial economy.." (*Scarbrough*, at p. 928.)

113

Defendants further argue that to conclude the petition procedure is their exclusive remedy only affords them the right to new factual determinations about their liability by a sentencing court rather than by a jury, in violation of their constitutional right to a jury trial. This argument is unpersuasive because the retroactive relief they are afforded by Senate Bill 1437 is not subject to Sixth Amendment analysis. Rather, the Legislature's changes constituted an act of lenity that does not implicate defendants' Sixth Amendment rights. (See *People v. Perez* (2018) 4 Cal.5th 1055, 1063–1064 [a trial court may make determinations of fact based on new evidence regarding a petitioner's eligibility for resentencing under Proposition 36 because retroactive application of the benefits from the proposition are a legislative act of lenity that does not implicate Sixth Amendment rights].)

Finally, defendants contend that certain language in Senate Bill 1437 indicates the court did not intend the petition procedure to exclude their right to raise their claims on direct appeal. They first point to section 1170.95, subdivision (f), which states, "This section does not diminish or abrogate any rights or remedies otherwise available to the petitioner." We disagree. The *Conley* court rejected such an argument based on the same language, as the court explained in *Martinez*: "The court in *Conley* rejected a similar argument concerning an analogous provision included in the text of Proposition 36, reasoning that provision 'contain[ed] no indication that automatic resentencing—as opposed to, for example, habeas corpus relief—ranks among the "rights" the electorate sought to preserve.' (*Conley*, *supra*, 63 Cal.4th at p. 661.) We reach the same conclusion here, where there is no indication that reversal of a defendant's sentence on direct appeal without compliance with the procedures outlined in section 1170.95 was among the 'rights' the Legislature sought to preserve in enacting Senate Bill 1437." (*Martinez*, *supra*, 31 Cal.App.5th at p. 729.)

Defendants also point out that section 1170.95, subdivision (a) merely states that a person "may" file a petition in the sentencing court. But this was also true of the statutes addressed in *Conley* and *DeHoyos*. (§ 1170.126, subd. (a) [Prop. 36], cited in *Conley*, *supra*, 63 Cal.4th at p. 655; § 1170.18, subd. (a) [Prop. 47], cited in *DeHoyos*, *supra*,

114

4 Cal.5th at p. 598.)  That defendants have the choice of seeking trial court relief does not suggest they may seek relief on appellate review of their original convictions.

Defendants also point to the instruction contained in section 1170.95, subdivision (d)(3) that, "[i]f the prosecution fails to sustain its burden of proof, *the prior conviction . . .* shall be vacated" (italics added) as a further indication that the petition procedure was not intended to apply to their non-final cases, since the term "prior conviction" usually means convictions that are final.  Defendants provide no authority for this proposition, which is unpersuasive.  We must read the statute " 'as a whole' " and " 'harmoniz[e] the various elements by considering each clause and section in the context of the overall statutory framework.' " (*People v. Francis* (2017) 16 Cal.App.5th 876, 885.)  Doing so here, we note that the Legislature used the phrase "prior conviction" in section 1170.95 only once, in subdivision (d)(3), otherwise referring to convictions without signaling finality.  Further, it clearly indicated in the opening paragraph of the statute, section 1170.95 subdivision (a), that "[a] person convicted . . . under a natural and probable consequences theory may file a petition with the court that sentenced the petitioner" without qualification.  We see no reason to adopt defendants' interpretation of the phrase "prior conviction" in this context.  Also, it is reasonable that the Legislature would have been more explicit if it intended this petition procedure to be limited to defendants whose convictions were final in light of the Legislature's presumed knowledge of our Supreme Court's decisions holding very similar petition procedures applied to defendants with non-final convictions in *Conley* and *DeHoyos*.  (See *Scarbrough*, *supra*, 240 Cal.App.4th at p. 928.)

In short, defendants' contention that we should consider their claims for retroactive relief under Senate Bill 1437 in this appeal lack merit.  Defendants must first raise these issues before the sentencing court by petition, as provided for in section 1170.95.  Accordingly, although in several of the subparts that follow, we address issues raised by defendants that implicate the natural and probable consequences doctrine, we discuss this doctrine only as it existed at the time of trial.

## XII.

115

***The Court Did Not Err in Instructing the Jury Regarding the Murder Counts***
***for Perea and Ross.***

Anthony, Flowers, Price and Campbell argue the trial court should have instructed sua sponte on involuntary manslaughter as a lesser included offense for counts two and three, alleging they murdered Perea and Ross, respectively, because there was substantial evidence of involuntary manslaughter on the theories of misdemeanor manslaughter and negligent homicide. Also, Price, Flowers and Campbell argue their convictions for these murders must be reversed because there was no instruction that they had to have killed Perea and Ross with express or implied malice. We analyze these claims of instructional error based on the law of second degree murder, including possible liability under the natural and probable consequences doctrine, that was in effect at the time of trial. As we have discussed, any defendant who claims he is entitled to relief based on the recently enacted Senate Bill 1437 must first bring a petition in superior court under the procedure established by Senate Bill 1437. We express no other opinion about the application of Senate Bill 1437 to any of the claims defendants have raised.

We conclude there was no substantial evidence to support an involuntary manslaughter instruction and, therefore, the court did not err in failing to give one. As the People contend, the evidence indicates that Anthony acted with implied malice in directly murdering Perea and Ross. Price, Flowers and Campbell were tried for these murders under both a direct liability theory and the natural and probable consequences doctrine as it applied to second degree murder at the time of their trial. Because at the very least there was strong evidence to convict them under the natural and probable consequences theory, they were not then entitled under case law to an instruction that they *had* to have acted with express or implied malice.

**A. Anthony**

A trial court must instruct the jury sua sponte on all general legal principles relevant to issues supported by substantial evidence in the case (*People v. Souza* (2012) 54 Cal.4th 90, 115), including lesser included offenses. (*People v. Duff* (2014) 58 Cal.4th 527, 561.) "The duty applies whenever there is evidence in the record from which a

116

reasonable jury could conclude the defendant is guilty of the lesser, but not the greater, offense." (*Ibid.*) "It is error, however, to instruct on a lesser included offense when a defendant, if guilty at all, could only be guilty of the greater offense, i.e., when the evidence, even construed most favorably to the defendant, would not support a finding of guilt of the lesser included offense but would support a finding of guilt of the offense charged." (*People v. Stewart* (2000) 77 Cal.App.4th 785, 795–796.) We independently review a claim that the trial court improperly failed to instruct on a lesser included offense. (*People v. Avila* (2009) 46 Cal.4th 680, 705.)

Involuntary manslaughter is a lesser included offense of murder. (*People v. Prettyman* (1996) 14 Cal.4th 248, 274 (*Prettyman*).) It is "distinguished by its mens rea. [Citation.] The mens rea for murder is specific intent to kill or *conscious disregard for life*. [Citation.] Absent these states of mind, the defendant may incur homicide culpability for involuntary manslaughter." (*People v. Butler* (2010) 187 Cal.App.4th 998, 1006, italics added.) Here, the evidence established decisively that Anthony killed Perea and Ross by driving the Cadillac with conscious disregard for life. Upon driving away from the scene of Charles's murder and being spotted by police, Anthony, with the other defendants in the car, drove the Cadillac through city streets at high speeds for five to seven minutes, racing through red lights and stop signs and at one point driving onto a grass median adjacent to the street, in an effort to evade multiple police cars that were in pursuit of defendants. According to Lee, one of the pursuing officers, the Cadillac at one point accelerated down a narrow residential street at so high a speed that it repeatedly crashed down to the pavement in a shower of sparks as it passed over speed bumps, it did not stop at red lights or stop signs on the street and it entered an intersection at well over 60 miles an hour and there crashed into another car, leading to Perea's and Ross's deaths. The evidence shows conclusively that Anthony drove the Cadillac to evade the police with a conscious disregard of human life. As one court wrote, "conscious disregard" means, " 'I know my conduct is dangerous to others, but I don't care if someone is hurt or killed.' " (*People v. Olivas* (1985) 172 Cal.App.3d 984, 988.) To borrow from our colleague, Justice Arthur Gilbert of the Second Appellate District, whether Anthony was

117

subjectively aware of the risk is best answered by the question: how could he not be? (See *People v. Moore* (2010) 187 Cal.App.4th 937, 941.)

Because the evidence makes plain that Anthony acted with implied malice in causing the deaths of Perea and Ross and reasonable jurors could not have found otherwise, he was not entitled to an instruction on the lesser included offense of involuntary manslaughter. The trial court thus did not err in failing to give such instruction.

### B. Price, Flowers and Campbell

At the time of trial, Price, Flowers and Campbell were liable not only for any murder based on their implied or express malice, but also for the natural and probable consequences of their participation in the first degree murder of Charles, whether as aiders and abettors or conspirators. Anthony's murders of Perea and Ross were among those natural and probable consequences.

As we have discussed, the evidence shows Flowers was the direct perpetrator of this first degree murder; therefore, at the time of trial, he was liable for the natural and probable consequences of his crime against Charles. To the extent the jury concluded that defendants acted together as conspirators to murder Charles and escape capture, "each member of a conspiracy is criminally responsible for the acts of fellow conspirators committed in furtherance of, and which follow as a natural and probable consequence of, the conspiracy, even though such acts were not intended by the conspirators as a part of their common unlawful design." (*People v. Zielesch* (2009) 179 Cal.App.4th 731, 739.) To the extent the jury found that the other three defendants acted as aiders and abettors, there "culpability under the natural and probable consequences doctrine is not premised upon [their] intention . . . to commit the nontarget offense"—the killing of Perea and Ross—"because the nontarget offense was not intended at all." Rather, under the natural and probable consequences doctrine, "the mens rea of the aider and abettor with respect to [the nontarget] offense is irrelevant and culpability is imposed simply because a reasonable person could have foreseen the commission of the nontarget crime." (*People v. Canizalez* (2011) 197 Cal.App.4th 832, 852.)

118

Thus, whatever the jury thought was the specific nature of Flowers's, Price's and Campbell's participation in the first degree murder of Charles and subsequent escape efforts, it did not need to determine these defendants' liability for the killings of Perea and Ross on the strength of the evidence that they acted with a murderous mens rea against those two victims.[49] Rather, it could determine each defendant's liability on the strength of the evidence that Perea and Ross were murdered (by Anthony) and, if so, that these murders were the natural and probable consequences of defendants' participation in the murder of Charles. There was strong evidence of both. The four defendants drove in a distinctive vehicle to the heart of a rival gang's territory and in broad daylight murdered Charles on an urban, residential street, with Flowers firing a burst of bullets from a semiautomatic assault rifle. They then attempted to evade detection by driving away at high speeds through city streets. Under these circumstances, it was reasonably foreseeable that neighbors would observe the murder of Charles, the police would quickly arrive, the police would attempt to apprehend defendants, Anthony would try to evade the police by driving at high speeds and recklessly through city streets and the reckless driving would result in a collision that would hurt or kill someone.

In short, a reasonable juror could only conclude from the evidence presented that Anthony's reckless murders of Perea and Ross were at the very least the natural and probable consequence of defendants' first degree murder of Charles. Under these circumstances, the trial court had no obligation to instruct the jury on the lesser included offense of involuntary manslaughter. (See, e.g., *People v. Stewart*, *supra*, 77 Cal.App.4th at pp. 795–796.)[50]

---

[49] Given that it is not necessary to do so, we also do not state a view about the strength of this direct liability evidence in this opinion because of the possibility that the parties will raise the issue before the trial court in a petition under section 1170.95 and introduce additional evidence in doing so.

[50] In light of our conclusion, we have no need to address the other issues debated by the parties, including whether defendants have forfeited this instructional error claim

119

Because of the overwhelming evidence that Price, Flowers and Campbell were guilty of the murders of Perea and Ross under the natural and probable consequences doctrine as it existed at the time of trial, there also was no need for an instruction that their guilt for these murders depended on whether or not they acted with express or implied malice. At the time of trial, defendants' argument to the contrary conflicted with long-standing precedent. Under that natural and probable consequences doctrine, "a defendant may be held criminally responsible as an accomplice not only for the crime he or she intended to aid and abet (the target crime), but also for any other crime that is the 'natural and probable consequence' of the target crime." (*Prettyman*, *supra*, 14 Cal.4th at p. 261.) The defendant need only intend to assist the actual perpetrator of the target crime. (*People v. Canizalez*, *supra*, 197 Cal.App.4th at p. 852.) "By its very nature, aider and abettor culpability under the natural and probable consequences doctrine is not premised upon the intention of the aider and abettor to commit the nontarget offense because the nontarget offense was not intended at all." (*Ibid*.) Therefore, "the mens rea of the aider and abettor with respect to that offense is irrelevant and culpability is imposed simply because a reasonable person could have foreseen the commission of the nontarget crime." (*Ibid*.)

The Supreme Court confirmed the continued vitality of this approach generally in *Chiu*. The court explained, "The natural and probable consequences doctrine is based on the principle that liability extends to reach 'the actual, rather than the planned or "intended" crime, committed on the *policy* [that] . . . aiders and abettors should be responsible for the criminal *harms* they have naturally, probably, and foreseeably put in motion.' [Citations.] We have never held that the application of the natural and probable consequences doctrine depends on the foreseeability of every element of the nontarget offense. Rather, in the context of murder under the natural and probable consequences

---

by not raising it below and Anthony's alternative argument that he received ineffective assistance of counsel.

120

doctrine, cases have focused on the reasonable foreseeability of the actual resulting harm or the criminal act that caused that harm. [Citations.]

"In the context of murder, the natural and probable consequences doctrine serves the legitimate public policy concern of deterring aiders and abettors from aiding or encouraging the commission of offenses that would naturally, probably, and foreseeably result in an unlawful killing. A primary rationale for punishing such aiders and abettors—to deter them from aiding or encouraging the commission of offenses—is served by holding them culpable for the perpetrator's commission of the nontarget offense of second degree murder. [Citation.] It is also consistent with reasonable concepts of culpability. Aider and abettor liability under the natural and probable consequences doctrine does not require assistance with or actual knowledge and intent relating to the nontarget offense, nor subjective foreseeability of either that offense or the perpetrator's state of mind in committing it. [Citation.] It only requires that under all of the circumstances presented, a reasonable person in the defendant's position would have or should have known that the nontarget offense was a reasonably foreseeable consequence of the act aided and abetted by the defendant." (*Chiu*, *supra*, 59 Cal.4th at pp. 164–166, fn. omitted.) The court concluded, "Accordingly, we hold that punishment for second degree murder is commensurate with a defendant's culpability for aiding and abetting a target crime that would naturally, probably, and foreseeably result in a murder under the natural and probable consequences doctrine." (*Id*. at p. 166.)[51]

Price, Flowers and Campbell assert that, regardless of our Supreme Court's articulation of the law in *Chiu*, this general rule is "no longer reasonable nor logical." They point out, among other things, that generally a homicide without mens rea is not necessarily a murder; that the "provocative act doctrine," under which a defendant can be liable for the murder of an unintended victim when the defendant intended to kill

---

[51] The court went on to articulate an exception to this general rule for the "unique" circumstances involved in an aider and abettor's liability for first degree murder, as we have already discussed in part X, *ante*. (*Chiu*, *supra*, 59 Cal.4th at pp. 166–167.)

121

someone else, requires proof of malice; and that the "transferred intent doctrine" similarly attaches liability for any person's death as long as the defendant intended to kill. They assert that, under the natural and probable consequences doctrine, "the aider and abettor's mental state at the time of direct aiding and abetting the target crime, or subsequently developed [at] the time of the nontarget killing," must be an element of proof of second degree murder, and claim this construction of the law is consistent with direct aiding and abetting principles articulated in *People v. Beeman* (1984) 35 Cal.3d 547, 560–561.

Price's, Flowers's and Campbell's argument has been made before. "The Supreme Court has repeatedly rejected the contention that an instruction on the natural and probable consequences doctrine is erroneous because it permits an aider and abettor to be found guilty of murder without malice." (*People v. Culuko* (2000) 78 Cal.App.4th 307, 322, citing *People v. Garrison* 47 Cal.3d 746, 777–778 and *People v. Bunyard* (1988) 45 Cal.3d 1189, 1231–1232.) Defendants in effect ask us to rule contrary to the Supreme Court's determination of the issue, which we have no authority to do. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) The court's jury instructions correctly set forth the law regarding aiders and abettors' natural and probable consequence liability for second degree murder as it existed at the time of trial. The defendants' argument to the contrary lacks merit.[52]

## XIII.

### *The Court Did Not Err in Its CALCRIM No. 417 Instruction.*

Flowers and Price argue the trial court prejudicially erred in its description of crimes contained in the court's modified version of CALCRIM No. 417, which it used to instruct the jury on the natural and probable consequences liability of criminal

---

[52] In light of our conclusion, we do not address the People's forfeiture argument regarding this issue and whether any error by the court was harmless.

conspirators as that law existed at the time of trial.[53]  As a result, they contend, we must reverse their convictions for the second degree murders of Ross and Perea, and for vehicular evasion of a peace officer causing Ross's and Perea's deaths.  We conclude the court did not err.

## A.  The Relevant Proceedings Below

The parties discussed modifications to CALCRIM No. 417 at length prior to the court's instructing the jury.  The court said it would not identify the degree of murder for that possible target crime of the conspiracy to murder Charles because it did not think the jury was required to agree on the degree of the target crime.  The court also said it would not refer to "second degree" in describing murders that might be the natural and probable consequences of the target crime.  It continued, "So I think this then captures the idea that if someone conspired to commit assault with a firearm and the natural and probable consequence of that is the . . . first degree murder of [Charles], the second degree murder of Mr. Perea, the second degree murder of Mr. Ross, or evading the police in a vehicle causing the death of either of those gentlemen, they would be guilty.  Right? [¶] Or if you conspire to commit either a second or first degree murder of [Charles] and the murder of Mr. Perea or Mr. Ross or evading the police in the vehicle causing either of their death[s] is a natural and probable consequence, you're on the hook."  None of the defense counsel objected to the court's modifications.

The court subsequently instructed the jury in relevant part:  "A member of a conspiracy is criminally responsible for the crimes that he or she conspires to commit, no matter which member of the conspiracy commits the crime. [¶] A member of a conspiracy is also criminally responsible for any act of any member of the conspiracy if

---

[53]  Again, we analyze this claim of instructional error based on the law of second degree murder, including possible liability under the natural and probable consequences doctrine, that was in effect at the time of trial.  As we have discussed, any defendant who claims he is entitled to relief based on the recently enacted Senate Bill 1437 must first bring a petition in superior court under the procedure established by Senate Bill 1437.  We express no other opinion about the application of Senate Bill 1437 to any of the claims defendants have raised.

that act is done to further the conspiracy and that act is a natural and probable consequence of the common plan or design of the conspiracy. . . . [¶] . . . [¶]

"To prove that the defendant is guilty of any of the crimes charged under a theory of conspiracy, the People must prove that: [¶] 1. The defendant conspired to commit assault with a firearm or murder; [¶] 2. A member of the conspiracy committed murder and/or evading police in a vehicle causing death to further the conspiracy; [¶] AND [¶] 3. Murder and/or evading police in a vehicle causing death is a natural and probable consequence of the common plan or design of the crime that the defendant conspired to commit." Murder and vehicular evasion of a peace officer resulting in death were defined elsewhere in the instructions.

### B. It Was Not Reasonably Likely That the Jury Misinterpreted the Instruction.

Flowers and Price argue the trial court's instruction improperly told the jury that, if it concluded murder and/or vehicular evasion causing death was a natural and probable consequence of their participation in a conspiracy to commit assault with a firearm or murder, it was to find them guilty of "any of the crimes charged under a theory of conspiracy." Since murder is a common consequence of a conspiracy to murder and the murder of Charles satisfied that condition, jurors were left "with nothing else to deliberate regarding extension of the natural and probable consequences doctrine to the other crimes charged," meaning the murders of Perea and Ross and the vehicular evasions of a peace officer causing the deaths of Perea and Ross (counts two through five). "The misinstruction thus removed from the jury's consideration issues (1) whether a member of the conspiracy evaded police in a vehicle causing death in order to further the conspiracy and (2) whether evading police in a vehicle causing death was a natural and probable consequence of the common plan or design of the crime that appellant had conspired to commit," thereby depriving Flowers and Price of their "right to jury deliberation of material issues presented by application of the 'natural and probable consequences' doctrine."

"The independent or de novo standard of review is applicable in assessing whether instructions correctly state the law [citation] and also whether instructions effectively direct a finding adverse to a defendant by removing an issue from the jury's consideration." (*People v. Posey* (2004) 32 Cal.4th 193, 218.) "In assessing a claim of instructional error, 'we must view a challenged portion "in the context of the instructions as a whole and the trial record" to determine " 'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution." ' " (*People v. Jablonski*, *supra*, 37 Cal.4th at p. 831; accord, *People v. Houston* (2012) 54 Cal.4th 1186, 1229.)

Flowers and Price's argument stems from the natural and probable consequences theories that the prosecution argued in the case. Among other things, the prosecution contended defendants conspired to murder Charles and escape detection together, the natural and probable consequences of which were the murders/deaths of Perea and Ross. The prosecution contended in the alternative that, should the jury conclude defendants did not conspire to murder Charles, it should find defendants conspired to assault him with a firearm, the natural and probable consequences of which were the murders/deaths of Perea and Ross, *and* the murder of Charles. The court's CALCRIM No. 417 instruction was responsive to both of these theories, as the court's remarks to counsel indicate.

Flowers and Price's argument rests on their views that the jury would not distinguish the "murder" referred to in the paragraph numbered "1" of the court's CALCRIM No. 417 instruction with the "murder and/or evading police in a vehicle causing death" referred to in paragraphs numbered "2" and "3" and, further, that the jury would have construed all of these crimes as referring to Charles only. As a result, Flowers and Price contend, the trial court in effect instructed the jury to find them guilty for the murders/deaths of Perea and Ross without considering whether any evidence supported those convictions. We disagree for several reasons.

First, the court's CALCRIM No. 417 instruction was clear when considered with the allegations and evidence presented to the jury. Paragraph "1" referred to a conspiracy

125

to commit "assault with a firearm or murder," which alternative conspiracies the prosecution only alleged and attempted to prove regarding Charles. Paragraphs "2" and "3" referred, first, to "evading police in a vehicle causing death," which the prosecution only alleged and attempted to prove regarding Perea and Ross. These last two paragraphs also referred to "murder," which the prosecution only alleged and attempted to prove regarding Charles, Perea and Ross. Under these circumstances, the jury was plainly instructed that, if it found defendants only conspired to assault Charles with a firearm, it should consider whether natural and probable consequences were the murders not only of Ross and/or Perea, but also of Charles, and/or vehicle evasion of the police causing the deaths of Perea and/or Ross. If it found defendants conspired to murder Charles, it should consider whether the natural and probable consequences of that murder were the murders of Perea and Ross and/or the vehicular evasion of a peace officer causing their deaths.

Further, other plain language in the court's CALCRIM No. 417 instruction undermines Flowers's and Price's interpretation. (See *People v. Genovese* (2008) 168 Cal.App.4th 817, 832 [concluding that "defendant's argument is defeated by the plain language of the instructions"].) The instruction states that a conspirator is criminally responsible "for the crimes that he or she conspires to commit," and then states that "[a] member of a conspiracy is *also* criminally responsible" for acts done in furtherance of the conspiracy that are the natural and probable consequence of the common plan or design of the conspiracy. (Italics added.) The term "also" signals that the acts referred to thereafter are in addition to the crime planned in the conspiracy. Furthermore, paragraph "3" refers to acts that are the "natural and probable consequence" of the crime that was the "common plan or design" of the conspiracy, indicating again that these acts are in addition to the planned crime. Given this plain language, it is clear that paragraph "1" refers to the assault or murder of Charles, while paragraphs "2" and "3" referred to the murder/deaths of Perea and/or Ross and, further, to the murder of Charles if the jury determined defendants conspired only to assault him.

126

This meaning is made even clearer by the jury instructions as a whole. (See *People v. Campos* (2007) 156 Cal.App.4th 1228, 1237 ["In determining the correctness of jury instructions, we consider the instructions as a whole"].) The court's CALCRIM No. 417 instruction followed immediately after its CALCRIM No. 416 instruction regarding conspiracy. This CALCRIM No. 416 instruction makes clear that the phrase "assault with a firearm or murder" refers to Charles. It expressly states that the People, in order to prove a defendant was a member of a conspiracy, must prove, among other things, that "[o]ne of the defendants committed at least one of the following overt acts to accomplish *assault with a firearm or murder*: [¶] a. Drove to 10th Street and Allston in Berkeley in the Cadillac on May 16, 2009; [¶] b. Was armed with a firearm at that time and place, or [¶] c. Shot Charles Davis . . . ." (Italics added.) This makes it even more obvious that the purpose of the court's CALCRIM No. 417 instruction was to define what was necessary to find liability for additional acts that were the natural and probable consequences of the conspiracy's originally planned crime against Charles.

The court's CALCRIM No. 403 instruction provided further clarification. It states, also in three numbered paragraphs, that an aider and abettor of the "target offense," defined as "an assault with a firearm or murder," was guilty of "*another* murder (the non-target offense)" if "a coparticipant in that [target] crime committed *another* murder" and "a reasonable person in the defendant's position would have known that the commission of the *subsequent* murder was a natural and probable consequence of the commission of the intended assault with a firearm or murder." (Italics added.) This aider and abettor liability instruction was parallel to CALCRIM No. 417's instruction about conspirator liability. It further indicates the jury was to consider any target crime relating to Charles, and any crime that was its natural and probable consequence, such as the alleged murders/deaths of Ross and Perea, and, if the jury found a conspiracy to assault Charles only, the alleged murder of Charles.

Finally, the jury clearly did not interpret the instructions as Flowers and Price suggest. As we have discussed, it found them guilty of the first degree murder of Charles via a direct liability theory, *not* a natural and probable consequences theory. As

127

discussed above, this is indicated by its count one special circumstance findings that they intended to kill Charles. Therefore, to the extent the jury convicted Flowers and Price of counts two through five on a conspiracy theory, it at the very least determined that Perea's and Ross's deaths were the natural and probable consequences of the conspiracy to murder Charles.

In short, the trial court did not err in giving the CALCRIM No. 417 instruction.[54]

## XIV.

### *Any Error in Instructing the Jury About an "Escape Rule" Was of No Consequence.*

All four defendants argue their convictions for the murders and vehicular deaths of Perea and Ross (the "nontarget" crimes) must be reversed because the jury was erroneously instructed that defendants could only be found guilty of these crimes under aider and abettor or conspiracy theory if the crimes occurred during the commission of the "target" murder of Charles, i.e., during defendants' attempted escape from detection for Charles's murder. We disagree. Assuming for the sake of argument that the instruction was in error, it was superfluous under the law that existed at the time of the trial[55] and, therefore, harmless.

The trial court, without objection from counsel, instructed the jury on the "escape rule" as follows: "Under the theory of aiding and abetting a target offense, the People must prove that the non-target offense occurred during the commission of the target offense. [¶] Also, under a theory of conspiracy, the People must prove that the offense was committed before 'the goal of the conspiracy had been accomplished.' [¶] The crime

---

[54] In light of our conclusion, we do not address the parties' debate over whether Flowers and Price forfeited their appellate claim regarding CALCRIM No. 417.

[55] Again, we analyze this claim of instructional error based on the law of second degree murder, including possible liability under the natural and probable consequences doctrine, that was in effect at the time of trial. As we have discussed, any defendant who claims he is entitled to relief based on the recently enacted Senate Bill 1437 must first bring a petition in superior court under the procedure established by Senate Bill 1437. We express no other opinion about the application of Senate Bill 1437 to any of the claims defendants have raised.

128

of murder or assault with a firearm continues until the perpetrators have actually reached a temporary place of safety. [¶] The perpetrators have reached a temporary place of safety if they have successfully escaped from the scene and are no longer being chased."

The prosecutor alluded to this instruction in his closing argument when he stated, "And the crime isn't finished simply because it's a murder scene. Any aider and abettor or conspirator is also intending to get away with the crime. If there's going to be an escape attempt . . . until the crime is done and you've actually escaped and gotten away with it . . . you're still on the hook." He continued: "When you commit a crime with people, you expect to get away with it also and that during the course of your flight other people die, that's a natural and probable consequence."

Defendants argue the trial court's instruction wrongly told the jury that any target crime committed against Charles continued while the perpetrators attempted to escape. According to defendants, only felony murder and certain other offenses not implicated in this case qualify as continuing crimes. They contend this error requires reversal because it is impossible to determine from the record the theory or theories the jury used to convict defendants of either the target or nontarget crimes. Assuming for the sake of argument that the trial court committed instructional error, we disagree that it was prejudicial. [56]

---

[56] We do not mean to imply that defendants are correct in their assertion of error. The People make a compelling argument that in determining the liability of aiders and abettors and conspirators, a crime's commission includes the perpetrator or perpetrators' efforts to escape detection. (See, e.g., *Prettyman*, *supra*, 14 Cal.4th at p. 261 [discussing a prior holding in *People v. Kauffman* (1907) 152 Cal. 331 that the jury could reasonably infer a plan to burglarize a cemetery safe included protecting all members of the group from arrest and detection, and find that a member's shooting of a police officer after the group left the cemetery was a natural and probable consequence of this unlawful enterprise].) Further, we see no reason why a reasonable juror could not conclude that defendants together intended to escape detection based on their fleeing the murder scene together in Anthony's car. Nonetheless, we have no need to decide this "escape" issue because we conclude any error was harmless.

As we have already discussed, it is apparent that the jury determined all four defendants were guilty of murdering Charles together. As for Anthony, he was obviously and directly guilty of the Perea and Ross crimes as the driver of the Cadillac and, therefore, regardless of the escape rule instruction. The jury's question to the trial court about the application of the vehicular evasion law regarding just Price, Flowers and Campbell, which we discuss in part XV, *post*, indicates it found Anthony guilty of the crimes under this direct liability theory, and not under any escape rule.

Regarding Flowers, Price and Campbell, as we have already discussed, the trial court instructed the jury that it could find defendants who were guilty as aiders and abettors or conspirators in the target crime against Charles guilty of the non-target murders of Perea and Ross under the natural and probable consequences doctrine as it existed at the time of trial. This doctrine does *not* require that the non-target crimes occur during the target crime's commission, whether a party acts as an aider and abettor or a conspirator in the commission of the target crime. (See *People v. Zarazua* (2008) 162 Cal.App.4th 1348, 1362 [the defendants proximately caused child's death under natural and probable consequences theory when the child was killed in a crash with the car of defendants' victims, who had fled after defendants had assaulted them by shooting at their car].) It is apparent that the jury at a minimum determined the three were guilty of murdering Charles together and of the Perea and Ross crimes as the natural and probable consequences of that murder, and ample evidence supports this conclusion. Therefore, the jury's additional finding that the Ross and Perea crimes occurred during the commission of the murder of Charles was superfluous.

In short, any "escape rule" instructional error regarding defendants was of no consequence; in other words, it was harmless beyond a reasonable doubt under *Chapman v. California*, *supra*, 386 U.S. at p. 24.

## XV.

### *The Trial Court's Response to a Jury Request Regarding Vehicular Evasion Was Not Error.*

130

Flowers and Price, with Flowers taking the lead, argue the trial court erred in answering the jury's question during deliberations about vehicular evasion of a peace officer causing death, the offense charged in counts four and five regarding Perea and Ross respectively. The two defendants claim this created an "instructional confusion" that requires reversal of their convictions on counts two and three, the second degree murders of Perea and Ross. Flowers and Price argue the court's response, which included that aiders and abettors were "equally guilty" as the driver of a vehicle for the crime of vehicular evasion of a peace officer causing death, created "instructional confusion" by suggesting that aiders and abettors to the vehicular murder charges (counts two and three) could not possess a less culpable mental state than the principal and, therefore, could not be guilty of a lesser offense than second degree murder. We conclude the trial court did not err. The jury and the court's answer were expressly limited to vehicular evasion of a peace officer causing death. There was no reasonable likelihood the jury misunderstood or misapplied the court's answer so as to lessen the People's burden regarding an aider and abettor's mental state in participating in the murders of Perea and Ross.[57]

## A. The Relevant Proceedings Below

The trial court instructed the jury regarding aiding and abetting in general. It also instructed the jury on the elements of the crime of vehicular evasion of a peace officer causing death. This crime was also identified as a potential natural and probable consequence of a conspiracy to commit murder or assault with a firearm, although it was

---

[57] Again, we analyze this claim of instructional error based on the law of second degree murder, including possible liability under the natural and probable consequences doctrine, that was in effect at the time of trial. As we have discussed, any defendant who claims he is entitled to relief based on the recently enacted Senate Bill 1437 must first bring a petition in superior court under the procedure established by Senate Bill 1437. We express no other opinion about the application of Senate Bill 1437 to any of the claims defendants have raised.

131

not included in the natural and probable consequences instruction related to aiding and abetting.

During closing argument, the prosecutor argued, "People can be guilty as principals, as aiders and abettors, equally guilty, equally responsible." Regarding conspiracy, the prosecutor argued that all of the defendants "pulled that trigger" and "all drove" the car.

During deliberations, the jury sent the following note to the court: "We require Section 2800.3 of the Vehicle Code of California, for clarification on Count 4/5, for Price, Flowers, Campbell. The reason for this request is for #1 on page 39 section 2180, states 'was pursuing the defendant, who was also driving a vehicle.' "[58]

The jury also asked about the definition of second degree murder in the jury instructions, to which the court answered by instructing on malice and referencing the instruction it had already given to the jury.

Without objection from counsel, the court answered, "It is unclear what you mean in your note by 'we require Section 2800.3 of the Vehicle Code of California for clarification on Count 4/5.' If this is a request for a copy of the code section, that is unnecessary as the required legal elements of that offense are outlined in Instruction 2180. [¶] However, because your request further specifies Mr. Price, Flowers and Campbell, note that as with all of the charged offenses the principles of aiding and abetting and conspiracy apply. The instruction references 'the defendant, who was also driving the vehicle' as the perpetrator of the offense. Those who meet the requirements of an aider and abettor of or co-conspirator with the perpetrator in that offense would be equally guilty, even if not the driver of the vehicle."

Subsequently, the jury found all defendants guilty of the second degree murders of Perea and Ross, and guilty of vehicular evasion of a peace officer causing death.

---

[58] The note refers to the portion of the trial court's instruction on the crime of vehicular evasion of a peace officer causing death which states the People must prove, among other things: "1. A peace officer in a vehicle was pursuing the defendant, who was also driving a vehicle . . . ."

**B. Analysis**

Section 1138 permits a trial court to provide information "on any point of law arising in the case" if requested by a deliberating jury. (See *People v. Smithey* (1999) 20 Cal.4th 936, 985.) The court must do so when the jury appears confused about instructions already provided. (*People v. Huggins*, *supra*, 38 Cal.4th at pp. 193, 261.) When the original instructions are complete, " 'the court has discretion under . . . section 1138 to determine what additional explanations are sufficient to satisfy the jury's request for information' " (*People v. Davis* (1995) 10 Cal.4th 463, 522), which we typically review under an abuse of discretion standard. (*Waidla*, *supra*, 22 Cal.4th at pp. 745–746.) However, Flowers and Price do not contend the trial court misstated the law of vehicular evasion of a peace officer causing death or abused its discretion in answering the jury's question. Instead, they assert the answer created "instructional confusion" regarding the vehicular murder charges. Given the nature of their claim, we consider whether it is reasonably likely that the jury misunderstood or misapplied the law because of the court's instruction. (See *People v. Carrington* (2009) 47 Cal.4th 145, 192.)

We conclude for two reasons that it is not reasonably likely the jury misunderstood or misapplied the trial court's instruction to mean that an aider and abettor's mental state is necessarily the same as the perpetrator's for vehicular murder. First, the jury's question and the court's answer were about counts four and five alone, which were not the murder counts, but the counts for vehicular evasion causing death. We presume the jury applied the court's answer to these counts only. (See *People v. Gonzales* (2011) 51 Cal.4th 894, 940 ["It is fundamental that jurors are presumed to be intelligent and capable of understanding and applying the court's instructions"].)

Second, the jury was instructed that defendants could be guilty of the count two and count three second degree murder allegations under the theory that the murders were the natural and probable consequences of aiding and abetting, or conspiring to commit, murder or assault with a firearm on Charles. We have already discussed the overwhelming evidence to support the jury's finding of criminal liability under this

133

theory, which did not require the jury to make a finding about an aider and abettor's mental state in causing these vehicular murders. The jury had only to find the crimes committed were murder (i.e., that Anthony acted with conscious disregard) and that they were the natural and probable consequences of Charles's murder.

For these reasons, defendant's argument is without merit.[59]

## XVI.

### *The Trial Court's Jury Instruction on Motive Did Not Reduce the People's Burden of Proof Regarding the Special Circumstance Gang Allegations.*

Flowers argues the trial court's jury instruction on motive improperly diluted the standard of proof the jury had to apply to find true the special circumstance allegation that he carried out Charles's murder for the benefit of a criminal street gang (§ 190.2, subd. (a)(22)). We disagree.

The trial court instructed the jury on motive with CALCRIM No. 370: "The People are not required to prove that a defendant had a motive to commit any of the crimes charged. In reaching your verdict you may, however, consider whether a defendant had a motive. [¶] Having a motive may be a factor tending to show that the defendant is guilty. Not having a motive may be a factor tending to show the defendant is not guilty."

The trial court instructed the jury with CALCRIM No. 1401 regarding the criminal street gang special circumstance allegation for count one. It stated in relevant part: "If you find a defendant guilty of the crime charged in Count One, you must then decide whether the People have proved the additional allegation that the defendant committed that crime for the benefit of, at the direction of, or in association with a criminal street gang. [¶] To prove this allegation, the People must prove that: [¶] 1. The defendant committed the crime for the benefit of, at the direction of, or in association with a criminal street gang; [¶] AND [¶] 2. The defendant intended to assist, further, or promote

---

[59] In light of our conclusion, we have no need to address the other issues debated by the parties, including whether defendants have forfeited this instructional error claim by their failure to raise it in the court below.

134

criminal conduct by gang members." The court also instructed that "[t]he People have the burden of proving each allegation beyond a reasonable doubt. If the People have not met this burden, you must find that the allegation has not been proved." Further, the court instructed pursuant to CALCRIM No. 220 that "[w]henever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt unless I specifically tell you otherwise."

Flowers contends CALCRIM No. 370 diluted the prosecution's burden of proof regarding this special circumstance gang allegation because the jury was instructed to find a criminal street gang motive for the special circumstance allegation, but was also instructed that the People did not have to prove motive. The two instructions in combination undermined the jury's understanding that it needed to find beyond a reasonable doubt that Flowers murdered Charles for the benefit of a criminal street gang.

As we have already stated, "[t]he independent or de novo standard of review is applicable in assessing whether instructions correctly state the law [citation] and also whether instructions effectively direct a finding adverse to a defendant by removing an issue from the jury's consideration." (*People v. Posey*, *supra*, 32 Cal.4th at p. 218.) "In assessing a claim of instructional error, 'we must view a challenged portion "in the context of the instructions as a whole and the trial record" to determine " 'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution." ' " (*People v. Jablonski*, *supra*, 37 Cal.4th at p. 831.)

Flowers's argument is unpersuasive because the jury had to find Flowers had the *intent* to benefit a criminal street gang, not the motive to do so, in order to find the special circumstance allegation true. As our Supreme Court has explained, " 'Motive, intent, and malice . . . are separate and disparate mental states. . . .' [Citation.] Motive describes the reason a person chooses to commit a crime. The reason, however, is different from a required mental state such as intent or malice." (*People v. Hillhouse* (2002) 27 Cal.4th 469, 504.) With a few exceptions not relevant here, "motive itself is not an element of a criminal offense." (*People v. Smith* (2005) 37 Cal.4th 733, 740; see also *People v. Ibarra*

135

(2007) 156 Cal.App.4th 1174, 1193 ["CALCRIM No. 370 instructs on motive, . . . not on burden of proof"].)

This difference between motive and intent was at the core of the court's holding in *People v. Fuentes* (2009) 171 Cal.App.4th 1133 (*Fuentes*), which rejected an argument practically identical to Flowers's argument here. Fuentes claimed the trial court's CALCRIM No. 370 motive instruction conflicted with a criminal street gang enhancement instruction because the latter required a finding that he had an intent to further gang activity while the former "contradicted this, telling the jury it did not have to make that finding." (*Fuentes*, at p. 1139.) The appellate court disagreed. It held, "An intent to further criminal gang activity is no more a 'motive' in legal terms than is any other specific intent. We do not call a premeditated murderer's intent to kill a 'motive,' though his action is motivated by a desire to cause the victim's death. Combined, the instructions here told the jury the prosecution must prove that [the defendant] intended to further gang activity but need not show what motivated his wish to do so. This was not ambiguous and there is no reason to think the jury could not understand it. . . . There was no error." (*Id*. at pp. 1139–1140.)

Flowers acknowledges *Fuentes* and argues this court "may, but is not required to follow" it. However, he does not discuss any legal authority disagreeing with its reasoning or holding or otherwise provide a reason for us to reject it. We find *Fuentes* persuasive and adopt its reasoning. Further, the record is devoid of any evidence that the jury misunderstood the trial court's instructions so as to disregard that it was required to find beyond a reasonable doubt that Flowers had the intent to benefit a street gang in order to find the special circumstance gang allegation to be true. Again, "[i]t is fundamental that jurors are presumed to be intelligent and capable of understanding and

applying the court's instructions." (*People v. Gonzales*, *supra*, 51 Cal.4th at p. 940.) Flowers's "motive" argument lacks merit.[60]

## XVII.

### *Remand Is Proper to Permit the Trial Court to Exercise Its Discretion in Choosing Whether to Strike or Dismiss the Firearm Enhancements.*

In supplemental briefing, all four defendants seek remand of the court's imposition of consecutive 25-years-to-life sentences for the use of a firearm in violation of section 12022.53, subdivision (e) so the trial court may exercise its new discretion to decide whether to strike or dismiss these firearm enhancements under recently enacted Senate Bill No. 620. Senate Bill No. 620 amended sections 12022.5, subdivision (a) and 12022.53, subdivision (h), effective January 1, 2018, to give trial courts the discretion to strike or dismiss firearm enhancements imposed under these sections. (Stats. 2017, ch. 682, §§ 1, 2.) The People agree the amended section 12022.53, subdivision (h) applies to defendants, but argue remand is unnecessary because the trial record demonstrates the court would not have dismissed the firearm enhancements.

Before Senate Bill No. 620 amended section 12022.53, subdivision (h), that subdivision prohibited courts from striking section 12022.53 enhancements. (Stats. 2017, ch. 682, § 2.) Senate Bill No. 620 amended section 12022.53, subdivision (h) to read in relevant part: "The court may, in the interest of justice pursuant to Section 1385 and at the time of sentencing, strike or dismiss an enhancement otherwise required to be imposed by this section." (*Ibid.*) This amendment applies here because the judgment is not final and because the amendment could affect the trial court's imposition of consecutive 25-years-to-life sentences for each defendant under section 12022.53, subdivision (e). (See *Estrada*, *supra*, 63 Cal.2d at pp. 747–748.)

The People argue the record indicates the trial court will not exercise its discretion to strike or dismiss these enhancements. We will not presume to know what the trial

---

[60] In light of our conclusion, we have no need to address the other issues raised by the parties, including whether defendants have forfeited this instructional error claim by their failure to raise it in the court below.

court might do.  We remand this sentencing matter to give it the opportunity to exercise its discretion.

## XVIII.

### *Remand Is Proper to Permit the Trial Court to Exercise Its Discretion in Choosing Whether to Strike Price's and Campbell's Prior Serious Felony Convictions for Sentencing Purposes.*

At sentencing, the trial court imposed consecutive five-year sentences for Price and Campbell under section 667, subdivision (a), because they each had suffered a prior serious felony conviction.  At that time, the court was required under that section to impose these sentences, and it, under section 1385, subdivision (b), had no discretion to strike any prior conviction of a serious felony for purposes of enhancement of a sentence under section 667.  (*People v. Garcia* (2018) 28 Cal.App.5th 961, 971 (*Garcia*).)  However, on September 30, 2018, the Governor signed Senate Bill No. 1393 which, effective January 1, 2019, amended sections 667, subdivision (a) and 1385, subdivision (b) to allow a sentencing court to exercise its discretion to strike or dismiss a prior serious felony conviction for sentencing purposes.  (Stats. 2018, ch. 1013, §§ 1–2.)  Price and Campbell contend that, since their appeals were not final at the time that Senate Bill 1393 went into effect on January 1, 2019, they are entitled to the benefit of the change in the law retroactively under *Estrada*, *supra*, 63 Cal.2d 740, and ask us to remand these sentencing matters to the trial court for reconsideration under this new discretionary authority.

The People do not contest the retroactive application of Senate Bill No. 1393 to defendants' cases.  Instead, they argue the record indicates the trial court will not exercise its discretion to strike or dismiss these enhancements.

We agree that Price and Campbell are entitled to the benefit of the change in the law retroactively under *Estrada*, *supra*, 63 Cal.2d 740.  As the *Garcia* court explained, although the Legislature did not expressly declare that Senate Bill No. 1393 applied retroactively to judgments of conviction that were not final on January 1, 2019, "under the *Estrada* rule, . . . it is appropriate to infer, as a matter of statutory construction, that

138

the Legislature intended [Senate Bill No.] 1393 to apply to all cases to which it could constitutionally be applied, that is, to all cases not yet final when [Senate Bill No.] 1393 [became] effective on January 1, 2019." (*Garcia*, *supra*, 28 Cal.App.5th at pp. 972–973.) We reach this same conclusion. Further, regardless of what the record indicates, we will not presume to know what the trial court might do with its discretion in these sentencing matters. Therefore, we remand these sentencing matters to give it the opportunity to exercise its discretion.

## XIX.

### *There Was Not Cumulative Error Requiring Reversal.*

Price, Anthony and Campbell argue that cumulative error requires reversal. We reject their arguments. Where there is no substantial error in any respect, a cumulative error claim must be rejected. (*People v. Butler* (2009) 46 Cal.4th 847, 885.) There was no substantial error in this case. The errors we have found were harmless individually, and we conclude they were harmless in the aggregate for the reasons we have discussed herein. They do not merit reversal, particularly in the face of the overwhelming evidence of defendants' guilt.

## DISPOSITION

The judgments appealed from are affirmed, except that we remand to the trial court to give it the opportunity to exercise its discretion regarding its imposition of a consecutive 25-years-to-life enhancement sentence on each defendant for the use of a firearm in violation of section 12022.53, subdivision (e) and regarding its imposition of a consecutive 5-year enhancement sentence on each of Price and Campbell for a prior serious felony conviction under section 667, subdivision (a). The court should issue an amended abstract of judgment and provide a copy to correctional authorities with any changes to sentencing.

_____
STEWART, J.

We concur.

_____
KLINE P.J.

_____
MILLER, J.

*People v. Anthony* (A139352)

Trial Court:   Alameda County Superior Court

Trial Judge:   Hon. Thomas M. Reardon

Counsel:

Linda M. Leavitt, Bradley O'Connell, under appointment by the Court of Appeal, for Defendant and Appellant Stephon Anthony.

J. Courtney Shevelson, under appointment by the Court of Appeal, for Defendant and Appellant Rafael Campbell.

Dirck Newbury, under appointment by the Court of Appeal, for Defendant and Appellant Samuel Flowers.

Waldemar D. Halka, under appointment by the Court of Appeal, for Defendant and Appellant Anthony Price.

Kamala D. Harris, Xavier Becerra, Attorneys General, Gerald A. Engler, Jeffrey M. Laurence, Assistant Attorneys General, Donna M. Provenzano, J. Michael Chamberlain, Deputy Attorneys General for Plaintiff and Respondent.